**BEFORE THE FINANCIAL INDUSTRY REGULATORY AUTHORITY
IN THE MATTER OF THE ARBITRATION BETWEEN**

| | |
|---|---|
| **DON, JR. AND MARLA LAIR,** | |
| **Claimants,** | |
| **v.** | **FINRA CASE NO.: 22-02945** |
| **CENTER STREET SECURITIES, INC.,** <br> **JACK ROBERT THACKER, JR.,** <br> **MICAH HARDING RAYNER,** <br> **THOMAS LISK, JASON LAMB, BILLY JAMES AYCOCK,** <br> **ANTHONY MICHAEL ROMANO,** <br> **AND JEFFREY T. KENNEDY,** | |
| **Respondents.** | |

## AMENDED[1] STATEMENT OF CLAIM

Claimants Don Jr. and Marla Lair (hereinafter referred to as the "Claimants" or the "Lairs") respectfully state the following for their claims against Respondents, Center Street Securities, Inc., ("Center Street"), Jack Thacker, Micah Rayner, Thomas Lisk, Jason Lamb, Billy James Aycock, Anthony Michael Romano, and Jeffrey T. Kennedy, and in support thereof allege the following:

## SUMMARY OF CLAIM

Claimants bring this claim to recover losses suffered at the hands of Respondents. As will be shown, these losses were sustained because Respondents mishandled the Claimants' assets by failing to properly allocate and diversify Claimants' investment portfolio. Instead, Respondents filled Claimants' portfolio with unsuitable securities, including various Non-Conventional Investments (NCIs, also known as "alternative" products) such as unlisted, non-traded real estate investment trusts ("REITs") and other high commission and high fee, illiquid, alternative investments such as Business Development Companies ("BDCs") and Limited Partnerships ("LPs") or the like.[2] The investments recommended were high risk and speculative investments. Further, Respondents, including, *inter alia*, Center Street, Thacker,

---

[1] This Amendment is made as a matter of right under FINRA Rule 12309. Claimants request that the current hearing dates remain as scheduled. Should any newly added Respondent be unable to prepare for the hearing as scheduled, Claimants are open to discussing options with Respondents who will be unprepared for the currently scheduled final hearing, including severing the claims into a separate arbitration proceeding.

[2] Thus, this is a product case given that it involves Respondent's widespread mismarketing and/or the defective development of NCIs. *See* FINRA Discovery Guide at p. 6 (December 2, 2013).

Rayner, Lisk, Lamb and Romano, failed to adequately supervise the Financial Advisor, or appropriately train him to prevent his mishandling of the Claimants' portfolios. Further, Respondents either failed to conduct adequate due diligence or negligently conducted due diligence on the products and types of products recommended to Claimants.

As Claimants' financial advisors, Respondents owed Claimants a fiduciary duty to act in Claimants' best interest. Yet, Respondents recommended significant concentrations in high-commission and risky products. Respondents misrepresented the investments and investment strategy to Claimants. Respondents represented the recommended investments as not carrying any significant risk and appropriate for retirees and investors like Claimants. Respondents represented the strategy recommended as one that would "manage the downside risk," as "holistic planning" comparable to "top endowment fund managers." Respondents' communications focused on how it "managed risk" for its clients like Claimants, including helping to "protect" against the "downside risk." Further, the Respondents recommended the portfolios it sold in NCIs as "true diversification." Contrary to what Respondents represented, Respondents recommended an investment strategy that focused on numerous speculative and high-risk investments which generated substantial commissions and exposed Claimants to tremendous conflicts of interest. As a result, Claimants' portfolios were significantly concentrated in the NCIs and other unsuitable and inappropriate investments. Respondents failed to correct this or inform Claimants of their wrongdoing, and Claimants continued to trust and rely on Respondent throughout their relationship with them.

Respondents' recommendations do not conform to industry standards. The portfolios and investment strategies recommended to Claimants were not well-allocated or diversified. Because of Respondents' misconduct, Claimants have suffered significant losses to their retirement savings. Respondents' actions in this case constitute breach of contract, fraud, misrepresentation, failure to supervise, breach of fiduciary duty, as well as NYSE and FINRA rules. FINRA has jurisdiction over this matter pursuant to FINRA Code of Arbitration Procedure Rule 12200.

## **PARTIES**

Don and Marla Lair are a married couple, both of whom are 58-years-old, who have lived in Illinois as their primary residence at all times relevant to this claim.

Respondent Center Street Securities (CRD# 26898/SEC # 8-42786) was an independent and broker-dealer headquartered in Nashville, Tennessee. Center Street was affiliated with Center Street Advisors, Inc. (CRD# 169329 / SEC # 801-80344), an SEC Registered Investment Adviser. Center Street was a national independent broker/dealer licensed to offer securities, investment advisory services, and insurance products. Center Street's business model focused heavily on the sale of NCIs. Center Street claims to be different and offer predictable and stable portfolios for their clients. "We differ greatly from other brokers in our approach to portfolio construction and client management. Our philosophy emphasizes predictability and stability, similar to the approach most endowments take. We've developed ways to take the same strategies used by institutions and

universities and offer them to average investors." Center Street touts its ability to link investment professionals and clients of "Main Street," like Claimants, to "world class investments and client services" of the industry. Center Street offers an array of "alternative opportunities to investors at all levels." In 2021 Center Street was acquired by Arete Wealth, which has over $5.5 billion in assets under management and more than 265 registered representatives nationwide. Center Street proclaimed that its acquisition by Arete strengthened its position as the "premier choice for alternative investments." Alternative investments, of course, is another descriptor for NCIs that FINRA has warned brokerage firms about recommending to clients. As should be no surprise, Center Street's NCI focused business model had dramatic negative effects on its clients and ultimately drove Center Street's business into the ground. Center Street's managers, executives, supervisors, and compliance officers knowingly participated in this scheme and business model that had detrimental effects on customers and ultimately forced Center Street to withdraw its registration due to its misconduct.

Jack Robert Thacker, Jr., ("Thacker"), CRD # 2754773 served as President and Chief Executive Officer of Center Street from 2007 through 2023 and by reason of the facts alleged herein at the relevant times Thacker was and has been a member of the controlling persons group of Center Street within the meaning of the Illinois Act and the 1933 Act, and industry rules and standards.

Respondent Micah Harding Rayner, ("Rayner"), CRD # 6252596 served as a Vice President of Operations for Center Street from 2016 through 2023 and by reason of the facts alleged herein at the relevant times Rayner was and has been a member of the controlling persons group of Center Street within the meaning of the Illinois Act and the 1933 Act, and industry rules and standards.

Respondent Thomas Samuel Lisk ("Lisk"), CRD # 5010650 served as a Vice President of Center Street from 2007 through 2023 and by reason of the facts alleged herein at the relevant times Lisk was and has been a member of the controlling persons group of Center Street within the meaning of the Illinois Act and the 1933 Act, and industry rules and standards.

Respondent Jason Price Lamb ("Lamb"), CRD # 3248356 served as a Senior Compliance Officer of Center Street from 2009 through 2023 and by reason of the facts alleged herein at the relevant times Lamb was and has been a member of the controlling persons group of Center Street within the meaning of the Illinois Act and the 1933 Act , and industry rules and standards.

Respondent Billy James Aycock ("Aycock"), CRD # 4069907 served as the Due Diligence Officer of Center Street from 2013 through 2023 and by reason of the facts alleged herein at the relevant times Aycock was and has been a member of the controlling persons group of Center Street within the meaning of the Illinois Act and the 1933 Act.

Respondent Michael Anthony Romano ("Romano"), CRD # 734293 served the Chief Compliance Officer of Center Street from 2016 through 2023 and by reason of the facts

alleged herein at the relevant times Romano was and has been a member of the controlling persons group of Center Street within the meaning of the Illinois Act and the 1933 Act, and industry rules and standards.

Respondent, Jeffrey T Kennedy CRD # 5094149 (hereinafter "Financial Advisor" or "Mr. Kennedy") was at all relevant times employed in Center Streets' remote branch offices in Quincy, IL and acting as a registered representative within the scope of his employment. The Financial Advisor was a broker and SEC Registered Investment Advisor and was an agent of Center Street, and was directly supervised and managed by Center Street. As the website home page clearly confirms, the Financial Advisor was a fiduciary. Mr. Kennedy operates "Kennedy Wealth Group." Mr. Kennedy and Kennedy Wealth Group pledged to "fight to protect your financial future and the legacy you will leave behind." Mr. Kennedy often touted the "legacy living" offered by his management and advice – which included "wealth management and preservation" and "preservation." Mr. Kennedy caters his services to elderly, retired, and conservative investors. Mr. Kennedy has numerous pending disclosures on his FINRA BrokerCheck record which alleges recommendations of unsuitable investments.

kennedywealthgroup.com



KENNEDY WEALTH GROUP™

Home    Client Portal

Austin 512-575-0574 | Quincy 217-221-1300 | Bethalto 618-377-2004



**Fighter Pilot**

A former Navy fighter pilot who fought to protect our country.



