#### IN THE UNITED STATES BANKRUPTCY COURT
#### FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| IN RE: ) | |
| ) | |
| JACK ROBERT THACKER, JR., ) | Case No: 2:25-bk-50237 |
| ) | Chapter 11 |
| Debtor. ) | Judge Mancl |
| ) | |
| ) | |
| ARETE WEALTH, INC. ) | |
| ) | |
| Plaintiff, ) | Adv. Proc. No. _____ |
| ) | |
| v. ) | |
| ) | |
| JACK ROBERT THACKER, JR., ) | |
| ) | |
| Defendant. ) | |

**COMPLAINT FOR FRAUDULENT INDUCMENT AND
FOR NONDISCHARGEABILITY UNDER 11 U.S.C. § 523(a)(2) AND (6)**

Plaintiff Arete Wealth, Inc. ("Arete") files this Complaint seeking a judgment against Defendant-Debtor Jack Robert Thacker, Jr. for fraudulent inducement and for nondischargeability under 11 U.S.C. § 523(a)(2) and 523(a)(6).

#### INTRODUCTION

1. In December 2020, Debtor Jack R. Thacker, Jr. lied about the liabilities of his prior company, Center Street Holdings, Inc., so that he could sell it for $5 million to Old Growth Capital, LLC ("Old Growth"), the predecessor to Plaintiff Arete. Before the sale, Mr. Thacker wholly owned his company and was president of its subsidiary, Center Street Securities, Inc. ("CS Securities"), an investment company like Old Growth and Arete.

2. When Mr. Thacker went to sell his company to Old Growth, the parties' contract was clear: Mr. Thacker represented that Center Street Holdings, Inc. ("CS Holdings") and its subsidiaries "have no Liabilities except" those "reflected or

1

reserved against in the Balance Sheet" and those "incurred in the ordinary course of business" since that Balance Sheet's date. Ex. A, Stock Purchase Agreement, at 21. And the Agreement's definition of "Liabilities" made that promise broad, encompassing "any liability, commitment or obligation (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due)." *Id.* at 8.

3. But Mr. Thacker's representation was never true. Instead, when the parties executed the contract, he knew that CS Securities had massive undisclosed liabilities, including an underlying culture of non-compliance with internal policies, FINRA rules, and other regulations and guidelines. That non-compliant culture included selling customers unsuitable investments, letting accounts languish unmonitored, failing to report product-issuer misconduct, and concealing the downfall of its best investment product. CS Securities was, in short, a ticking timebomb that Old Growth never could have suspected without truthful disclosures.

4. So Old Growth bought the company—and suffered the fallout. To date, at least fifty customers harmed by CS Securities' improper business practices have filed arbitration claims against CS Holdings *and* Arete, with every claim requiring massive resources to defend against. And those are just the start, with other latent liabilities still capable of arising.

5. To hold Mr. Thacker accountable, Arete sued him in federal court in Illinois to both rescind the contract and to get damages for his fraudulent inducement and contract breach.

6. To escape that accountability, Mr. Thacker filed bankruptcy here. But bankruptcy was never meant to shield debts stemming from this kind of "fraud," "materially false" statements, and "willful and malicious injuries"—which is why the Bankruptcy Code excepts those debts from discharge. 11 U.S.C. § 523(a)(2), (6).

7. Because of that, this Court should do three things to hold him accountable: (1) enter a judgment of at least $5 million against Mr. Thacker for fraudulently inducing Arete into this scam, (2) enter a judgment rescinding the Agreement, and (3) hold that, under either § 523(a)(2) or § 523(a)(6), this debt to Arete is not dischargeable.

## JURISDICTION, VENUE AND PARTIES

8. On March 6, 2025, Mr. Thacker filed a voluntary Chapter 11 bankruptcy petition in this Court.

9. This Complaint is timely because August 8, 2025, is the deadline for filing challenges to dischargeability. D.E. 110.

10. This Adversary Proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(I). Arete consents to the Court's entry of final orders and judgment. Fed. R. Bankr. P. 7008.