**Educator**

A financial advisor committed to education and knowledge.



**Fiduciary**

A fiduciary holding a legal and ethical relationship of trust.

Kennedy Wealth Group is a comprehensive team of dedicated financial professionals helping to guide you on your path to financial freedom.

Mr. Kennedy recommended the improper investment strategy and caused the Claimants to invest and hold positions in a concentrated portfolio of high-fee, illiquid, and

risky NCIs and other inappropriate investments. At the same time, Mr. Kennedy represented the investments as inconsistent with what the investments were. Further, Mr. Kennedy was dismissive of the paperwork, including the alternative investment paperwork as "the fine print" that was "laborious" and perhaps was only put in there because as he quipped maybe the lawyers got paid more for drafting the disclosure statements. Mr. Kennedy represented that he performed ongoing due diligence, and that they "add only the best" investments to their offerings, assuring clients that most investments "don't meet our high standards." Mr. Kennedy represented that he maintained "top-notch experts" to ensure that customers would achieve superior risk-adjusted returns while protecting customers' wealth and legacy. Mr. Kennedy and Center Street routinely recommended 30-50% of their clients' portfolios be invested in high risk, high fee/commission, illiquid, and/or conflicted NCIs. At the same time, Respondents Kennedy and Center Street represented that the strategy recommended maintained the flexibility to get Claimants and other customers out of harm's way when necessary. Respondent Kennedy compared the recommended investment strategy as comparable to that of major endowments such as the "Yale Endowment Model."[3] Respondent Kennedy unequivocally presented the investments and investment strategy as ones that would reduce volatility and mitigate risk, as is reflected by the following video posted by Kennedy Wealth Group's YouTube page:



---

[3] Claimants specifically allege that none of NCIs sold to Claimants were investments that the Yale Endowment managers would ever purchase.

Even as red flags abounded with the investments they recommended, Respondent Kennedy continued to recommend Claimants and other customers to hold the investments, follow the strategy, and to sit tight and not worry. Center Street and its agents have attempted to cover up their misconduct as recently as August of 2022.

## **FACTUAL BACKGROUND**

Don Lair was born on November 18, 1964 in Quincy Illinois. Mr. Lair attended Payson-Seymour High School and graduated in 1983. In August 1986 Mr. Lair began to work for ADM of Quincy Illinois where he is currently a foreman.

Marla Lair was born on September 14, 1964 in Quincy Illinois. Mrs. Lair attended Payson-Seymour High School and graduated in 1982. Between May 1990 and August 2016 Mrs. Lair worked at Fast Stop Payson, and her most senior position was that of a manager. Between April 2017 and March 2019, Mrs. Lair worked at Town and Country Bank Midwest as a teller. In March of 2019, Mrs. Lair began working for the Bank of Springfield in Quincy Illinois.

The Lairs spent their working lives saving for retirement and managed to save a nest egg. Mr. Lair wanted to invest his profit-sharing rollover and sought out the services of Financial Advisor Jeff Kennedy. Mr. Lair explained that he was interested in growing his retirement fund but wasn't interested in anything that carried significant risk. Mr. Kennedy recommended investments such as Franklin Realty BSP and Hospitality Investment Trust and claimed that these investments carried minimal risk. These investments were in fact wholly inappropriate for the Lairs due to their speculative nature. Mr. Lair trusted the expertise of Mr. Kennedy. Mr. Lair met with Mr. Kennedy in person several times over the years to discuss the Lair's portfolio.

In 2019, Mr. Lair began to notice a decline in the value of his account. When he asked Mr. Kennedy about this, Mr. Kennedy assured him that it will come back and to hold the investments. The account is currently open and is not transferrable.

Due to Respondent's actions, The Lairs have suffered an estimated loss in excess of $100,001.

Center Street and its agents never properly explained to the Claimants that the investments and strategy recommended were not suitable or appropriate for their stated goals or that the allocation of the investment portfolio was inappropriate or defied industry standards. Instead, Respondent recommended and advised Claimants to continue to hold and purchase illiquid, unsuitable investments and maintain an inappropriate asset allocation, which had been recommended by Respondent. Unaware of Respondent's fraud and misrepresentations, Claimants continued communicating with and relying on Respondent throughout their relationship. Respondent's misconduct is a violation of industry rules and its mishandling of Claimants' investment portfolio constitutes a breach of fiduciary duty and negligence. Additionally, Respondent's failure to supervise the Financial Advisor and properly train him on industry rules of conduct, and non-traded REITs and other illiquid

alternative investments resulted in significant, unnecessary losses in Claimants' retirement savings.

### Industry Standards for Selling Alternative Investments and Non-Conventional Investments

Because of the significant risks of non-conventional investments, including non-traded REITs, special care must be taken to ensure that client accounts are not concentrated in these risky alternative products.

FINRA's instructs that non-traded REITs are non-conventional investments subject to the specifications of NASD Notice to Members 03-71. **See Exhibit A**. FINRA specifically reminded firms in NTM 03-71 that:

> Given the complex nature of NCIs [Non-Conventional Investments a/k/a Alternative Investments] and the potential for customer harm or confusion, members are cautioned to ensure that their sales conduct procedures fully and accurately address any of the special circumstances presented by the sale of NCIs. Additionally, NASD is concerned that investors, particularly retail investors, may not fully understand the risks associated with these products.

FINRA went on to remind members offering Non-Conventional Investments such as REITs and other alternatives of their obligations to: (1) conduct adequate due diligence to understand the features of the product; (2) perform a reasonable-basis suitability analysis; (3) perform customer-specific suitability analysis in connection with any recommended transactions; (4) provide a balanced disclosure of both the risks and rewards associated with the particular product, especially when selling to retail investors; (5) implement appropriate internal controls; and (6) train registered persons regarding the features, risks, and suitability of these products.

FINRA has also reminded firms of the need to conduct adequate due diligence and a reasonable-basis suitability analysis. FINRA noted that the features of appropriate reasonable basis suitability analysis include the liquidity of the product, the creditworthiness of the issuer, the creditworthiness and value of underlying collateral, principal, return, and/or interest rate risks, and costs and fees associated with purchasing and selling the product. NTM 03-71.

FINRA issued a clear warning for firms regarding customer specific suitability:

> NASD cautions members against relying too heavily upon a customer's financial status as the basis for recommending NCIs. A customer's net worth alone is not necessarily determinative of whether a particular product is suitable for that investor. Given the unique nature of NCIs, these products may present challenges when it comes to a member's duty to dispense its suitability obligation; however, the difficulty in meeting such challenges cannot be considered as a mitigating factor in determining whether members have met

their suitability obligations. **NCIs with particular risks may be suitable for recommendation to only a very narrow band of investors** capable of evaluating and being financially able to bear those risks.

Amid the numerous fraud investigations and significant investment losses resulting from private placements/alternative investments as well as the increase in the sale of non-traded REITs and other alternative investments, FINRA issued an additional Regulatory Notice in February 2009.

Regulatory Notice 09-09 concerns the pricing of non-traded (or unlisted) REITs as well as the due diligence requirements of brokerage firms that solicit and sell these investments to their customers. In the Notice, FINRA reminds brokerage firms that NASD Rule 2810[4] requires that brokerage firms, "prior to participating in a public offering of a real estate investment program, have reasonable grounds to believe that all material facts are adequately and accurately disclosed and provide a basis for evaluating the program." The Notice then highlights steps brokerage firms should take to ensure compliance with industry rules.

In addition to Regulatory Notice 09-09, which is meant to **remind** brokerage firms of their **already existing obligations** under industry rules and standards, FINRA also issued an investor alert to educate the public on these complex products. Specifically, the alert was meant to inform investors of the features and risks of non-traded REITs. In the alert, FINRA highlights the fact that non-traded REITs are often very complex investments that typically have high fees and liquidity problems.

By investing Claimants in these non-traded REITs, Respondents not only concentrated Claimants in the real estate and small/financially troubled business sectors, but did so in complex, opaque, illiquid alternatives such as non-traded REITs and other similar investments.

## I.    Background on Non-Traded Real Estate Investment Trusts (REITs)

There are two types of public REITs: those that trade on a national securities exchange and those that do not. REITs in this latter category are generally referred to as publicly registered non-exchange traded, or simply non-traded REITs.  Non-traded REITs are not listed on an exchange; their shares are illiquid and they have substantial valuation and

---

[4] NASD Rule 2810 has been superseded by FINRA Rule 2310.  FINRA Rule 2310(b)(2)(B)(i) has the same basic requirements as it predecessor and states:  In recommending to a participant the purchase, sale or exchange of an interest in a direct participation program, a member or person associated with a member shall:
(i) have reasonable grounds to believe, on the basis of information obtained from the participant concerning his investment objectives, other investments, financial situation and needs, and any other information known by the member or associated person, that: a. the participant is or will be in a financial position appropriate to enable him to realize to a significant extent the benefits described in the prospectus, including the tax benefits where they are a significant aspect of the program; b. the participant has a fair market net worth sufficient to sustain the risks inherent in the program, including loss of investment and lack of liquidity; and c. the program is otherwise suitable for the participant;

redemption risks.  Investors of non-traded REITs can typically only sell their shares after a holding period of a year and under a limited repurchase program.