11. This Court has jurisdiction under 28 U.S.C. §§ 157 and 1334.

12. Venue is proper under 28 U.S.C. § 1409.

13. Arete is a Delaware corporation with its principal place of business in Chicago, Illinois. Arete is the successor in interest to Old Growth Capital, LLC, the original buyer in the parties' underlying contract.

14. Mr. Thacker is the Debtor in this bankruptcy case and is domiciled in Bristol, Tennessee. He is the former sole owner of Center Street Holdings, Inc. ("CS Holdings") and the former president of its subsidiary, Center Street Securities, Inc. ("CS Securities"). Mr. Thacker may be served with process at 2261 Bullock Hollow Road, Bristol, Tennessee 37620.

3

# BACKGROUND

## I. Arete Acquires CS Holdings from Mr. Thacker.

15. Jack Robert Thacker, Jr. is the former owner of a holding company, CS Holdings, and its subsidiary, CS Securities, which is an investment company. On December 30, 2020, however, Mr. Thacker sold CS Holdings to Plaintiff Arete's predecessor, Old Growth Capital, LLC, for $5 million through a Stock Purchase Agreement. *See* Ex. A, Stock Purchase Agreement ("SPA").

16. Within that Agreement, Mr. Thacker made representations about the liabilities of CS Holdings and its subsidiaries, including CS Securities. *See id.* at 6,

17. One representation is primarily at issue here: Mr. Thacker represented that his company had "no Liabilities except (a) those which are adequately reflected or reserved against in the Balance Sheet as of the Balance Sheet Date, and (b) those which have been incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date and which are not, individually or in the aggregate, material in amount." *Id.* at 21. For clarity, the Agreement defined "liabilities" broadly: "[A]ny liability, commitment or obligation (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due)." *Id.* at 8.

18. At the same time, he represented that "Other than the Legacy Arbitrations, there are no Actions pending or, to Seller's Knowledge, threatened against or by the Seller, or any of the Companies: (i) relating to or affecting any of the Companies." *Id.* at 27. "Legacy Arbitrations" there covers "all FINRA or other arbitrations, or any ancillary Actions relating thereto (including all related counterclaims, cross claims, appeals and other similar Actions), whether threatened, pending or pursued at some future date (including after Closing), brought by any Person in connection with, in whole or in part, such Person's purchase or ownership of any investment

4

products sold by [CS] Securities prior to the Closing Date, including those described in Section 3.13(a) of the Disclosure Schedules." *Id.* at 8.

19.  Arete had every reason to believe Mr. Thacker's representation, with the written disclosure schedules backing it up.  Plus, the Agreement authorized both parties to "rely fully upon [each's] representations, warranties, covenants and agreements." *Id.* at 60.  Were that not enough, it also promised that "[n]o representation or warranty by [Mr. Thacker]" and "no statement" in "any certificate or other document furnished or to be furnished to [Old Growth/Arete] pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements . . . not misleading." *Id.* at 38-39.

## II.   Mr. Thacker's representations in the Agreement covered up CS Securities' vast liabilities.

20.  Despite the Agreement's promise of full disclosure, Mr. Thacker executed it knowing that his representations about CS Holdings' liabilities were false. To be sure, it is not that he failed to disclose Legacy Arbitrations; it is that he failed to disclose a litany of improper business practices that posed their own liabilities.

### A.   Mr. Thacker never disclosed CS Securities' liability for its compliance system failing to stop sales representatives' misconduct.