Non-traded REITs are illiquid investments with substantial risk.  Non-traded REITs are opaque, do not re-price on a regular basis, are ridiculously expensive, have historically been outperformed by REITs that are traded on national exchanges, and carry significant risk. Most important to Mr. Kennedy, non-traded REITs pay large commissions. In sum, non-traded REITs suffer from illiquidity, unreasonable commissions, poor diversification, and numerous conflicts of interest.

Many of the dividend payments made by non-traded REITs do not actually represent distribution of earnings from the REIT, but instead either represent debt or a return of principal. For instance, an analysis of the dividend coverage ratio (dividing funds from operations (FFO) by total dividends paid reflecting the percent of dividend payments that come from sources relating to the REIT's actual earnings as opposed to debt) is highly illustrative of these problems as the graph below demonstrates.



Another issue with non-traded REITs is that they are typically highly illiquid investments. As no public secondary market exists for shares of non-traded REITs, investors are effectively unable to sell their shares even if the value of the REIT or its underlying assets significantly decrease. In order to mask this illiquidity and justify their reported valuations, many non-traded REITs offer grossly imbalanced repurchase programs through which investors can sell their shares to other investors or back to brokers at a significantly lower price. These repurchase programs come with restrictions. Investors can participate in the repurchase program only after an initial holding period, typically a year, and if there are a large number of shareholders wanting to sell, the non-traded REITs' management reserves the right to limit the number of investors who are permitted to redeem their shares.

Non-traded REITs also tend to be financially weak, generating low or even negative return on equity. Comparing non-traded REITs with traded REITs demonstrates significant difference in value between a diversified traded REIT and the illiquid and non-traded REIT.

Had Claimants been invested in a well allocated and diversified portfolio, Claimants would have experienced substantial gains.

For example, Hospitality REIT was a speculative investment that involved substantial risks. For instance, the Hospitality REIT had *no operating history or established financing sources* and relied on its advisor, who also had no operating history and was newly formed entity. Further, the Hospitality REIT was a blind pool – meaning it did not own properties and had not identified properties to acquire other than a few properties. The investment also charged 10% in selling commission and dealer manager fees, which enriched Respondents but reduced the amount of Claimant's investment capital that actually went toward investments.

In addition, had Respondents, including, inter alia, Respondents Aycock and Kennedy, conducted reasonable or adequate due diligence on the investments Kennedy recommended, they would have identified additional significant red flags. For instance, in or around September 2014 the Hospitality REIT sponsor announced investigation into accounting irregularities. Some broker dealers who had sold Hospitality REIT refused to continue selling the Hospitality REIT as a result of the investigation into Hospitality REIT's finances. In December 2014, the Hospitality REIT's founder and members of the board of directors resigned amid an accounting probe. In March of 2015, the Hospitality REIT's parent announced negative findings of the audit committee's investigation. Respondents either conducted inadequate due diligence or refused to follow up on the red flags Respondents should have identified.

## BOILERPLATE DISCLOSURES DID NOT CURE RESPONDENT'S MISREPRESENTATIONS AND UNSUITABLE RECOMMENDATIONS

Both the courts and regulatory authorities have routinely recognized that merely handing out disclosures to investors does not magically immunize broker/dealers from liability for fraudulent misrepresentations and omissions or unsuitable recommendations. If a boilerplate risk disclosure was enough, a seller could orally promise safety and evade liability by simply handing clients prospectuses warning that the client could lose all of his money. Indeed, this is exactly what Respondents will attempt to do in this case. Respondents may have internally created a series of "CYA paperwork" designed not to inform the customer but to protect Respondents when the fraud was discovered – this is particularly true here where Mr. Kennedy dismissed, diminished, and belittled the significance of the paperwork Claimants and other customers signed.

According to the SEC, a person who makes oral misrepresentations to sell a security cannot wash away his liability by handing his victim a prospectus:

> **At the expense of restating the obvious, we emphasize that compliance with these requirements for delivery of a prospectus or offering circular does not, however, license broker-dealers or their salesmen to indulge in false or fanciful oral representations to their customers**. The anti-fraud provisions of the Securities Act and the Securities Exchange Act apply to **all**

representations whether made orally or in writing, during or after the distribution. **We have repeatedly held that the making of representations in the sale of securities unsupported by a reasonable basis is contrary to the obligation of fair dealing imposed on broker-dealers and their salesmen by the securities laws. This obligation is not diminished because a prospectus or offering circular containing information specified by the Act and our rules has been or is to be delivered. Such information furnishes the background against which the salesman's representations may be tested. Those who sell securities by means of representations inconsistent with it do so at their peril.**

*In the Matter of Ross Secs., Inc.*, SEC Release No. 7069, 41 SEC Docket 509 (Apr. 30, 1963). *See also In the Matter of the Application of Larry Ira Klein*, SEC Release No. 37835, 63 SEC Docket 52 (Oct. 17, 1996) ("Klein's delivery of a prospectus to Towster does not excuse his failure to inform fully the risks of the investment package he proposed").

FINRA also has formally warned its members against such attempts to ward off liability through risk disclosures in prospectuses:

Members are also advised that, although the prospectus and sales material of a fund include disclosures on many matters, **oral representations by sales personnel that contradict the disclosures in the prospectus or sales literature may** nullify the effect of the written disclosures and they **make the member liable for** rule violation and **civil damages to the customers that result from such oral representations.**

NASD Notice to Members 94-16 (emphasis added).

In Notice to Members 04-30, FINRA similarly discussed the specific sales obligations of firms selling bond funds. In addition to reminding firms of their unquestionable obligation "to carefully review and understand" the terms and conditions of the funds, the NTM requires that any sales efforts be made based on a "fair and balanced picture" of the fund and its risks. While firms offering bond funds must, of course, provide a prospectus, FINRA warned:

**However, NASD reminds firms that simply providing a prospectus does not cure unfair or unbalanced sales or promotional materials, whether prepared by the firm or the issuer.**

NASD Notice to Members 04-30 (emphasis added).  Moreover, supplemental disclosures made subsequently to the initial sales pitch for a product cannot cure the initial misrepresentations or omissions in the pitch. FINRA has declared:

**Members are further reminded that providing risk disclosures in a prospectus supplement does not cure otherwise deficient disclosure in sales material, even if such sales material is accompanied or preceded by the prospectus supplement.**

NASD Notice to Members 05-59 (emphasis added). Indeed, even if a broker explained the risk of a proposed transaction to a client and the client knowingly and willingly assumed that risk (which certainly did not occur here), a broker may not make an unsuitable solicitation even with full risk disclosure. *See NASD Dept. of Enforcement v. Kernweis*, No. CO2980024, 2000 WL 33299605 (Feb. 16, 2000).

## RESPONDENTS' FINRA AND COMMON LAW FIDUCIARY DUTIES

### A.    Fiduciary Duty

It is well established that a financial consultant owes a fiduciary duty to a securities investor. *See Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1049 (11th Cir. 1987); *Ward v. Atlantic Security*, 777 So. 2d 1144 (Fla. 3d DCA 2001); *State ex. rel. Painewebber v. Voorhees*, 891 S.W.2d 126 (Mo. 1995); *Glisson v. Freeman*, 532 S.E.2d 442 (Ga. App. 2000); *Beckstrom v. Parnell*, 730 So. 2d 942 (La. App. 1st Cir. 1998).   This issue is not in dispute, Mr. Kennedy publicly held himself out as a fiduciary. As fiduciaries, Respondents owed the Claimants a duty to: (1) provide full, candid, and truthful communication to the Claimants of all known facts; (2) refrain from making any misstatement, misrepresentation, or omission concerning any matter; (3) always place Claimants' welfare and best interests above his own and refrain from self-dealing; (4) transact business only after receiving approval from the customer; and, (5) recommend an investment only after studying it sufficiently. *Gochnauer v. A.G. Edwards & Sons, Inc.,* 810 F.2d 1042, 1049 (11th Cir. 1987).

Courts also impose a fiduciary duty to recommend investments to clients only after studying them sufficiently to become informed as to their nature, price, and financial prognosis and <u>a duty to inform the customer of risks involved in purchasing or selling a particular security</u>. *Ward v. Atlantic Security Bank*, 777 So. 2d 1144 (3rd DCA Fla. 2001) (emphasis supplied). There is no question that at all times during Respondents' relationship with Claimants; Respondents owed Claimants a fiduciary duty.