21.  To start, Mr. Thacker never disclosed the liabilities stemming from the company's nonfunctioning regulatory compliance system.  CS Holdings' subsidiary, CS Securities, is governed by the regulations of the Financial Industry Regulatory Authority, or "FINRA."  And FINRA Rule 3110 requires CS Securities to maintain and certify that it has a system to ensure that its personnel comply with various securities laws.  Atop that, it required Mr. Thacker, as CS Securities' president, to annually certify that he had discussed compliance with the company's Chief Compliance Officer.  Mr. Thacker knew this rule and, even if he had not, he had a duty to ensure the company's compliance with it.

5

22. But he failed at that, exposing the company to liability from both regulatory authorities and customers. Contrary to his representations in the Agreement, Mr. Thacker knew that CS Securities had never maintained or adequately enforced the required compliance system. Part of the company's compliance system did have a policy prohibiting sales representatives from allowing customers to be more than 10% invested in alternative investment products like unsecured bonds. But even when CS Securities tried to discipline its sales representatives for ignoring such policies, Mr. Thacker knew that he had many times personally overridden the company's own enforcement staff, allowing representatives to go unpunished.

23. Mr. Thacker's lax compliance approach took its toll on customers. For example, in 2017, FINRA punished a CS Securities representative, David Escarcega, for manipulating elderly and conservative investors into buying unsecured bonds that he marketed as guaranteed, low-risk—safe. Unsecured bonds are nothing of the sort, appropriate only for those with enough money to absorb a potential loss. Yet, for seven of those customers, the FINRA National Adjudicatory Council found that Escarcega's intentional and materially false statements about the bonds robbed victims of $516,825 in sales. For twelve others, the Council found that he made the company $1.5 million selling them the same unsecured bonds without considering these customers' risk tolerance, investment objectives, or financial profiles. And to cover up his scheme, he then lied about these customers' net worths on company paperwork, leading to inaccurate CS Securities books and records. As punishment, the Council barred Escarcega from selling more securities and ordered him to refund the $52,270 in commissions he made off his victims.

24. Mr. Thacker knew all this, mainly because he was president of CS Securities throughout Escarcega's scheme and testified at his disciplinary hearing. Because of that, Mr. Thacker—more than most—also knew that CS Securities'

6

compliance system was to blame, with Escarcega's own defense arguing that, had the company's system worked, his scheme would never have succeeded.

25. Despite Escarcega's punishment, Mr. Thacker also knew about another finding of the Council: The risk of loss to Escarcega's victims remained, as did CS Securities' liability to each. And Mr. Thacker knew that the Council's finding was accurate, because complaints from Escarcega's victims, like customer Roy Lance in 2018, had been bubbling up in the company long before the 2020 Agreement.

26. CS Securities' nonfunctioning compliance system paved the way for Escarcega's scheme. Still other sales representatives may have copied his example. He is just the only one that got caught. But despite Escarcega's saga and the risk of sabotaging the company's compliance system, not once before the Agreement did Mr. Thacker disclose these liabilities to Arete.

### B. Mr. Thacker never disclosed CS Securities' liability for automatically renewing unsuitable investment products.

27. Mr. Thacker also never disclosed CS Securities' liability for its policy of automatically renewing risk-laden alternative investment products, like unsecured bonds, upon their maturity. While some financially stable customers may appreciate that convenience, that policy applied *even* to Escarcega's financially vulnerable victims—and *even* after his downfall. By the December 2020 Agreement, Mr. Thacker knew that applying the auto-renew policy to *any* customer—especially Escarcega's—conflicted with customers' best interests, violated FINRA best-interest regulations, and exposed CS Securities to liability each time. Yet he enforced the policy anyways.

28. As before, not once did Mr. Thacker disclose these liabilities to Arete before the Agreement.

7

**C.  Mr. Thacker never disclosed CS Securities' liability in not monitoring unassigned customer accounts, i.e. "House" accounts.**

29.  Mr. Thacker also failed to disclose CS Securities' liability in letting many customer accounts linger unmonitored. Of course, as president, he knew about these accounts: When the company fired a sales representative, any customer account not reassigned to another representative would be listed as Mr. Thacker's in a "House" account. Make no mistake though—neither Mr. Thacker nor any representative actively serviced those House accounts, meaning no one monitored them to ensure they continued serving customers' best interests. Having lingered in the ether, those House accounts pose their own liability.