### B.    FINRA Regulations

FINRA imposes strict requirements upon its members, and their associated persons, and requires, in the conduct of all business, that the member must "observe high standards of commercial honor and just and equitable principles of trade." FINRA Rule 2010. Respondents' conduct throughout its relationship with Claimants directly violated FINRA Rule 2010. Among the requirements that FINRA places upon its members, is the requirement that all recommendations be suitable and that firms appropriately supervise their associated persons.

FINRA Rules and Regulations establish the standard of care owed by Respondents to Claimants.  Respondents violated this standard of care, breaching its duties to the Claimants and causing the losses for which this claim seeks recovery.

### *Suitability*

FINRA Rule 2111 provides that firms and associated persons have three main suitability obligations to their customers:

- **Reasonable-basis suitability** requires a broker to have a reasonable basis to believe, based on reasonable diligence, that the recommendation is suitable for at least some investors.  Reasonable diligence must provide the firm or associated person with an understanding of the potential risks and rewards of the recommended security or strategy.

- **Customer-specific suitability** requires that a broker, based on a particular customer's investment profile, has a reasonable basis to believe that the recommendation is suitable for that customer. The broker must attempt to obtain and analyze a broad array of customer-specific factors to support this determination.

- **Quantitative suitability** requires a broker with actual or de facto control over a customer's account to have a reasonable basis for believing that a series of recommended transactions, even if suitable when viewed in isolation, is not excessive and unsuitable for the customer when taken together in light of the customer's investment profile.

See FINRA: Suitability, *http://www.finra.org/industry/suitability.  See also* FINRA Rule 2111.

FINRA's suitability rules not only require that individual recommendations of securities be suitable, but that any recommended "investment strategy involving a security" be "suitable for the customer."  FINRA Rule 2111.  The requirement that investment strategies be suitable is meant to be "broad", and even covers recommendations of an investment strategy which contains non-security investments, in addition to securities.  *See* FINRA Rule 2111 (Suitability) FAQ, *http://www.finra.org/industry/faq-finra-rule-2111-suitability-faq.*

Not only must initial recommendations of securities or investment strategies be suitable, but any recommendations to hold an investment must be suitable as well. FINRA Rule 2111.03 ("Recommended Strategies. The phrase 'investment strategy involving a security or securities' used in this Rule is to be interpreted broadly and would include, among other things, an explicit recommendation to hold a security or securities.")

FINRA Rule 2111 also "prohibits a member or associated person from recommending a transaction or investment strategy involving a security or securities or the continuing purchase of a security or securities or use of an investment strategy involving a security or securities unless the member or associated person has a reasonable basis to believe that the customer has the financial ability to meet such a commitment."  FINRA Rule 2111.06.

FINRA also imposes upon members an elevated duty of care in dealing with customers and requires that "[a] member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade."

Current FINRA Rule 2111 is a continuation, clarification, and update of the long-standing suitability obligations outlined in NASD Rule 2310, which provided that "[i]n recommending to a customer the purchase, sale, or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs." As FINRA stated when the new rules were released in 2011, "The know-your-customer and suitability obligations are critical to ensuring investor protection and promoting fair dealing with customers and ethical sales practices. . . . The new rules retain the core features of these important obligations and at the same time strengthen, streamline, and clarify them." *See* FINRA Regulatory Notice 11-02.

### *Supervision*

FINRA places strict supervisory obligations on its members. FINRA Rule 3110 "requires a firm to establish and maintain a system to supervise the activities of its associated persons that is reasonably designed to achieve compliance with the applicable securities laws and regulations and FINRA rules." FINRA Supervision, *http://www.finra.org/industry/supervision.* It is not enough to just have a system in place – the member must make certain the system is working. To that end, FINRA Rule 3120 "requires a firm to have a system of supervisory control policies and procedures (SCPs) that tests and verifies a firm's supervisory procedures." *Id.* Indeed, FINRA believes supervision and compliance with industry rules is so important that FINRA Rule 3130 "requires a firm to designate and identify to FINRA . . . one or more principals to serve as a chief compliance officer (CCO)," and requires the firm's CEO "to certify annually that the firm has in place processes to establish, maintain, review, test and modify policies and procedures reasonably designed to achieve compliance with applicable securities laws and regulations and FINRA rules." FINRA states that "[t]he intent of Rule 3130 is to increase attention to firms' compliance programs by requiring substantial and purposeful interaction between business managers and compliance officers throughout the firm." Indeed, FINRA routinely levies heavy sanctions against firms for violations involving supervision failures. *See*, *e.g.*, FINRA Supervision News Releases at *http://www.finra.org/industry/supervision*.

FINRA makes it clear that FINRA members must supervise both registered representatives' recommendations of particular securities, as well as "registered representatives' recommendations of investment strategies with both a security and non-security component" and that such "supervisory system[s] ... [must be] reasonably designed to achieve compliance with applicable securities laws, regulations and FINRA rules, [such that] a firm could focus on the detection, investigation and follow-up of 'red flags' indicating that a registered representative may have recommended an unsuitable investment strategy with both a security and non-security component." See FINRA Regulatory Notice 12-55.

FINRA's current supervision rules, 3110, 3120, 3130, *et seq*., are both based on and consolidate, update, and clarify the long-standing supervision rules set out in NASD Rule 3010 (Supervision), NASD Rule 2013 (Supervisory Control System), and corresponding industry interpretations and provisions. *See* FINRA Regulatory Notice 14-10. The updated rules enforce and provide clarification about the manner in which FINRA members are required to "establish and maintain a system to supervise the activities of each registered representative, registered principal, and other associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable NASD Rules." *See* NASD Rule 3010.

In addition, the NASD and FINRA have routinely fined and sanctioned brokers for providing clients with over-concentrated or unsuitable accounts.  Some sanctions are as follows:

> **Jeffrey L. Salzwedel (Registered Principal, Tualatin, Oregon)**: ". . . censured**,** fined $107,000, and suspended . . . in view of the number of shares purchased and held, the nature of the recommended securities, ***the concentration of securities held in the accounts***, and the customers' specific financial situations, circumstances, and needs." <u>NASD Case</u> *#C2B980013*

> **Joel Dean Moore (CRD #2025699, Registered Principal, Redding, California):** "...was censured, fined $25,000, suspended from association with any NASD member in any capacity for 10 business days, and required to re-qualify by exam as a general securities representative.  The NAC imposed the sanctions following review of a San Francisco DBCC decision.  The sanctions were based on findings that Moore made unsuitable recommendations to public customers in that he failed to make a customer-specific ***suitability determination*** prior to making recommendations." <u>NASD Case</u> *#C01970001*.

(emphasis added).

## <u>RESPONDENTS FAILED TO COMPLY WITH FINRA AND NYSE RULES,</u> <u>AND OBLIGATIONS</u>

### A.    Respondents Failed to Properly Diversify Claimants' Portfolios.

Diversification means creating an investment portfolio that contains different types of investments within each of the different industry sectors. A well-diversified portfolio is invested in each of the different industry sectors (i.e., healthcare, financials, industrial, technology, utilities, manufacturing, telecommunications and the like) commensurate with the investor's risk tolerance.  Industry sectors tend to move up and down at different times and at different rates. Investing a portfolio across each of the industry sectors reduces risk and in many cases can even increase return. Diversifying a portfolio, therefore, across the industry sectors is vital to the success of a portfolio.

Two important reasons to diversify one's investment portfolio are to take maximum advantage of market conditions in specific sectors and to protect one-self against downturns in one specific industry or in one specific size company like the "small caps." When a portfolio is concentrated in companies in the same industry or in all in the same size company the value of the portfolio can drop sharply if that industry provides disappointing returns or if there is a general downturn in companies of a similar size like the "small caps." If the portfolio, however, was comprised of different-sized companies in different parts of the economy, some may go down in value while others may remain stable or go up. In any case, different types of stocks will not lose value at the same rate or at the same time. Diversification, therefore, is extremely important because an investor can reduce risk and increase the returns.

From the time the account opened, it was significantly concentrated in NCIs or other alternative investments, including, non-traded REITS and illiquid BDCs or LPs. This overconcentration in illiquid alternative investments exposed Claimants to significantly more risk than a well-balanced allocation that complies with industry standards.

## B.    The Importance of Asset Allocation.

Allocating one's investments into different investment vehicles such as fixed income and cash is vital. The allocation you choose has a major impact on your investment return, and on the level of risk you take as an investor. Asset allocation determines the investment returns you achieve because different asset classes- stocks, bonds and cash equivalent-typically react differently to changes in the financial markets and to broader economic conditions. For example, a market that produces strong stock returns may cause bond returns to slump, and vice versa. But, if you spread your investments across different asset classes, you may be able to limit, or offset, potential losses in one asset class with stable values, or even gains, in another.