30.  Never did Mr. Thacker disclose this exposure before the Agreement.

**D.  Mr. Thacker never disclosed CS Securities' liability from selling an unsuitable real estate investment trust.**

31.  Separately, Mr. Thacker never mentioned a brewing complaint by customer Dale Smith alleging that CS Securities had improperly sold him a real estate investment trust. Despite Mr. Smith not filing a claim until 2022, Mr. Thacker, as CS Securities' president, knew about it even as he signed the 2020 Agreement.

32.  He never disclosed this liability to Arete beforehand.

**E.  Mr. Thacker never disclosed CS Securities' liability in failing to report misconduct by one of its product issuers.**

33.  Alongside that, Mr. Thacker failed to disclose that CS Securities breached its duty to report material red flags relating to its customers' investments. Specifically, the issuer of the company's unsecured bonds, GPB Capital Holdings, missed its public financial disclosure deadline.

34.  CS Securities remained silent, Mr. Thacker knew about it, and Arete suffered the consequences. After the Agreement, Arete had to pay a $70,000 fine and $89,652.50 in restitution to affected customers.

35.  Never did Mr. Thacker reveal this liability to Arete.

8

### F. Mr. Thacker never disclosed CS Securities' liability in having one of its best-selling products become a troubled investment.

36. Last, Mr. Thacker never revealed that the issuer of perhaps its best-selling product was in financial straits. Legendary Capital had long issued real estate investment trusts that CS Securities' customers enthusiastically purchased. But before entering the Agreement in December 2020, Mr. Thacker knew that Legendary was struggling to survive the Covid-19 pandemic, jeopardizing this popular product. He had this knowledge because he was on Legendary's investment committee, holding a personal relationship with insiders there.

37. Also because of that connection, Mr. Thacker knew in July 2020 that Legendary would not be making shareholder distributions, and he knew that the Securities Exchange Commission had begun investigating Legendary in December 2020—the same month that he entered the Agreement.

38. Despite these known liabilities, not once did he disclose any of them.

### III. Arete never would have entered the Agreement had it known of these hidden liabilities.

39. With CS Securities having so many liabilities, Arete never would have bought the parent company, CS Holdings, had they been disclosed beforehand. Even though the Agreement allows Arete to rely on Mr. Thacker's representations, and explicitly relieves Arete of performing any investigation, Arete never would have discovered the liabilities even had it investigated. After all, Mr. Thacker had certified to regulators that the company complied with all regulations, and the market conditions at the time concealed the company's sideways practices. Regardless, the Agreement covers even "unknown" liabilities, "unasserted" liabilities, and "contingent" liabilities that no investigation would have revealed. *See* SPA, p.8.

40. Even after the Agreement, Mr. Thacker's cover-up continued. Assuming his good faith, Arete hired Mr. Thacker as Senior Vice President of Business

9

Development to help carry on the business. Even in this role, having fiduciary duties to Arete, CS Holdings, and CS Securities, he still never disclosed the liabilities.

41. Instead, he made things worse. After hiring a new compliance employee without consulting Arete's management, he then helped that employee avoid Arete's own compliance training program. When Arete confronted him about it, Mr. Thacker again never disclosed that he had done the same before the Agreement, creating a host of liabilities in the process. He ultimately resigned in September 2023.

42. Not until he left did these liabilities come to light.

### IV. Mr. Thacker's misrepresentations have sunk CS Holdings' value.

43. With the mountain of liabilities Mr. Thacker hid, CS Holdings' value has sunk. For instance, over *fifty* past customers have filed FINRA arbitration complaints against CS Securities based on the liabilities Mr. Thacker covered up. With each new suit, CS Holdings' value sinks lower, stripping Arete of the benefit of its bargain under the Agreement.