Financial professionals generally assert that asset allocation is the most important determinant of returns, accounting for more than 90 percent of fund performance. This assertion stems from the well-known studies by Brinson, Hood, and Beebower[5] which state, "...investment policy dominates investment strategy (market timing and security selection), explaining on average 93.6 percent of the variation in total plan return." Ibbotson Associates, ed. Stocks, Bonds, Bills, and Inflation 2005 Yearbook. Chicago: Ibbotson Associates, 2005.

The value of asset allocation as a risk management strategy was clear during the severe stock market decline in October 1987. While stocks, as measured by the Dow Jones Industrial Average, fell 21.5% that month, bonds rose 6.2% (footnotes omitted) and cash equivalents rose 0.6%. A blended portfolio model consisting of 40% stocks, 40% bonds and 20% cash resulted in only a 6.46% loss for the month, far less than the loss sustained by the stocks.

---

[5] "Determinants of Portfolio Performance," Gary P. Brinson, L. Randolph Hood, and Gilbert P. Beebower, *Financial Analysts Journal*, July/August 1986.

**C.      Respondents Failed to Properly Allocate Claimants' Portfolio.**

Respondents exposed Claimants to an inordinate amount of risk for their investment needs. The failure of the Respondents to recommend a meaningful allocation to investment grade fixed income violates industry standards and left Claimants exposed to risk that could have been significantly reduced without losing significant return potential.

It is a well-known standard in the securities industry that older investors cannot sustain the same volatility in their portfolios as younger investors who have the ability to replace their losses. In fact, the New York Institute of Finance[6] and others recommend that investors should consider a stock allocation percentage equal to 100 minus their age. According to those calculations, Claimants should have had approximately 40 percent of the portfolio invested in stocks, with 60 percent or more invested in investment grade fixed income and cash. Clearly the continued recommendation to significantly concentrate Claimants' portfolio allocation in illiquid funds was far too risky for Claimants' investment time horizon, risk tolerance, and ability to replace the losses.

Although Respondents are likely to argue that Claimants' losses were the result of overall market decline, a well-balanced portfolio that complied with industry standards would have performed significantly better than the investments at issue.

**D.      Respondents Failed In Their Duties To Properly Supervise Its Financial Advisor And Protect Its Clients.**

In creating and managing the Claimants' portfolios, Respondents met none of the standards described above.  The portfolios Respondents created were far too risky for the Claimants.  Furthermore, Respondents recommended similar concentrations in similar products to many of their clients. The portfolios recommended to Claimants were not properly allocated or diversified.  As a result, it was clearly unsuitable for the Claimants and did not comport with their needs and risk tolerances.  Respondents never advised Claimants of the true risks of the portfolio.  Moreover, Respondents failed in their duty to supervise Mr. Kennedy to ensure that they fulfilled their obligation to the Claimants. Center Street's "supervisory system" was designed primarily to protect Respondents and not the customers, and the "supervisory system" routinely rubber-stamped transactions regardless of the risks or features of the products.

According to NASD Notice to Members 03-49, the NASD staff reviewed CRD data regarding industry/regulatory events for persons currently registered with NASD to determine what numerical tests would be appropriate as triggers to require firms to assess whether to impose a heightened supervision plan.  They found the following:

A preliminary review of existing data as reported to the CRD system indicates that 29,500 out of the 663,000 persons currently registered with NASD (approximately four percent of currently active registered persons)

---

[6] http://www.icief.org/risk/risk_quiz.html

have been subject to one or more customer complaints and arbitrations within the last five years.  Of this number, 2,751 persons (.41 percent of all registered persons) have had three or more complaints and arbitrations.

The preliminary data show that of the 29,500 persons subject to customer complaints within the last five years, 3.3 percent of all registered persons (22,003 persons) were subject to 1 complaint, .71 percent of all registered persons (4,726 persons) were subject to 2 complaints, .22 percent of all registered persons (1,487 persons) were subject to 3 complaints, and .04 percent of all registered persons (290 persons) were subject to 5 complaints.

Respondents had a duty to review the new account forms for every new client that opened an account.  Even a bare-bones supervisory system could have detected that Claimants' asset allocation and lack of diversification were improper for a retirement account and doomed to fail in a declining market.

Notice to Member 97-19 provides guidelines for implementing heightened supervision whenever a member firm is hiring brokers with pre-existing customer complaints. When hiring registered representatives such as the Financial Advisor, it is recommended that the member firm keep the advisor on heightened supervision and closely review all new accounts, and trade activity. With a proper review of the Financial Advisor's accounts, Respondent would have quickly noticed the improper allocation and diversification in these accounts. Furthermore, even if Respondent did not detect the unsuitable securities and improper asset allocation when the securities were first purchased, it should have been detected during a periodic review of the accounts. In addition a periodic review of the account would have detected the financial services concentration and overall risk of the portfolio.

Had Respondents followed industry standards and properly allocated and diversified the portfolio or had Respondents supervised its at-risk Financial Advisor, Mr. Kennedy, Claimants would not have sustained the significant losses that were incurred.  Unfortunately, Respondents' grossly unsuitable investment advice left Claimants with virtually no downside protection for their retirement savings. As a result, the Claimants lost valuable investment principal which they cannot recoup.

## **LEGAL ANALYSIS**

Based upon the foregoing facts, the Claimants' claims against Respondents include, without limitation:

## **COUNT I**
## **Breach of Fiduciary Duty**

Claimants trusted and relied upon Respondents to advise them in making and managing their investments.  Respondents had a fiduciary duty to exercise the utmost good

faith and loyalty.  *Gochnauer v. A.G. Edwards & Sons, Inc.,* 810 F.2d 1042, 1049 (11th Cir. 1987); *Thompson v. Smith, Barney, Harris, Upham & Co.,* 709 F.2d 1413, 1418 (11th Cir. 1983); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1481 (6th Cir. 1989) (a "stock or commodities broker is the agent of the customer and a fiduciary relationship exists between them.").  RESTATEMENT (SECOND) AGENCY § 425 (1958) (agents employed to make manage or advise on investments have fiduciary duties).  According to the SEC, securities brokers have a fiduciary obligation to their customers under both the common law rules of agency and the rules of the NASD (now FINRA) and NYSE.  *See, In re E.F. Hutton & Co. Inc.,* Exchange Act Release No. 25,887 [1988-89 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 84,303 (July 6, 1988) ("The concept of just and equitable principles of trade embodies basic fiduciary responsibilities....").  At the most basic level, as stated by the United States Supreme Court, a securities professional such as a broker-dealer "owes a duty of honesty and fair dealing toward his clients."  *Bateman Eichler Hill Richards, Inc. v. Berner*, 472 U.S. 299, 314 (1985).  Simply put, Respondents were required to place Claimants' interest first.

The specific fiduciary responsibilities of a broker, even for a non-discretionary account, include:

- The duty to recommend a stock only after studying it sufficiently to become informed as to its nature, price and financial prognosis;
- The duty to carry out the customer's orders promptly and in a manner best suited to serve the customer's interests;
- The duty to inform the customer of the risks involved in purchasing or selling a particular security;
- The duty to refrain from self-dealing;
- The duty not to misrepresent any material fact to the transaction; and
- The duty to transact business only after obtaining prior authorization.

*Gochnauer v. A.G. Edwards & Sons, Inc.,* 810 F. 2d 1042, 1049 (11th Cir. 1987) quoting *Lieb v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 461 F. Supp. 951, 953 (E.D. Mich. 1978); *Johnson v. John Hancock Funds,* 217 S.W. 3d 414, 428 (Tenn. Ct. App. 2006) (when broker gives investment advice he "assumes broad fiduciary obligations that extend beyond the individual transactions.").

A fiduciary owes duties not only of utmost good faith and honesty but also that of competence.[7]  The fiduciary duty of competence requires more than ordinary care – the broker is judged against the standard of prudence and care expected of a financial professional.  As stated in Professor Norman Poser's influential treatise *Broker-Dealer Law & Regulation*:

Since the fiduciary duties of a broker include the duty to use the skill and diligence necessary to protect his customer's interests, negligent conduct

---

[7] *Davis v. Merrill Lynch*, 906 F.2d 1206, 1215 (8th Cir. 1990); *Johnson,* 217 S.W. 3d at 428-429.  Both negligent conduct and intentional wrongs by a fiduciary give rise to liability.  *Thropp v. Bache Halsey*, 650 F.2d 817, 820 (6th Cir. 1981); *Baker v. Wheat First Sec.*, 643 F. Supp. 1420, 1430-31 (D.W. Va. 1986).

may be a breach of fiduciary duty. In this regard, it is normally not sufficient for a broker to exercise ordinary care and judgment in discharging his duties, he must employ such care, skill, prudence, diligence and judgment as might reasonably be expected of persons skilled in his calling.  If his customer's money is lost because the broker undertakes his duties without possessing the requisite skills, or because of his negligence, the broker is liable for the loss.

§ 16.03[A][1] (4th ed., 2007) (hereinafter "Poser").