44. It is not just CS Securities either. Numerous of these arbitration claims name *Arete*, too. Yet, even with Arete's own liability shield, it still must pay to defend every one of these. So even after paying $5 million for CS Holdings, Arete must now defend both CS Holdings and itself in each of at least fifty arbitrations resulting from undisclosed liabilities. And these are just the beginning, with Arete walking in a minefield until the next undisclosed liability is uncovered.

### V. Arete sues Mr. Thacker.

45. To hold Mr. Thacker accountable, Arete sued him individually in federal court in 2024 for fraudulent inducement, breach of contract, and indemnification. *See Arete v. Thacker*, No. 1:24-cv-02191 (N.D. Ill.). Besides wanting the Agreement rescinded, Arete wanted compensatory and punitive damages, along with its attorney's fees and costs. Ex. B, *Arete*, Compl.

10

46. Mr. Thacker of course pushed back, moving to dismiss for failure to state a claim. Ex. C, *Arete*, Def.'s MTD. His motion centered on one thing: How could the term "liabilities" as used in the Agreement include liabilities that were unknown at the time of the Agreement?

47. According to the District Court, "[t]he answer is found in the Contract's definition of 'Liabilities'—a definition that [Mr. Thacker's] lawyers either proposed or agreed to—and thus should not have come as a surprise to Mr. Thacker." Ex. D, *Arete*, Op. & Order at 6. And per that "agreed-to term," the definition of liabilities includes "'unknown' liabilities, 'unasserted' liabilities, 'contingent' liabilities, and so on." *Id.* Because Mr. Thacker's motion never came "to grips" with that "mutually agreed upon, contractual language," the court dismissed without prejudice to "allow both sides an opportunity to reexamine their positions in light of the language they chose" in the Agreement. *Id.* at 8.

48. Mr. Thacker got the message. In light of the contract language he chose, he filed bankruptcy to avoid legal liability for his false representations.

## COUNT I
## Fraudulent Inducement

49. All prior paragraphs are incorporated here

50. Mr. Thacker's misrepresentation is textbook fraudulent inducement, which requires four things:

    (1) "a false representation of material fact,"

    (2) "made with knowledge or belief of that representation's falsity,"

    (3) "made with the purpose of inducing another party to act or to refrain from acting," and

    (4) "the other party reasonably relies upon the representation to its detriment."

11

*Colagrossi v. Royal Bank of Scotland*, 57 N.E.3d 601, 611 (Ill. App. Ct. 2016); *See* SPA, p.64 (setting Illinois law as "governing law").

51. For the first element, Mr. Thacker misrepresented material facts by falsely claiming that he had disclosed all of CS Holdings' liabilities, as defined by the Agreement.

52. On the second, as CS Holdings' sole owner, and CS Securities' president, at the time of the Agreement's execution, the only inference is that Mr. Thacker knew that his misrepresentations about CS Holdings' liabilities were false.

53. Third, not disclosing those liabilities was intentional: Mr. Thacker wanted out of CS Holdings, because he knew that the liabilities he had hidden would soon cause the company's value to plummet. Having reaped the rewards of his own improper business practices, he hid all the liabilities those practices created so that Arete would reap only the fallout.

54. And that is exactly what happened. Since the Agreement, Arete has suffered severe damage, defending CS Holdings and itself against a wave of litigation caused by those same undisclosed liabilities. Besides the costs of defending those known complaints, still others lie dormant, decreasing CS Holdings' value overall.

55. Fourth, Arete reasonably relied on Mr. Thacker's misrepresentations about CS Holdings' liabilities and never would have bought the company had it known of them.

56. To put the fallout back in Mr. Thacker's hands, this Court should enter a judgment against him for at least $5 million, plus any other damages Arete has suffered, and should rescind the Agreement.