Plainly, Respondents and their agents violated their duties as fiduciaries.  Respondents either intentionally misled Claimants about the risks of the portfolio or were, at the least, inexcusably reckless in failing to understand those risks.

Further, the fiduciary duties owed to Claimants did not "end with the sale" of the securities to the Claimants. "[T]the duties of a broker in a fiduciary status **are not at an end when a transaction is complete**; they include a continuing duty to keep abreast of financial information that may affect the customer's portfolio and to act on the basis of that information." *Paine, Webber, Jackson & Curtis, Inc. v. Adams*, 718 P. 2d 508 (Colo. 1986), citing *Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 461 F. Supp. 951 (E.D. Mich. 1978) (broker in fiduciary status "must keep informed regarding changes in market which affect his customer's interest and act responsively to protect those interests.") (emphasis added).[8]

## COUNT II
## Violation of FINRA/NYSE Rules, Breach of Contract and Negligence

At all times relevant to this claim, Center Street was a member of the New York Stock Exchange and FINRA and as such was required to abide by their rules including those required for the protection of customers such as Claimants. The rules of the self-regulatory organizations such as the NYSE and FINRA "set out general standards of industry conduct" and are evidence of the standard of care by which brokers must abide in dealing with their clients.  *In re E.F. Hutton & Co. Inc., Exchange Act Release No. 25,887* [1988-89 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 84,303 (July 6, 1988); *see also Miley v. Oppenheimer & Co. Inc.,* 637 F. 2d 318, 333 (5th Cir. 1981) (industry rules are "excellent tools against which to assess in part the reasonableness or excessiveness of a broker's handling of an investor's account")*; Lange v. Hentz & Co*., 418 F. Supp. 1376, 1383-84 (N.D. Tex. 1976) (violations of industry rules and practices give rise to common law claim for negligence). Center Street's own statements and confirmation slips stipulate that all transactions are subject applicable federal, state, and

---

[8] Even without a fiduciary relationship such as exists between a broker and his client, the law has imposed a duty to correct prior impressions given by earlier statements, when ongoing developments "undermine[] the accuracy of the earlier statements." *In re Cabletron Systems, Inc.*, 311 F.3d 11, 36 (1st Cir. 2002). Two duties exist, a duty to correct statements that are subsequently discovery to have been incorrect when made, and a duty to update "statements that, although reasonable at the time made, become misleading when viewed in the context of subsequent events." *In re Burlington Coat Factory Secur. Litig.*, 114 F.3d 1410, 1431 (3d Cir. 1997); accord, *In re Int'l Bus. Machines Corp. Secur. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998); *Rubenstein v. Collins*, 20 F.3d 160, 170 n. 41 (5th Cir. 1994).

foreign laws and regulations, and to the rules, regulations, interpretations and customs of the exchange on which they are executed, the rules of those exchanges become a part of the firm's contract with its client.

Respondents, as members of FINRA, are subject to the industry Rules and the Conduct Rules of the FINRA, and as such, were obligated to provide services to Claimants in conformity with those rules. The FINRA Rules and guidelines are used to create the standard of care that govern financial advisors and supervisors.

Just as they were required to "know" the security they recommended, Respondents were similarly required to "know" their customers and to only recommend investments which were suitable for those customers. In allowing the improper and unsuitable investments in Claimants' portfolios, Respondents Center Street, Thacker, Rayner, Lisk, Lamb, Aycock, and Romano violated their duties to supervise their employees, including Respondent Kennedy and Respondent Kennedy's accounts. Respondents previously described violations of industry rules and standards constitute breaches of fiduciary duty, negligence, common law fraud, securities fraud, breach of contract, and failure to supervise.

## COUNT III
## Negligent Supervision

The Claimants adopt and incorporate by reference each and every preceding paragraph as if fully set forth herein.

Securities laws impose a duty upon Respondents to properly and reasonably supervise their registered representatives, according to the general and statutory standard of care. Here, Respondents either failed to understand or misrepresented the risk of the securities sold to Claimants. Respondents Center Street, Thacker, Rayner, Lisk, Lamb, Aycock, and Romano failed to ensure that Center Street employees met their 04-30 obligations. Respondents Center Street, Thacker, Rayner, Lisk, Lamb, Aycock, and Romano, by virtue of their superior knowledge, judgment, and skill in the financial markets, owed Claimants a duty to properly and reasonably supervise Respondent Kennedy. Respondents failed in this regard. Claimants suffered damages as a result of Respondents' failure to supervise Respondent Center Street's employees. Respondents are liable to Claimants for the negligent supervision of Respondent Kennedy and are also liable for the actions of Respondent Kennedy pursuant to the doctrines of *respondeat superior* and ostensible agency because the alleged unsuitable recommendations and allocations were completed in the scope of Respondent Kennedy's employment with Respondent Center Street. At all relevant times Respondent Kennedy acted with the actual or apparent authority of Respondent Center Street. *Dougherty v. Mieczkowski*, 661 F. Supp. 267, 279 (D. Del. 1987) ("In the context of broker-dealers a stringent duty to supervise employees is imposed, and a broker's employer is liable for violations under traditional agency principles.")

## COUNT IV
## Violations of the Illinois Securities Law and Other Securities Laws

Respondents are liable to Claimants pursuant to the Securities laws and corresponding regulations which, which provides an express right of recovery for those who commit such acts described above. For instance, the Illinois Blue Sky law holds:

It shall be a violation of the provisions of this Act for any person:
A. To offer or sell any security except in accordance

with the provisions of this Act. . .

F. To engage in any transaction, practice or course
of business in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof.
G. To obtain money or property through the sale of
securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

I. To employ any device, scheme or artifice to defraud in connection
with the sale or purchase of any security, directly or indirectly.

815 ILCS 5/12.

Respondents violated the Securities Laws and the Rules and Regulations thereunder in that the securities sold to Claimants were unsuitable, risky investments that were not in any way appropriate for Claimants. Furthermore, Respondents violated the law and rules by placing their interest first and breaching their Fiduciary Duties to Claimants. Respondents additionally misrepresented the nature, the risks, and the suitability of the investments among other misrepresentations and omissions which Claimants directly relied on. As a result, Respondents violated the Illinois Securities Laws and regulations and other laws and regulations and are liable thereunder.

## COUNT V
## Fraudulent Inducement to Hold Investment

The allegations of the preceding paragraphs of this Statement of Claim are incorporated here by reference.

This Count is brought pursuant to the widely-recognized doctrine that a common law right of action to recover losses can be maintained, based upon wrongful or fraudulent inducement by a Respondent of a claimant to maintain a position and not to change such position, resulting ultimately in a loss.

Respondents committed fraud on an ongoing basis, by inducing the Claimants to hold onto the unsuitable non-traded REITs and other NCIs. Respondents were providers of investment advice to Claimants, including ongoing advice as to retention of the REITs. Respondent sowed duties to Claimants as previously described, including the duty not to make misrepresentations of material facts and not to omit to disclose material facts from any communications or reports (oral or in writing) conveyed or delivered to Claimants, on an ongoing basis, not just on the front end.

Respondents induced the Claimants to refrain from selling or disposing of the REITs. Such conduct violates a number of applicable tort law principles, as well as a massive wave of court decisions across the United States recognizing the existence of liability for falsely inducing investors and others not to act, to their detriment, among which principles are the following:

Restatement of Torts (Second), sec 525: "One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation."

Restatement of Torts (Second), sec 531: "One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced."

Restatement of Torts (Second), sec 551(1): "One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose .... "

Respondent shad a duty to know the security about which they were advising, to know their customers, and a duty to ensure the statements they made about the security were truthful and did not contain half-truths and omissions of facts that should be disclosed.

As a proximate cause of such false and continuing inducements to retain the unsuitable investment and unsuitable asset allocation in Claimants' portfolio, the Claimants were made to suffer a loss.

## COUNT VI
### Control Person / Aider and Abettor Liability Under Illinois and Federal Securities Laws
### (Against Center Street, Thacker, Rayner, Lisk, Lamb, Aycock and Romano)

The Claimants adopt and incorporate by reference each and every preceding paragraph as if fully set forth herein.

This Count is asserted by Claimants against all the Respondents and is based upon the relevant securities laws, including 815 ILCS 5/12 of the Illinois Securities Law together with the material participation and aider/abettor liability provision of 815 ILCS 5/13 of the Illinois Securities Law.  Claimants have alleged herein all the necessary elements of a claim under the aforesaid sections. A cause of action under said provisions does not require pleading or proof of: (1) a Respondent's scienter; (2) the Claimants' reliance; (3) loss causation.

Respondents Thacker, Rayner, Lisk, Lamb, Aycock, and Romano participated or aided in making the sale of the NCIs to Claimants.  During the relevant time period, Respondents, acting in concert or conspiracy, and materially aiding each other carried out a plan, scheme and course of conduct which was intended to and, throughout the relevant time period, did cause Claimants to purchase the NCIs discussed herein, when if the truth had been disclosed, the Claimants would not have invested in the NCIs or, after purchase, continued to hold such NCIs.