## COUNT II
## Nondischargeability: 11 U.S.C. § 523(a)(2)

57. All prior paragraphs are incorporated here.

58. Even in bankruptcy, Mr. Thacker cannot escape Arete's fraudulent-inducement claim against him and the debt it imposes. Rather, the Bankruptcy Code *stops* the discharge of a debt "for money" to "the extent obtained by" using "a statement in writing" that

> (1) is "materially false,"
>
> (2) concerns "the debtor's or an insider's financial condition,"
>
> (3) the creditor "reasonably relied" upon, and
>
> (4) the debtor "made or published with intent to deceive."

11 U.S.C. § 523(a)(2)(B).

59. Under that first prong, "reasonable inferences" can prove a statement's falsity. *In re Newman*, 7 F.3d 234, at *3 (6th Cir. 1993). That statement qualifies as "material" if it contains "an important or substantial untruth" like "[t]he omission, concealment, or understatement of a Debtor's material liabilities." *In re Frugh*, 133 B.R. 870, 874 (Bankr. N.D. Ohio 1991) (quotations omitted). The usual "guidepost" is "whether the creditor would have made the loan had it known of Debtor's true financial condition." *Id.* (collecting cases). Here, there is no question: Arete would never have entered the Agreement had it known of CS Securities' liabilities that has sunk its value and unleashed the current flood of litigation.

60. The second prong, that the statement concerns the financial condition of the debtor or an insider, speaks for itself. CS Securities, as a company wholly owned by Mr. Thacker, was undoubtedly an insider. And Arete's entire complaint here concerns Mr. Thacker's written misrepresentations in the Agreement about that insider's liabilities that affect its financial condition.

61.   Even if his misrepresentations do not concern CS Securities' "financial condition," they would necessarily then trigger § 523(a)(2)(B)'s companion provision—§ 523(a)(2)(A). By it, a debt is nondischargeable when obtained by "actual" fraud "other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). "Actual fraud" there just means "anything that counts as 'fraud' and is done with wrongful intent." *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 360 (2016). With Mr. Thacker's false statement (prong one above) and wrongful intent (prong four below), this "actual fraud" exception would still make his debt to Arete nondischargeable.

62.   The third prong under § 523(a)(2)(B)—reasonable reliance—"is not a 'rigorous requirement' but one that is 'directed at creditors acting in bad faith.'" *In re Oster*, 474 F. App'x 422, 427 (6th Cir. 2012) (quoting *Martin v. Bank of Germantown*, 761 F.2d 1163, 1166 (6th Cir.1985)). Plainly, no evidence exists that Arete is acting in bad faith here. Mr. Thacker's debt (Arete's claims against him) derives from a commercial (not personal) transaction, and no red flags appeared at the time of the Agreement based on positive market conditions covering it up.

63.   Again, even if only § 523(a)(2)(A)'s "actual fraud" exception applies, its reliance prong is even easier, only requiring "the lesser showing of justifiable reliance." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 724 n.6 (2018). For the same reasons, Arete justifiably relied on Mr. Thacker's misrepresentations about the company's liabilities.

64.   For the last prong (intent), the Sixth Circuit does "not require proof of the debtor's subjective intent." *Oster*, 474 F. App'x at 427 (citing *Martin*, 761 F.2d at 1167). Instead, "gross recklessness is sufficient," which "circumstantial evidence" and "inference" can prove. *Id.* (quotations omitted); *see In re Rembert*, 141 F.3d 277, 280 (6th Cir. 1998) (applying same standard in § 523(a)(2)(A) "actual fraud" context). Here, all signs point to Mr. Thacker's gross recklessness. Despite the Agreement's

14

representations, he decided to bury a mountain of liabilities, not disclosing them at any time before (or even after) the Agreement. To name a few, he hid the company's liability stemming from its dysfunctional compliance system, its automatic renewal of mismatched investments, its unmonitored House accounts, its unauthorized sale of trust products, its failure to report product-issuer misconduct, and its best-selling product's downfall. As president of CS Securities and sole owner of CS Holdings when each of these liabilities arose, Mr. Thacker had zero reason to hide these liabilities, but did so anyways to get a $5 million check from Arete. In walking away silently, the only inference is that he knew and intended that these liabilities would harm Arete's value, or at least acted with gross recklessness in overlooking them.