Thacker, Rayner, Lisk, Lamb, Aycock, and Romano each had legal duties to manage, supervise, and control the activities of Center Street and Kennedy to ensure compliance with applicable rules, regulations, and standards. Center Street, Thacker, Rayner, Lisk, Lamb, Aycock, and Romano knew or should have known of the violative conduct and other actions of Kennedy described in this claim. Due to their status as control persons, Center Street, Thacker, Rayner, Lisk, Lamb, Aycock, and Romano are jointly and severally liable as control persons for the violations described in this Claim.

Respondents are also liable under the relevant securities laws and acts for the misrepresentations and omissions. Further, Respondents Violated Reg BI's Obligations in further violation of the securities acts. *See, e.g.,* [Rule 15l-1(a)(1) of the Exchange Act, 17 CFR § 240.15l-1(a)(1)]. By engaging in the conduct described above Respondents failed to act in the best interest of the retail customers by failing to establish, maintain, and enforce written policies and procedures reasonably designed to achieve compliance with Regulation Best Interest and other relevant industry rules and standards. By engaging in the conduct described above, when making recommendations of securities transactions to retail customers, Respondents failed to act in the best interest of the retail customers by failing to exercise reasonable diligence, care, and skill to understand the potential risks, rewards, and costs associated with the recommendation.

By virtue of the foregoing, Respondents committed violations of Exchange Acts, including Rule 15l-1(a)(1) by making recommendations to purchase and hold the NCIs and related investments to retail customers while failing to exercise reasonable diligence, care, and skill to (a) understand the potential risks, rewards, and costs associated with the recommendation; and (b) form a reasonable basis to believe that the recommendation was in the best interest of the particular retail customer based on that retail customer's investment profile and the potential risks, rewards, and costs associated with the recommendation. Respondents exerted control over the activities of its registered

representatives, including the specific activity upon which the violations are based. By reason of the foregoing, Respondents are liable as control persons for the violations pursuant to Section 20(a) of the Exchange Act [15 U.S.C. §78t(a)].

**COUNT VII**
**Aiding And Abetting Breach of Fiduciary Duty**
**(Against Center Street, Thacker, Rayner, Lisk, Lamb, Aycock, Romano and Kennedy)**

The Claimants adopt and incorporate by reference each and every preceding paragraph as if fully set forth herein.

Respondents Center Street and Kennedy owed Claimants the fiduciary duties of due care, unflinching loyalty, good faith, candor, and prudence.  That Center Street and Kennedy owed these fiduciary duties was well known to Respondents Thacker, Rayner, Lisk, Lamb, Aycock, and Romano.  As alleged herein, Center Street and Kennedy breached their fiduciary duties to Claimants. Thacker, Rayner, Lisk, Lamb, Aycock, and Romano aided and abetted Center Street and Kennedy's breaches of fiduciary duty.  Thacker, Rayner, Lisk, Lamb, Aycock, and Romano actively, knowingly and/or negligently participated in Center Street and Kennedy's breaches of their fiduciary duties to Claimants. The actual knowledge of Thacker, Rayner, Lisk, Lamb, Aycock, and Romano of Center Street and Kennedy's breaches of fiduciary duty is based on, among other things, the nature of the scheme alleged herein. Thacker, Rayner, Lisk, Lamb, Aycock, and Romano participated in the breaches of the fiduciary duties by Center Street and Kennedy for the purpose of advancing their own interests.  Claimants were harmed by Thacker, Rayner, Lisk, Lamb, Aycock, and Romano aiding and abetting Center Street and Kennedy's breaches of fiduciary duty.  As a direct and proximate result of Thacker, Rayner, Lisk, Lamb, Aycock, and Romano aiding and abetting Center Street and Kennedy's breaches of fiduciary duty, Claimants suffered injuries for which monetary damages are sought.

**CONCLUSION**

As demonstrated above, and which will be proven at the final hearing, Respondents mishandled the assets Claimants entrusted to their care by over-concentrating the assets in illiquid non-traded alternative investments, which were unsuitable for Claimants' ages, investment goals, and risk tolerance. Claimants relied upon Respondents to provide them with sound financial advice and management. Unfortunately, rather than prudently investing Claimants' assets, Respondents exposed Claimants to unnecessary risk. Claimants' losses are a direct result of the Respondents' misconduct.

As a result of Respondents' actions set out herein, Claimants suffered damages and are entitled to recover as set out below:

(a)    Actual damages of no less than $100,001[9] as outlined above as well as damages for the loss of income that would have been received had Claimants' money been managed properly, as well as all other losses, foreseeable or not, that Claimants suffered, including non-pecuniary losses;

(b)    Disgorgement and return of all fees, management charges, and commissions;

(c)    Interest on Claimants' losses at the legal rate;

(d)    Claimants' costs, legal fees and expenses;

(e)    Rescission and/or statutory damages;

(d)    Throughout its dealings with Claimants, Respondent acted in bad faith, with willful misconduct, malice, fraud, intent to deceive or at least with such reckless disregard as would raise the presumption of conscious indifference to consequences. Accordingly, Claimants are entitled to an award of punitive damages; and

(e)    Such other and additional damages and relief as may be shown at hearing and which the Panel deems just and equitable.

Respectfully submitted this 26th day of January, 2024.

Michael C. Bixby, Esq.
**BIXBY LAW PLLC**
1149 Creighton Road, Suite 7
Pensacola, FL 32504
Michael@BixbyLawFirm.com

***Attorney for Claimants***

---

[9] Claimants reserve the right to supplement this pleading and Claimants' damage analysis as Claimants were not in possession of all their statements and other account documentation at the time of filing this claim.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was sent to Counsel for Respondent Center Street via the FINRA Portal on January 26, 2024 and via First Class U.S. Mail to Respondents Jack Robert Thacker, Jr., Micah Harding Rayner, Thomas Lisk, Jason Lamb, Billy James Aycock, Anthony Michael Romano, and Jeffrey T. Kennedy on January 29, 2024.

_____
Michael C. Bixby, Esq.

EXHIBIT A

# Notice to Members

**NOVEMBER 2003**

**SUGGESTED ROUTING**

Legal/Compliance

Retail

Senior Management

Internal Audit

**KEY TOPICS**

Advertising and Sales Literature

Due Diligence

Non-Conventional Investments

Suitability

**INFORMATIONAL**

# Non-Conventional Investments

## NASD Reminds Members of Obligations When Selling Non-Conventional Investments

## Executive Summary

In the aftermath of the recent downturn in the equity markets, NASD reviewed the services and products offered by members and observed that retail investors were being offered an array of different investments as alternatives to conventional equity and fixed-income investments. These alternative investments do not fall under a common category; the staff review indicates that brokers and retail investors have shown increased interest in products such as asset-backed securities, distressed debt, and derivative products (for ease of reference these products are collectively refered to as non-conventional investments or "NCIs"). NCIs often have complex terms and features that are not easily understood. NASD staff reminds members that the fact that an investment is an NCI does not in any way diminish a member's responsibility to ensure that such a product is offered and sold in a manner consistent with the member's general sales conduct obligations. This *Notice to Members* reminds members offering NCIs of their obligations to: (1) conduct adequate due diligence to understand the features of the product; (2) perform a reasonable-basis suitability analysis; (3) perform customer-specific suitability analysis in connection with any recommended transactions; (4) provide a balanced disclosure of both the risks and rewards associated with the particular product, especially when selling to retail investors; (5) implement appropriate internal controls; and (6) train registered persons regarding the features, risks, and suitability of these products.

# 03-71

## Questions/Further Information

Questions regarding this *Notice* may be directed to Gary L. Goldsholle, Associate General Counsel, Regulatory Policy and Oversight, NASD, at (202) 728-8104; or Janene Marasciullo, Senior Attorney, Regulatory Policy and Oversight, NASD, at (202) 974-2978.

## Background and Discussion

As a result of the recent downturn in the equity markets and historically low interest rates, brokers and retail investors have been turning to alternative investment vehicles in search of a better return or yield on investments. A review of members indicated that there is an increased interest in a variety of NCIs that have a wide array of terms, conditions, risks, and rewards.[1] Some of these NCIs are marketed as offering greater security or a "guaranteed" return on investments. Other products seek to maximize the potential return on investments. Some of these products have unique features relating to risk and reward that may not be readily understood, especially by retail investors.

For example, certain asset-backed securities and corporate bonds are secured by a range of collateral such as mobile homes, future royalty payments on popular music, payments from consumer credit cards or other consumer goods. The credit risks associated with these myriad forms of collateral are varied and for many non-institutional parties may be difficult to understand and assess. Other NCIs, such as distressed corporate bonds and certain derivative contracts, may be offered to retail investors in an attempt to maximize the return on investment, but they correspondingly may involve greater degrees of risk. These products also tend to have less market liquidity, less transparency as to their pricing and value and may entail significant credit risks that are difficult to understand and assess.