65. Bankruptcy cannot protect Mr. Thacker from the consequences of these misrepresentations. To hold him accountable, Arete seeks a judgment that its fraudulent-inducement claim against him is nondischargeable under 11 U.S.C. § 523(a)(2). Arete also moves for attorney's fees, costs under Bankruptcy Rule 7054, and any other relief this Court sees fit.

## COUNT III
### Nondischargeability: 11 U.S.C. § 523(a)(6)

66. All prior paragraphs are incorporated here.

67. The Bankruptcy Code provides still another way that makes Mr. Thacker's debt to Arete nondischargeable. A debtor cannot escape a debt resulting from the "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).

68. Arete qualifies as an "entity" here by being a "corporation," thereby triggering this discharge exception. *Id.* § 101(15) (defining "entity" to include "person"), (41) (defining "person" to include "corporation").

69. Nondischargeability under § 523(a)(6) has two parts—that the debtor willfully and maliciously injured the entity. *In re Berge*, 953 F.3d 907, 915 (6th Cir.

15

2020). For a debtor to act "willful[ly]" requires that the debtor "desired to cause the consequences of his act, or believed that the consequences are substantially certain to result from it," either of which "may be inferred." *Id.* (cleaned up). And a debtor acts "malicious[ly]" when the harm had no "justifie[d]" or "legally sufficient reason," but it "does not require a showing of specific intent to harm another." *Id.* at 915-16 (quotations omitted).

70. Mr. Thacker's deception here qualifies as both—willful and malicious.

71. First, he willfully injured Arete. In keeping a host of liabilities under wraps, the only inference is that he was substantially certain that the fallout was coming and that he wanted Arete to suffer the damage instead of himself. His plan worked. From all sides, Arete now defends against a flood of litigation from Mr. Thacker's victims. Had Arete seen the flood coming—had Mr. Thacker disclosed every liability as promised—Arete never would have entered the Agreement.

72. Second, he maliciously injured Arete. Again, Mr. Thacker hid liabilities stemming from compliance failures, mismatched investments, unmonitored accounts, unauthorized purchases, product-issuer misconduct, and the tanking of the company's best product. As CS Holdings' sole owner and CS Securities' president, no reason justifies lying about such numerous, material liabilities to a good-faith buyer like Arete. But he did.

73. Bankruptcy was never designed to reward this kind of bad faith. To ensure it does not, Arete seeks a judgment that its fraudulent-inducement claim against Mr. Thacker is nondischargeable under 11 U.S.C. § 523(a)(6). Arete also moves for attorney's fees, costs under Bankruptcy Rule 7054, and any other relief this Court sees fit.

16

## **PRAYER FOR RELIEF**

Arete moves this Court:

(1) To enter a judgment against Mr. Thacker in excess of $5 million, the exact number to be proven at trial, for fraudulent inducement;

(2) To enter a judgment rescinding the Agreement;

(3) To enter a judgment that Mr. Thacker's debt to Arete is nondischargeable under 11 U.S.C. § 523(a)(2), or alternatively under § 523(a)(6);

(4) To award Arete its attorney's fees and costs under Bankruptcy Rule 7054; and

(5) To provide any other relief that this Court sees fit.

RESPECTFULLY SUBMITTED:

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr. (021087)
Trent Meriwether (38577)
THOMPSON BURTON, PLLC
6100 Tower Circle, Suite 200
Franklin, TN 37067
(615) 465-6000
phillip@thompsonburton.com
tmeriwether@thompsonburton.com

*Counsel for Plaintiff Arete Wealth, Inc.*