In sum, recent trends indicate that brokers and investors may be turning to NCIs in search of increased yield or return. Although these products may have attractive qualities, it is crucial that members understand the distinct features, and risks and rewards, of any product they sell. Thus, whenever members recommend NCIs to investors, they must take special care to ensure that all registered persons understand the features of the product in order to be in a position to perform the required suitability analysis before executing a transaction. Likewise, members have an obligation to ensure that all marketing materials used by the member provide an accurate and balanced description of the risks and rewards.

NASD is issuing this *Notice to Members* to remind members of their sales conduct obligations.[2] Given the complex nature of NCIs and the potential for customer harm or confusion, members are cautioned to ensure that their sales conduct procedures fully and accurately address any of the special circumstances presented by the sale of NCIs. Additionally, NASD is concerned that investors, particularly retail investors, may not fully understand the risks associated with these products. Accordingly, NASD reminds members that the sale of NCIs, like more traditional investments, requires them to:

## 03-71

(1) conduct appropriate due diligence with respect to these products; (2) perform a reasonable-basis suitability analysis; (3) perform customer-specific suitability analysis for recommended transactions; (4) ensure that promotional materials used by the member are fair, accurate, and balanced; (5) implement appropriate internal controls; and (6) provide appropriate training to registered representatives that sell these products. Given the complex and, at times, difficult-to-understand nature of NCIs, members should take particular care to assure that they are fulfilling these obligations.

## Due Diligence/Reasonable-Basis Suitability

As NASD noted most recently in *Notice to Members 03-07* (pertaining to hedge fund sales to customers), performing appropriate due diligence is crucial to a member's obligation to undertake the required reasonable-basis suitability analysis.[3] A reasonable-basis suitability determination is necessary to ensure that an investment is suitable for some investors (as opposed to a customer-specific suitability determination, discussed below, which is undertaken on a customer-by-customer basis). Thus, the reasonable-basis suitability analysis can only be undertaken when a member understands the investment products it sells. Accordingly, a member must perform appropriate due diligence to ensure that it understands the nature of the product, as well as the potential risks and rewards associated with the product. Moreover, the fact that a member intends to offer an NCI only to institutional investors does not relieve the member of its responsibility to conduct due diligence and a reasonable-basis suitability analysis.

The type of due diligence investigation that is appropriate will vary from product to product. However, there are some common features that members must understand about products before registered representatives can perform the appropriate suitability analysis. These features include, but are not limited to:

- The liquidity of the product

- The existence of a secondary market and the prospective transparency of pricing in any secondary market transactions

- The creditworthiness of the issuer

- The creditworthiness and value of any underlying collateral

- Where applicable, the creditworthiness of the counterparties

- Principal, return, and/or interest rate risks and the factors that determine those risks

- The tax consequences of the product

- The costs and fees associated with purchasing and selling the product

EXHIBIT A

Members should examine these and other appropriate factors when conducting due diligence. A member may in good faith rely on representations concerning an NCI contained in a prospectus or disclosure document. However, reliance on such materials alone may not be sufficient for a member to satisfy its due diligence requirements where the content of the prospectus or disclosure document does not provide the member with sufficient information to fully evaluate the risk of the product or to educate and train its registered persons for sales purposes. In such case, the member must seek additional information about the NCI or conclude that the product is not appropriate for sale to the public. In addition, members should ensure that the persons responsible for conducting due diligence have appropriate training and skill to evaluate the terms of the investment as well as the potential risks and benefits.

## Customer-Specific Suitability

Members and their associated persons must reasonably believe that the product is a suitable investment prior to making a recommendation to a particular customer. To ensure that a particular investment is suitable for a specific customer, members and their registered persons must examine: (1) the customer's financial status; (2) the customer's tax status; (3) the customer's investment objectives; and (4) such other information used or considered to be reasonable by such member or registered representative in making recommendations to the customer. [4]

NASD cautions members against relying too heavily upon a customer's financial status as the basis for recommending NCIs. A customer's net worth alone is not necessarily determinative of whether a particular product is suitable for that investor. Given the unique nature of NCIs, these products may present challenges when it comes to a member's duty to dispense its suitability obligation; however, the difficulty in meeting such challenges cannot be considered as a mitigating factor in determining whether members have met their suitability obligations. NCIs with particular risks may be suitable for recommendation to only a very narrow band of investors capable of evaluating and being financially able to bear those risks.

## Promotional Materials

Sales materials and oral presentations regarding NCIs must present a fair and balanced picture regarding both the risks and benefits of investing in these products. For example, members may not claim that certain NCI products, such as asset-backed securities, distressed debt, derivative contracts, or other products, offer protection against declining markets or protection of invested capital unless these statements are fair and accurate. Moreover, when promoting the advantages of NCIs, it is critical that members balance their promotional materials with disclosures of the corresponding risks and limitations of the product discussed above in the "Due Diligence/Reasonable Basis Suitability" section of this *Notice*.

EXHIBIT A

Additionally, if applicable, members should provide investors with any prospectus and other disclosure material provided by the issuer or the sponsor. NASD reminds members, however, that simply providing a prospectus or offering memoranda does not cure unfair or unbalanced sales or promotional materials, whether prepared by the member, sponsor, or issuer.[5]

## Internal Controls

Members must establish sufficient internal controls, including supervision and training requirements, that are reasonably designed to ensure that sales of NCIs comply with all applicable NASD and SEC rules. Members must ensure that their written procedures for supervisory and compliance personnel require that (1) the appropriate due diligence/reasonable-basis suitability is completed before products are offered for sale; (2) associated persons perform appropriate customer-specific suitability analysis; (3) all promotional materials are accurate and balanced; and (4) all NASD and SEC rules are followed. In addition to establishing written procedures, members also must document the steps they have taken to ensure adherence to these procedures.

## Training

Members must train registered persons about the characteristics, risks, and rewards of each product before they allow registered persons to sell that product to investors. Likewise, members should train registered persons about the factors that would make such products either suitable or unsuitable for certain investors. Members' focus on training should not be limited to representatives selling such products; members also should provide appropriate training to supervisors of registered persons selling NCIs.

For a variety of reasons, the need for adequate training is heightened when registered persons sell NCIs. First, due to the unique nature of these products, many investors, especially retail investors, may not understand the features of the product, and may not fully appreciate the associated risks of investing in them. Moreover, in light of the fact that investors may be turning to these products as an alternative to traditional equity and fixed income investments, it is crucial for registered persons to provide a full and balanced disclosure regarding both the risks and the rewards of these products.

Educational brochures, videos, lectures, explanatory memoranda, and Web-based seminars are all appropriate ways of delivering training. The particular training methods will vary based upon the products themselves, as well as the size and customer base of the firm. NASD encourages firms that offer NCIs to offer training about these products as part of the Firm Element of their Continuing Education Program.

## Conclusion

NCIs can be unusual and complex investment vehicles that may appear increasingly attractive to investors during periods in which traditional equity and fixed income investments come into disfavor. However, the unique and complex features of some NCIs may be difficult to understand and may obscure the risks. Accordingly, members must conduct appropriate due diligence/reasonable-basis suitability before offering any product to the public. Likewise, members must conduct a customer-specific suitability analysis prior to making any recommendations to a customer. Members also must ensure that all promotional materials are fair, accurate, and balanced. Finally, in connection with the recommendation and sale of NCIs, members must ensure that they implement appropriate supervisory internal control and appropriate training to all registered persons who sell such products to customers.

## Endnotes

1   Approximately 35% of the firms reviewed sold NCIs in denominations that raise the possibility of sales to retail investors. The list of NCIs being offered is broad and includes asset-backed securities, index-linked notes, non-traded REITS, equity-linked notes, multi-callable step up notes, redeemable secured notes, auction rate preferred securities, principal protected index-linked CDs, distressed debt, derivative products, and emerging market debt securities.

2   Members also are reminded of the application of IM-2310-2(e) (Fair Dealing with Customers with Regard to Derivative Products or New Financial Products), which emphasizes members' obligations for fair dealing with customers when making recommendations or accepting orders for new financial products.

3   NASD's use of the term "due diligence" is not intended to equate the responsibilities of a member for its sales conduct obligations with the requirements of an underwriter under Section 11 of the Securities Act of 1933 and Securities Act Rule 176.

4   NASD Conduct Rule 2310(b).

5   *See* NASD Letter of Acceptance, Waiver and Consent, Altegris Invs., Inc., and Robert Amedeo, No. CAF030015 (April 15, 2003).

©2003. NASD. All rights reserved. *Notice to Members* attempt to present information to readers in a format that is easily understandable. However, please be aware that, in case of any misunderstanding, the rule language prevails.