EXHIBIT A

**EXECUTION VERSION**


## STOCK PURCHASE AGREEMENT


between


**JACK R. THACKER**


and


**OLD GROWTH CAPITAL, LLC**


dated as of


December 30, 2020

Case 2:25-bk-50237-RRM    Doc 154-1    Filed 08/07/25    Entered 08/07/25 11:28:34
Desc Exhibit Ex. A    Stock Purchase Agreement    Page 2 of 76

EXHIBIT A

## TABLE OF CONTENTS

**ARTICLE I DEFINITIONS** ..................................................................................................1

**ARTICLE II PURCHASE AND SALE** ...............................................................................13

    **Section 2.01**    **Purchase and Sale**................................................................................13

    **Section 2.02**    **Closing Spreadsheet; Payoff Letters; Expense Invoices.** .......................13

    **Section 2.03**    **Certain Transactions to be Effected at the Closing.**...............................13

    **Section 2.04**    **Purchase Price Adjustment.** ...................................................................14

    **Section 2.05**    **The Closing** .............................................................................................17

    **Section 2.06**    **Contingent Consideration.** .....................................................................18

    **Section 2.07**    **Withholding Tax.** ....................................................................................18

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER** .....................18

    **Section 3.01**    **Authority of Seller** .................................................................................18

    **Section 3.02**    **Organization, Authority and Qualification of the Companies**...............18

    **Section 3.03**    **Capitalization.**.........................................................................................18

    **Section 3.04**    **No Conflicts; Consents.**..........................................................................19

    **Section 3.05**    **Financial Statements; EBIT** ...................................................................20

    **Section 3.06**    **Undisclosed Liabilities; Holdings Bonds.**..............................................21

    **Section 3.07**    **Absence of Certain Changes, Events and Conditions** ...........................21

    **Section 3.08**    **Material Contracts.** .................................................................................23

    **Section 3.09**    **Real Property; Title to Assets**.................................................................25

    **Section 3.10**    **Condition and Sufficiency of Assets** ......................................................26

    **Section 3.11**    **Intellectual Property.** ..............................................................................26

    **Section 3.12**    **Insurance.**................................................................................................26

    **Section 3.13**    **Legal Proceedings; Governmental Orders.**.............................................27

    **Section 3.14**    **Compliance with Laws; Permits.** ...........................................................27

    **Section 3.15**    **Specific Matters Related to Securities.** ...................................................29

    **Section 3.16**    **Specific Matters related to Advisors.**......................................................31

    **Section 3.17**    **Employee Benefit Matters.** .....................................................................32

i

Case 2:25-bk-50237-RRM    Doc 154-1    Filed 08/07/25    Entered 08/07/25 11:28:34
Desc Exhibit Ex. A    Stock Purchase Agreement    Page 3 of 76

EXHIBIT A

Section 3.18     Employment Matters. ...................................................................................34

Section 3.19     Taxes ...............................................................................................................35

Section 3.20     Related Party Transactions. .........................................................................38

Section 3.21     Production of Registered Representatives ...................................................38

Section 3.22     Books and Records ........................................................................................38

Section 3.23     Brokers ...........................................................................................................38

Section 3.24     Full Disclosure ...............................................................................................38

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER** ...............39

Section 4.01     Organization and Authority of Buyer .........................................................39

Section 4.02     No Conflicts; Consents..................................................................................39

Section 4.03     Investment Purpose ......................................................................................39

Section 4.04     Brokers ...........................................................................................................39

**ARTICLE V COVENANTS**.........................................................................................40

Section 5.01     Conduct of Business Prior to the Closing....................................................40

Section 5.02     Access to Information. ...................................................................................42

Section 5.03     No Solicitation of Other Bids........................................................................42

Section 5.04     Notice of Certain Events. ..............................................................................43

Section 5.05     Resignations ...................................................................................................44

Section 5.06     Confidentiality ...............................................................................................44

Section 5.07     Non-competition; Non-solicitation................................................................44

Section 5.08     Governmental Approvals and Consents.......................................................46

Section 5.09     Books and Records. ........................................................................................47

Section 5.10     Closing Conditions ........................................................................................48

Section 5.11     Public Announcements ..................................................................................48

Section 5.12     Maintenance of Holdback Amount After Closing........................................48

Section 5.13     Advisory Client Consents. .............................................................................48

Section 5.14     Seller Release .................................................................................................49

Section 5.15     Supplemental Disclosures .............................................................................49

Section 5.16     Investment Repurchases ...............................................................................49

**ARTICLE VI TAX MATTERS** ...................................................................................................50

    **Section 6.01**    **Tax Covenants.** ..............................................................................50

    **Section 6.02**    **Termination of Existing Tax Sharing Agreements** ....................51

    **Section 6.03**    **Tax Indemnification** ......................................................................51

    **Section 6.04**    **Straddle Period** .............................................................................51

    **Section 6.05**    **Contests** .........................................................................................52

    **Section 6.06**    **Cooperation and Exchange of Information** ................................52

    **Section 6.07**    **Tax Treatment of Indemnification Payments** ...........................52

    **Section 6.08**    **Survival** .........................................................................................52

    **Section 6.09**    **Overlap** ..........................................................................................52

**ARTICLE VII CONDITIONS TO CLOSING** ........................................................................52

    **Section 7.01**    **Conditions to Obligations of Both Parties** ................................53

    **Section 7.02**    **Conditions to Obligations of Buyer** ...........................................53

    **Section 7.03**    **Conditions to Obligations of Seller** ...........................................55

**ARTICLE VIII INDEMNIFICATION** ....................................................................................55

    **Section 8.01**    **Indemnification.** ............................................................................55

    **Section 8.02**    **Defense of Claims.** ........................................................................56

    **Section 8.03**    **Limits on Indemnification.** ..........................................................58

    **Section 8.04**    **Exclusive Remedy** ........................................................................60

    **Section 8.05**    **Right to Setoff.** .............................................................................61

    **Section 8.06**    **Tax Treatment** ..............................................................................61

**ARTICLE IX TERMINATION** ...............................................................................................61

    **Section 9.01**    **Termination** ..................................................................................61

    **Section 9.02**    **Effect of Termination** ..................................................................62

**ARTICLE X MISCELLANEOUS** ...........................................................................................62

    **Section 10.01**    **Transaction Expenses.** .................................................................62

    **Section 10.02**    **Notices** ...........................................................................................62

    **Section 10.03**    **Interpretation.** ..............................................................................63

    **Section 10.04**    **Headings** ........................................................................................63

**Section 10.05**    **Severability** ................................................................................ 63

**Section 10.06**    **Entire Agreement** ......................................................................... 64

**Section 10.07**    **Successors and Assigns.** .............................................................. 64

**Section 10.08**    **No Third-party Beneficiaries.** ...................................................... 64

**Section 10.09**    **Amendment and Modification; Waiver** ......................................... 64

**Section 10.10**    **Governing Law; Submission to Jurisdiction; Waiver of Jury Trial** .................. 64

**Section 10.11**    **Specific Performance.** ................................................................... 65

**Section 10.12**    **Further Assurances** ...................................................................... 65

**Section 10.13**    **Counterparts.** ............................................................................... 65

## STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (this "**Agreement**"), dated as of December 30, 2020, is entered into between JACK R. THACKER, a resident of the State of Tennessee ("**Seller**") and OLD GROWTH CAPITAL, LLC, a Delaware limited liability company ("**Buyer**").

## RECITALS

WHEREAS, Seller owns all of the issued and outstanding shares of Class A common stock, no par value (the "**Shares**"), of CENTER STREET HOLDINGS, INC., a Tennessee corporation ("**Holdings**");

WHEREAS, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller, the Shares, subject to the terms and conditions set forth herein; and

WHEREAS, Holdings owns all of the issued and outstanding shares of capital stock of Center Street Securities, Inc., a Louisiana corporation ("**Securities**"), Center Street Advisors, Inc., a Tennessee corporation ("**Advisors**"), Center Street Insurance, Inc., a Tennessee corporation ("**Insurance**"), and Center Street Management Inc., a Tennessee corporation ("**Management**") (Securities, Advisors, Insurance, and Management being sometimes referred to herein as the "**Subsidiaries,**" and the Subsidiaries and Holdings being sometimes referred to herein as the "**Companies,**" and singly as a "**Company**").

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

The following terms have the meanings specified or referred to in this ARTICLE I:

"**Accounting Arbitrator**" has the meaning set forth in Section 2.04(c)(ii).

"**Acquisition Proposal**" has the meaning set forth in Section 5.03(a).

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration (including before FINRA), inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"**Actual Indebtedness**" has the meaning set forth in Section 2.04(b).

"**Actual Transaction Expenses**" has the meaning set forth in Section 2.04(b).

"**Actual Working Capital**" has the meaning set forth in Section 2.04(b).

"**Advisors**" has the meaning set forth in the Recitals.

"**Advisors PPP Loan**" means the loan issued by Regions Bank in the principal amount of $26,478 to Advisors pursuant to the Paycheck Protection Program under the CARES Act.

"**Advisory Agreement**" means an investment advisory agreement entered into by Advisors with an Advisory Client for the purpose of providing Investment Advisory Services to such Advisory Client.

"**Advisory Client**" means any client or customer of Advisors for Investment Advisory Services.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Balance Sheet**" has the meaning set forth in Section 3.05.

"**Balance Sheet Date**" has the meaning set forth in Section 3.05.

"**BD Compliance Policies**" has the meaning set forth in Section 3.15(f).

"**Benefit Plan**" has the meaning set forth in Section 3.17(a).

"**Bond Purchase Agreements**" means those certain Bond Purchase Agreements, dated on or about October 26, 2018, pursuant to which Holdings issued the Holdings Bonds.

"**Broker-Dealer**" means a "broker" or "dealer" (as defined in Sections 3(a)(4) and 3(a)(5) of the Securities Exchange Act).

"**Brokerage Client**" means any client or customer of a Broker-Dealer who receives Brokerage Services from such Broker-Dealer.

"**Brokerage Services**" means brokerage, broker-dealer transaction processing, dealer, distributorship, custodial, and related services, or any other services that involve acting as a Broker-Dealer, and performing ancillary services and activities related or incidental thereto.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in Chicago, Illinois are authorized or required by Law to be closed for business.

"**Buyer**" has the meaning set forth in the preamble.

"**Buyer Indemnified Parties**" has the meaning set forth in Section 8.01(a).

"**Buyer Indemnified Party**" has the meaning set forth in Section 8.01(a).

"**Buyer's Closing Statement**" has the meaning set forth in Section 2.04(b).

"**CARES Act**" means the Coronavirus Aid, Relief and Economic Security Act of 2020, as amended.

"**Carve-Out Product**" means any securities offering in which an investor may elect to establish a conservation easement for charitable purposes that was sold by the Companies or their Registered Representatives prior to the Closing Date.

"**Cash**" means cash and cash equivalents (marketable securities and short term investments and checks received by Holdings and the Subsidiaries prior to the Reference Time) calculated in accordance with GAAP; *provided* that "Cash" shall not include any (a) cash and cash equivalents held by Holdings and the Subsidiaries in trust on behalf of any Client, (b) the amount of cash to cover any issued but uncleared checks or outbound wires in transit, (c) any restricted cash (i.e. cash that is not freely usable, including, without limitation, cash pledged or offered by Holdings or the Subsidiaries to secure the obligations of Holdings or the Subsidiaries under any real property and equipment leases or any cash pledged, offered to or otherwise deposited by Holdings or the Subsidiaries with a contractual counter-party as a prepayment for or deposit with respect to the purchase or lease of equipment) or (d) the amount of cash reserved to pay for other in-progress pre-Closing liability payments as of the Reference Time.

"**Cause**" has the meaning set forth in the Employment Agreement.

"**Claim Dispute Notice**" has the meaning set forth in Section 8.02(b).

"**Client**" means any Advisory Client or Brokerage Client.

"**Client Consent Letter**" has the meaning set forth in Section 5.13(a).

"**Closing**" has the meaning set forth in Section 2.05.

"**Closing Consideration**" means an amount equal to the Total Consideration, *minus* the Contingent Consideration, and *minus* the Holdback Amount (which is represented by the principal amount of the Seller Note).

"**Closing Date**" has the meaning set forth in Section 2.05.

"**Closing Spreadsheet**" means the Closing Spreadsheet, which sets forth: (a) the amount and calculation (as applicable) of Total Consideration and Closing Consideration; (b) each item of Estimated Transaction Expenses, the Persons to whom such item of Estimated Transaction Expense is owed and the respective invoice amounts (as of the Reference Time) and wire transfer instructions (as applicable): (c) each item and outstanding balance (as of the Reference

3

Case 2:25-bk-50237-RRM    Doc 154-1    Filed 08/07/25    Entered 08/07/25 11:28:34
Desc Exhibit Ex. A    Stock Purchase Agreement    Page 9 of 76

EXHIBIT A

Time) of Estimated Indebtedness (other than the Indebtedness reflected by the Holdings Bonds), the Person to whom such item of Estimated Indebtedness (other than the Indebtedness subject to the Holdings Bonds) is owed and the respective wire transfer instructions (as applicable); and (d) wire transfer instructions for payment of the Closing Consideration to the Seller.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Common Stock**" has the meaning set forth in Section 3.03(a).

"**Company**" has the meaning set forth in the Recitals.

"**Companies**" has the meaning set forth in the Recitals.

"**Company Intellectual Property**" has the meaning set forth in Section 3.11(b).

"**Company IP Registrations**" has the meaning set forth in Section 3.11(b).

"**Company Regulatory Agreement**" has the meaning set forth in Section 3.14(d)(vi).

"**Contingent Consideration**" is the additional consideration listed on Exhibit B.

"**Contracts**" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

"**COVID-19**" means SARS-CoV-2 or COVID-19, and any evolutions thereof or related or associated epidemics, pandemic or disease outbreaks.

"**COVID-19 Measures**" means any quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shutdown, closure, sequester or any other Law, order, directive, guideline or recommendation by any Governmental Authority or public health agency in connection with or in response to COVID-19, including, but not limited to, the CARES Act and all guidelines and requirements, such as social distancing, cleaning, and other similar or related measures of the Occupational Safety and Health Administration ("**OSHA**") and the Centers for Disease Control and Prevention.

"**Direct Claim**" has the meaning set forth in Section 8.02(b).

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Seller concurrently with the execution and delivery of this Agreement.

"**Dispute Notice**" has the meaning set forth in Section 2.04(c)(ii).

"**Dollars or $**" means the lawful currency of the United States.

"**Downward Closing Working Capital Adjustment**" means (i) the amount, if any, by which Estimated Working Capital as of the Reference Time, as determined pursuant to Section

2.04(a), is less than the Target Working Capital, or (ii) zero dollars ($0), if the Estimated Working Capital is equal to or greater than the Target Working Capital.

"**Elected Restricted Period**" has the meaning set forth in Section 5.07(c).

"**Employment Agreement**" means the Employment Agreement, dated as of the Closing Date, between the Seller and Buyer substantially in the form of Exhibit A hereto.

"**Encumbrance**" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, pre-emptive right or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"**Equity Interests**" means (i) the shares of capital stock of a corporation, (ii) the general or limited partnership interests of any partnership, (iii) the membership or other ownership interest of any limited liability company, (iv) the equity securities or other ownership interests of any kind of any other legal entity, or (v) any security, instrument, binding obligation or option, call, warrant or other right (whether or not immediately exercisable) to acquire, convert into or otherwise receive any of the foregoing, in any such case, whether owned or held beneficially, of record or legally.

"**Estimated Closing Statement**" has the meaning set forth in Section 2.04(a).

"**Estimated Indebtedness**" has the meaning set forth in Section 2.04(a).

"**Estimated Transaction Expenses**" has the meaning set forth in Section 2.04(a).

"**Estimated Working Capital**" has the meaning set forth in Section 2.04(a).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**Final Indebtedness**" has the meaning set forth in Section 2.04(c)(i).

"**Final Total Consideration**" has the meaning set forth in Section 2.04(d)(i).

"**Final Transaction Expenses**" has the meaning set forth in Section 2.04(c)(i).

"**Final Working Capital**" has the meaning set forth in Section 2.04(c)(i).

"**Financial Statements**" has the meaning set forth in Section 3.05.

"**FINRA**" means the Financial Industry Regulatory Authority, Inc.

"**FINRA Application**" means an application pursuant to FINRA Rule 1017 seeking FINRA's approval of the change of ownership or control of a FINRA member Broker-Dealer.

5

"**First Anniversary Date**" has the meaning set forth in Section 2.06.

"**Fundamental Representations**" means the following Sections of this Agreement: 3.01 (Authority of Seller), 3.02 (Organization, Authority and Qualification of the Companies), 3.03 (Capitalization), 3.06 (Undisclosed Liabilities; Holdings Bonds), 3.19 (Taxes), 3.20 (Related Party Transactions), 3.21 (Production of Registered Representatives), 3.23 (Brokers), 4.01 (Organization and Authority of Buyer) and 4.04 (Brokers).

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Gross Purchase Price**" means $5,000,000.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, any Self-Regulatory Organization or other self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award, including any consent decree, settlement agreement or similar written agreement, entered or imposed by or with any Governmental Authority.

"**Historical Financial Statements**" has the meaning set forth in Section 3.05.

"**Holdback Amount**" means $1,000,000.

"**Holdings**" has the meaning set forth in the Recitals.

"**Holdings Bonds**" means $950,000 aggregate outstanding amount of bonds issued by Holdings, with an interest rate of 8% per annum and maturing on or about December 31, 2023, which were issued pursuant to the Bond Purchase Agreements.

"**Indebtedness**" means, with respect to any Person at any date, without duplication: (i) all obligations of such Person for borrowed money (excluding any trade payables less than 60 days past due, accounts payable and other current liabilities, *provided*, in each case, such payables and liabilities are taken into consideration in the calculation of Working Capital); (ii) all obligations evidenced by performance, surety and similar bonds, debentures, notes (convertible or otherwise) or similar instruments (including purchase money obligations); (iii) all obligations in respect of letters of credit banker's acceptance or similar credit transaction securing obligations of a type described in clauses (i), (ii), or (iii), but only to the extent of the obligation secured or to the extent actually then drawn; (iv) capitalized lease obligations or obligations that are required to be capitalized pursuant to GAAP; (v) all liabilities of Holdings and the Subsidiaries for the reimbursement of any obligor in respect to any off-balance sheet financing; (vi) liabilities for the deferred purchase price of property or services including, without limitation, the maximum potential amount payable with respect to earn-outs, purchase price

adjustments or other payments related to acquisitions (other than trade payables and other current liabilities payable to suppliers and similar accrued liabilities incurred in the ordinary course of business and consistent with past practice and reflected in Working Capital); (vii) liabilities under any existing interest rate, commodity or other swap, hedge or financial derivative agreement entered into by Holdings or any of the Subsidiaries prior to Closing; (viii) conditional sale obligations or vendor financing; (ix) any unfunded pensions, employee benefit obligations or similar arrangements that are due and owing as of the Closing Date, to the extent not accrued for and included in the calculation of Working Capital; (x) all obligations under any severance plan or arrangement (including any severance related to acquisitions) or deferred compensation plan or arrangement; (xi) to the extent not accrued for and included in the calculation of Working Capital, any accrued bonuses, profit sharing, retirement plan contributions, deferred compensation, unpaid bonuses or paid time off for the current or any prior fiscal year; (xii) any equipment leases or similar arrangements in existence as of the Closing; (xiii) fees payable to any Affiliates; (xiv) any deferred revenue or advances to any vendors or suppliers or other prepaid obligations; (xx) the amount of any unpaid payroll Taxes deferred by the Companies as permitted by the CARES Act; and (xxi) any guaranty given in respect of the foregoing and with all accrued interest thereon and any applicable prepayment, redemption, breakage, make-whole or other premiums, fees or penalties of any of the foregoing. For the avoidance of doubt, Indebtedness shall not include any Taxes (including but not limited to Transaction Payroll Taxes).

"**Indemnified Party**" has the meaning set forth in Section 8.01(b).

"**Indemnified Parties**" has the meaning set forth in Section 8.01(b).

"**Indemnifying Party**" has the meaning set forth in Section 8.02(a)(i).

"**Indemnity Cap**" means an amount equal to twenty percent (20%) of the Final Total Consideration.

"**Indemnity Threshold**" means $50,000 in the aggregate.

"**Insurance**" has the meaning set forth in the Recitals.

"**Insurance Policies**" has the meaning set forth in Section 3.12.

"**Intellectual Property**" has the meaning set forth in Section 3.11(a).

"**Interim Balance Sheet**" has the meaning set forth in Section 3.05.

"**Interim Financial Statements**" has the meaning set forth in Section 3.05.

"**Investment Advisers Act**" means the Investment Advisers Act of 1940, as amended.

"**Investment Advisory Services**" means investment management or investment advisory services or any other services that involve acting as an "investment adviser" within the meaning

of the Investment Advisers Act, and performing ancillary services and activities related or incidental thereto.

**"Knowledge of Seller" or "Seller's Knowledge"** or any other similar knowledge qualification, means the actual or constructive knowledge of Seller or any director or officer of any of the Companies, after due inquiry.

**"Law"** means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

**"Leases"** has the meaning set forth in Section 3.09(a).

**"Legacy Arbitrations"** means all FINRA or other arbitrations, or any ancillary Actions relating thereto (including all related counterclaims, cross claims, appeals and other similar Actions), whether threatened, pending or pursued at some future date (including after Closing), brought by any Person in connection with, in whole or in part, such Person's purchase or ownership of any investment products sold by Securities prior to the Closing Date, including those described in Section 3.13(a) of the Disclosure Schedules.

**"Legacy Arbitration Losses"** means all Losses, actually incurred or sustained by the Buyer Indemnified Parties, arising out of or relating to, in whole or in part, the Legacy Arbitrations.

**"Leiter"** means Matt Leiter.

**"Leiter Closing Fee"** means $225,000.

**"Liabilities"** (or **"Liability"**) means any liability, commitment or obligation (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due).

**"Losses"** means losses, damages, Liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder, the cost of pursuing any insurance providers, expenses of investigation, costs of defense and costs of expert witnesses; *provided, however,* that **"Losses"** shall not include punitive damages, except in the case of fraud or to the extent actually awarded to a Governmental Authority or other third party.

**"Management"** has the meaning set forth in the Recitals.

**"Material Adverse Effect"** means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, condition (financial or otherwise) or assets of the Companies, or (b) the ability of Seller to consummate the transactions contemplated hereby on a timely basis.

**"Material Contract"** has the meaning set forth in Section 3.08(a).

8

"**Pandemic Response Law**" means the CARES Act, the Families First Coronavirus Response Act, Pub. L. No. 116-127 (116th Cong.) (Mar. 18, 2020), and any other similar, future, or additional federal, state, local, or non-U.S. Law, or administrative guidance that addresses or is intended to benefit taxpayers in response to the COVID-19 pandemic and associated economic downturn.

"**Payoff Letters**" has the meaning set forth in Section 2.02(b).

"**Permits**" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities, including those necessary specifically for the businesses of Securities, Advisors and Insurance.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Post-Closing Litigation Matters**" means any Action involving the Companies (other than the Legacy Arbitrations), threatened or asserted after the Closing Date and arising from or relating to facts, circumstances, matters or events occurring prior to the Closing Date, whether known or unknown as of the Closing Date.

"**Post-Closing Litigation Losses**" means all Losses actually incurred or sustained by any Buyer Indemnified Parties arising out of or relating to the Post-Closing Litigation Matters.

"**Post-Closing Tax Period**" means any taxable period beginning after the Closing Date and, with respect to any Straddle Period, the portion of such taxable period beginning after the Closing Date.

"**PPP Loans**" means the Advisors PPP Loan and the Securities PPP Loan.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and, with respect to any Straddle Period, the portion of such taxable period ending on and including the Closing Date.

"**Pre-Closing Taxes**" means Taxes of any of the Companies for any Pre-Closing Tax Period.

"**Real Property**" means the real property owned, leased or subleased by any of the Companies, together with all buildings, structures and facilities located thereon.

"**Reference Time**" means 12:01 a.m. Central Time, on the Closing Date; *provided* that the Reference Time for purposes of calculating Tax assets and Tax liabilities included in Estimated Working Capital and Final Working Capital shall be 11:59 p.m. Central Time on the Closing Date.

"**Registered Representative**" means each Person registered with FINRA as a general securities representative of a Broker-Dealer and/or registered with the IARD as an investment advisory representative.

"**Regulatory Agencies**" has the meaning set forth in Section 3.14(d)(iii).

"**Regulatory Documents**" means, with respect to a Person, all filings (including the current Form ADV of Advisors and the current Form BD (of Securities), together with any amendments required to be made with respect thereto, filed, or required to be filed, by such Person with any applicable Governmental Authority pursuant to applicable Law, including the Securities Laws or the applicable rules and regulations of any Governmental Authority.

"**Related Party**" has the meaning set forth in Section 3.20(a).

"**Released Claims**" has the meaning set forth in Section 5.14(b).

"**Released Parties**" has the meaning set forth in Section 5.14(a).

"**Releasing Party**" has the meaning set forth in Section 5.14.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Restricted Business**" means any Broker-Dealer business, financial advisory business or insurance agency business operating in the Territory; provided, that this definition does not include Seller operating as a broker-dealer, registered investment advisor and/or insurance agent in a personal practice setting.

"**Restricted Period**" means the three (3) year period beginning on the Closing Date.

"**Restricted Solicitation Activities**" has the meaning set forth in Section 5.07(a).

"**SEC**" means the Securities and Exchange Commission.

"**Securities**" has the meaning set forth in the Recitals.

"**Securities Act**" has the meaning set forth in Section 4.03.

"**Securities Exchange Act**" means Securities Exchange Act of 1934, as amended.

"**Securities Laws**" means the Securities Act, the Securities Exchange Act, the Investment Company Act, the Investment Advisers Act, state "blue sky", securities and investment advisory laws, all applicable foreign securities laws and, in each case, the rules of each applicable Self-Regulatory Organization.

"**Securities PPP Loan**" means the loan issued by Regions Bank in the principal amount of $227,500 to Securities pursuant to the Paycheck Protection Program under the CARES Act.

"**Self-Regulatory Organization**" means a self-regulatory organization, including any "self-regulatory organization" as such term is defined in Section 3(a)(26) of the Securities Exchange Act, any "self-regulatory organization" as such term is defined in CFTC Rule 1.3, and any other U.S. or non-U.S. securities exchange, futures exchange, futures association, commodities exchange, clearinghouse or clearing organization.

"**Seller**" has the meaning set forth in the preamble.

"**Seller Indemnified Parties**" has the meaning set forth in Section 8.01(b).

"**Seller Note**" means that certain promissory note of Buyer in the principal amount of the Holdback Amount, in substantially the form attached hereto as Exhibit C.

"**Shared Transaction Expenses**" means the expenses of the parties' legal advisors related exclusively to the transactions contemplated hereby, any expenses of the parties' accountants related exclusively to the transactions contemplated hereby and the Leiter Closing Fee.

"**Shares**" has the meaning set forth in the Recitals.

"**Subsidiaries**" has the meaning set forth in the Recitals.

"**Subsidiary Shares**" has the meaning set forth in Section 3.03(d).

"**Straddle Period**" has the meaning set forth in Section 6.04.

"**Target Working Capital**" means $2,500,000.

"**Tax Claim**" has the meaning set forth in Section 6.05.

"**Tax Return**" means any return, declaration, report, claim for refund, information return, election or statement or other document relating to Taxes or the reporting of foreign assets or ownership, including any schedule or attachment thereto, and including any amendment thereof.

"**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, escheat, abandoned and unclaimed property, alternative or add-on minimum, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Territory**" means the United States.

"**Third Party Claim**" has the meaning set forth in Section 8.02(a)(i).

11

Case 2:25-bk-50237-RRM    Doc 154-1    Filed 08/07/25    Entered 08/07/25 11:28:34
Desc Exhibit Ex. A    Stock Purchase Agreement    Page 17 of 76

EXHIBIT A

"**Total Consideration**" means an amount equal to (a) Gross Purchase Price, *minus* (b) the amount of the Estimated Indebtedness (other than the Holdings Bonds), *minus* (c) the amount of the Estimated Transaction Expenses, *minus* (d) 30% of the Shared Transaction Expenses and *plus* or *minus*, as applicable, (e) the Upward Closing Working Capital Adjustment or the Downward Closing Working Capital Adjustment.

"**Transaction Documents**" means this Agreement, the Employment Agreement and the Seller Note.

"**Transaction Expenses**" means, without duplication, the aggregate fees, costs and expenses incurred by or on behalf of the Seller, Holdings and their Subsidiaries and their representatives, on the one hand, or Buyer and its representatives, on the other hand, in connection with the negotiation and execution of this Agreement, any ancillary agreement hereto or the consummation of the transactions contemplated by this Agreement and to the extent unpaid as of the Reference Time, including without limitation (a) all fees, costs and expenses of any legal counsel, accounting advisor, Tax advisor, consultant or other third party advisor for services rendered in relation to the transactions contemplated by this Agreement, (b) any change of control, phantom equity or transaction bonus payments payable to any current or former employee, officer, director or independent contractor of Holdings or the Subsidiaries in connection with the consummation of the transactions contemplated by this Agreement and that are unpaid as of the Reference Time including any employment or payroll Taxes (including with respect to profit sharing accruals or deferred compensation) imposed on Holdings or any of the Subsidiaries as a result of payments made in connection with the transactions contemplated by this Agreement and (c) Transaction Payroll Taxes.  For the avoidance of doubt (solely so as to avoid double counting), and notwithstanding anything to the contrary contained herein, the term "**Transaction Expenses**" shall not include: (i) amounts to the extent included in Working Capital, (ii) amounts to the extent included in Indebtedness or (iii) if the Closing occurs, the Shared Transaction Expenses.

"**Transaction Payroll Taxes**" means the employer portion of payroll or employment Taxes incurred by Holdings or the Subsidiaries on or prior to the Closing Date in connection with profit sharing accruals, deferred compensation, Transaction Expenses and other compensatory payments made in connection with the transactions contemplated by this Agreement.

"**Upward Closing Working Capital Adjustment**" means, (i) the amount, if any, by which Estimated Working Capital as of the Reference Time, as determined pursuant to Section 2.04(a), exceeds Target Working Capital or (ii) zero dollars ($0), if the Estimated Working Capital is equal to or less than the Target Working Capital.

"**Working Capital**" means an amount equal to the current assets (including Cash) of Holdings and the Subsidiaries minus the current liabilities of the Company and the Subsidiaries. For the avoidance of doubt, Working Capital shall be calculated on a consolidated basis in accordance with GAAP, consistently applied, and in accordance with the methodology set forth

on Schedule A and, for clarity Indebtedness and Transaction Expenses shall be excluded from the calculation of Working Capital.

## ARTICLE II
## PURCHASE AND SALE

**Section 2.01    Purchase and Sale.** Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell to Buyer, and Buyer shall purchase from Seller, the Shares, free and clear of all Encumbrances, in consideration for (a) payment by Buyer at the Closing of the Closing Consideration, (b) the issuance by Buyer to Seller of the Seller Note and (c) the opportunity for Seller to earn the Contingent Consideration.

**Section 2.02    Closing Spreadsheet; Payoff Letters; Expense Invoices**.

(a)    No later than three (3) Business Days prior to the Closing, Seller shall deliver the Closing Spreadsheet to Buyer.

(b)    No later than three (3) Business Days prior to the Closing, Seller shall deliver to Buyer all appropriate payoff letters ("**Payoff Letters**") from lenders to the Companies (other than in relation to the Holdings Bonds), in each case, in form and substance reasonably satisfactory to Buyer, evidencing the amount of related Estimated Indebtedness as of the Closing Date and providing that, if such aggregate amount so identified is paid to such lender on the Closing Date, such Estimated Indebtedness shall be repaid in full, that all Encumbrances securing the Indebtedness of the Companies or affecting any property of the Companies existing prior to the Closing will be released, all related UCC-3 termination statements shall be filed and shall make arrangements reasonably satisfactory to Buyer for such holders to deliver releases and canceled notes at the Closing.

(c)    Seller shall deliver an invoice from each advisor or other service provider to the Companies (other than any employee, director or officer of the Companies) dated no more than three (3) Business Days prior to the Closing Date, with respect to all Estimated Transaction Expenses (as defined below) estimated to be due and payable to such advisor or other service provider, as the case may be, as of the Closing Date (each, an "**Invoice**").

**Section 2.03    Certain Transactions to be Effected at the Closing.**

(a)    At the Closing, Buyer shall:

(i)    deliver to Seller the payment by wire transfer of immediately available funds to the account or accounts designated by the Seller, of an amount of cash equal to the Closing Consideration;

(ii)    deliver the Transaction Documents and all other agreements, documents, instruments or certificates required to be delivered by Buyer at or prior to the Closing pursuant to Section 7.03 of this Agreement;

(iii)    deliver the Seller Note to Seller, duly executed by Buyer;

(iv)    repay, or cause to be repaid, on behalf of the Companies, all amounts necessary to discharge fully the then outstanding balance of the Estimated Indebtedness (as defined below) of the Companies, other than the Holdings Bonds, by wire transfer of immediately available funds as directed by the holders of the Estimated Indebtedness (and as set forth on the Closing Spreadsheet); and

(v)    repay, or cause to be repaid, the Estimated Transaction Expenses and the Shared Transaction Expenses by wire transfer of immediately available funds set forth in the applicable Invoice by the holders of the Estimated Transaction Expenses or Shared Transaction Expenses (and as set forth on the Closing Spreadsheet).

(b)    At the Closing, Seller shall deliver to Buyer:

(i)    stock certificates evidencing the Shares, free and clear of all Encumbrances, duly endorsed in blank or accompanied by stock powers or other instruments of transfer duly executed in blank, with all required stock transfer tax stamps affixed thereto; and

(ii)    the Transaction Documents and all other agreements, documents, instruments or certificates required to be delivered by Seller at or prior to the Closing pursuant to Section 7.02 of this Agreement.

**Section 2.04    Purchase Price Adjustment.**

(a)    Determination of Closing Adjustment.  No later than three (3) Business Days prior to the Closing, Seller shall provide Buyer with a statement (the "**Estimated Closing Statement**"), setting forth his good faith estimate of Working Capital as of the Reference Time ("**Estimated Working Capital**"), his good faith estimate of the aggregate amount of Indebtedness of the Companies (other than the Holdings Bonds) as of the Reference Time ("**Estimated Indebtedness**"), his good faith estimate of the aggregate amount of unpaid Transaction Expenses of the Companies as of the Reference Time ("**Estimated Transaction Expenses**"), and the resulting calculation of the Total Consideration and the Downward Closing Working Capital Adjustment or Upward Closing Working Capital Adjustment, if any, together with reasonable supporting detail and access to work papers used in preparing the Estimated Closing Statement. Notwithstanding the foregoing, in no event will any of Buyer's rights be considered waived, impaired or otherwise limited as a result of Buyer not making an objection prior to the Closing or its making an objection that is not fully implemented in a revised Estimated Closing Statement.

(b)    Determination of Post-Closing Adjustment.  No later than ninety (90) days after the Closing Date, Buyer shall deliver to Seller a statement ("**Buyer's Closing Statement**") setting forth its good faith calculation of the actual Working Capital as of

14

Case 2:25-bk-50237-RRM    Doc 154-1    Filed 08/07/25    Entered 08/07/25 11:28:34
Desc Exhibit Ex. A    Stock Purchase Agreement    Page 20 of 76

EXHIBIT A

the Reference Time ("**Actual Working Capital**"), a calculation of the actual Transaction Expenses of the Companies as of the Reference Time ("**Actual Transaction Expenses**"), and a calculation of the actual Indebtedness of the Companies (other than the Holdings Bonds) as of the Reference Time ("**Actual Indebtedness**") and the resulting calculations of the Total Consideration and the Downward Closing Working Capital Adjustment or Upward Closing Working Capital Adjustment, if any.

(c)    Disputed Final Adjustment.

(i)    No later than sixty (60) days following the delivery of Buyer's Closing Statement, Seller shall notify Buyer in writing whether he accepts or disputes the accuracy of the calculation of Actual Working Capital, Actual Transaction Expenses and/or Actual Indebtedness.  During such sixty (60) day period, Seller and his advisors (including, without limitation, his independent accounting firm) shall be provided with such access to the financial books and records (including working papers for the calculations) and personnel and advisors of the Companies as he may reasonably request to enable him to evaluate the calculations of Actual Working Capital, Actual Transaction Expenses and Actual Indebtedness prepared by Buyer.  If Seller accepts the calculation of Actual Working Capital, Actual Transaction Expenses, and Actual Indebtedness determined pursuant to Section 2.04(b), or if Seller fails within such sixty (60) day period to notify Buyer of any dispute with respect thereto, the calculation of Actual Working Capital determined pursuant to Section 2.04(b) shall be the "**Final Working Capital**," the calculation of the Actual Indebtedness pursuant to Section 2.04(b) shall be the "**Final Indebtedness**," the calculation of Actual Transaction Expenses determined pursuant to Section 2.04(b) shall be the "**Final Transaction Expenses**", which, in each case, shall be deemed final and conclusive and binding upon the parties hereto in all respects.

(ii)    If Seller disputes the accuracy of the calculation of Actual Working Capital, Actual Transaction Expenses and/or Actual Indebtedness, Seller shall provide written notice to Buyer no later than sixty (60) days following the delivery by Buyer to Seller of the calculation of Actual Working Capital, Actual Indebtedness and Actual Transaction Expenses (the "**Dispute Notice**"), setting forth in reasonable detail those items that Seller disputes.  During the thirty (30) day period following delivery of a Dispute Notice, Buyer and Seller shall negotiate in good faith to resolve their disagreements over the disputed items. During such thirty (30) day period and until the final determination of Final Working Capital, Final Indebtedness and/or Final Transaction Expenses in accordance with this Section 2.04(c)(ii), Seller and his advisors (including, without limitation, his independent accounting firm) shall be provided with such access to the financial books and records (including work papers for the calculations) and personnel and advisors of the Companies and Buyer as they may reasonably request to enable him to address all matters set forth in any Dispute Notice.  If the parties hereto resolve their differences over the disputed items in accordance with the foregoing procedure, "**Final Working Capital**," "**Final Indebtedness**," and "**Final Transaction Expenses**" shall be the amounts agreed

15

upon by them. If the parties hereto fail to resolve their differences over the disputed items within such thirty (30) day period, then Buyer and Seller shall jointly engage a mutually agreed upon certified public accounting firm that has not performed accounting, tax or auditing services for either Buyer or the Companies or any of their respective Affiliates during the three (3) years preceding the Closing Date (the "**Accounting Arbitrator**") to make a binding determination as to the disputed items in accordance with this Agreement and the calculations and principles set forth on Schedule A attached hereto (as applicable).

(iii)    The Accounting Arbitrator will under the terms of its engagement have no more than thirty (30) days from the date of referral and will be instructed to use its commercially reasonable efforts to deliver its decision to Buyer and Seller no more than ten (10) Business Days from the final submission of information and testimony by Buyer and Seller within which to render its written decision with respect to the disputed items (and only with respect to any unresolved disputed items set forth in the Dispute Notice) and the final calculation of Actual Working Capital, Actual Transaction Expenses and/or Actual Indebtedness shall be based solely on the resolution of such disputed items. The Accounting Arbitrator shall review such submissions and base its determination solely on such submissions and shall act as an arbitrator and not as an expert. In resolving any disputed item, the Accounting Arbitrator may not assign a value to any item greater than the greatest value for such item claimed by either Buyer or Seller or less than the least value for such item claimed by either Buyer or Seller. The decision of the Accounting Arbitrator shall be deemed final and binding upon Buyer and Seller and enforceable by any court of competent jurisdiction and the Accounting Arbitrator's final calculation of the Accounting Arbitrator's final calculation of Actual Working Capital shall be deemed the "**Final Working Capital**," the Accounting Arbitrator's final calculation of Actual Indebtedness shall be deemed the "**Final Indebtedness**" and the Accounting Arbitrator's final calculation of Actual Transaction Expenses shall be deemed the "**Final Transaction Expenses**" and not subject to appeal, absent manifest error or fraud. Each of Buyer and Seller agrees not to engage the Accounting Arbitrator for any other services until final resolution of the Dispute Notice. Each of Buyer and Seller shall, and shall cause their representatives to, cooperate and assist in the Accounting Arbitrator's review, including making available books, records and personnel. The fees and expenses of the Accounting Arbitrator shall be paid by Buyer, on the one hand, and Seller, on the other, based upon the percentage that the portion of the contested amount not awarded to each such party bears to the amount actually contested by such party, as determined by the Accounting Arbitrator.

(d)    Payment Following Calculation of Final Working Capital.

(i)    Following the determination of the Final Working Capital, Final Indebtedness and Final Transaction Expenses, the Total Consideration shall be recalculated substituting the Final Working Capital for the Estimated Working

16

Case 2:25-bk-50237-RRM    Doc 154-1    Filed 08/07/25    Entered 08/07/25 11:28:34
Desc Exhibit Ex. A    Stock Purchase Agreement    Page 22 of 76

EXHIBIT A

Capital in the definitions of Upward Closing Working Capital Adjustment and Downward Working Capital Adjustment, as applicable, substituting the Final Indebtedness for the Estimated Indebtedness in the definition of Total Consideration and substituting the Final Transaction Expenses for the Estimated Transaction Expenses in the definition of Total Consideration (the resulting amount of such recalculation, the "**Final Total Consideration**") and if (A) the Final Total Consideration is greater than the Total Consideration on the Closing Date, then such difference shall be paid by Buyer to Seller and (B) the Total Consideration on the Closing Date is greater than the Final Total Consideration, then Seller shall pay such difference to Buyer.

(ii)    All payments pursuant to this Section 2.04(d) shall be made in cash in immediately available funds by wire transfer to the accounts designated in advance by Buyer or Seller, as applicable, and shall be made on or prior to the fifth (5th) Business Day after the first to occur of the following:  (A) the date that is thirty (30) days following Buyer's delivery of the calculation of the Actual Working Capital, Actual Transaction Expenses and Actual Indebtedness pursuant to Section 2.04(b) if Seller does not timely dispute such amounts pursuant to Section 2.04(c)(ii) or if Seller accepts the calculation of Actual Working Capital, Actual Transaction Expenses and Actual Indebtedness within thirty (30) days pursuant to Section 2.04(c)(i); (B) the date of Seller's and Buyer's mutual determination of Final Working Capital, Final Transaction Expenses and Final Indebtedness in the event Seller timely disputes any of such amounts pursuant to Section 2.04(c)(ii) and Seller's and Buyer's differences are resolved without the engagement of an Accounting Arbitrator pursuant to Section 2.04(c)(ii); or (C) the date of the Accounting Arbitrator's determination of Final Working Capital, Final Transaction Expenses and/or Final Indebtedness pursuant to Section 2.04(c)(ii) in the event Seller timely disputes any of such amounts pursuant to Section 2.04(c)(ii) and Seller and Buyer are unable to resolve their differences pursuant Section 2.04(c)(ii).  Notwithstanding anything to the contrary in this paragraph, if Seller owes a payment to Buyer pursuant to this Section 2.04, Seller may direct Buyer in writing to offset such payment amount against the principal balance of the Seller Note, to the extent such principal amount remains outstanding.

(iii)    Any payments made pursuant to this Section 2.04 shall be treated as an adjustment to the Total Consideration by Buyer and Seller for Tax purposes, unless otherwise required by Law.

**Section 2.05    The Closing.**  Subject to the terms and conditions of this Agreement, the purchase and sale of the Shares contemplated hereby shall take place at a closing (the "**Closing**") to be held at 10:00 a.m., Chicago time, no later than two Business Days after the last of the conditions to Closing set forth in ARTICLE VII have been satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), at the offices of Croke Fairchild Morgan & Beres LLC, 180 N. LaSalle St., Suite 2750, Chicago, IL 60601, or remotely by exchange of documents and signatures (or their electronic counterparts), or at such other place as Seller and Buyer may mutually agree upon in writing (the day on which the Closing takes place being the "**Closing Date**").

Case 2:25-bk-50237-RRM    Doc 154-1    Filed 08/07/25    Entered 08/07/25 11:28:34
Desc Exhibit Ex. A    Stock Purchase Agreement    Page 23 of 76

EXHIBIT A

**Section 2.06    Contingent Consideration.** Within five (5) Business Days of the date which is the one (1) year anniversary of the Closing Date (the "**First Anniversary Date**"), Buyer shall pay Seller the Contingent Consideration by wire transfer of immediately available funds to an account specified by Seller.

**Section 2.07    Withholding Tax.** Buyer shall be entitled to deduct and withhold from the Closing Consideration or the Contingent Consideration all Taxes that Buyer may be required to deduct and withhold under any provision of Tax Law.  All such withheld amounts shall be treated as delivered to Seller hereunder.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Seller represents and warrants to Buyer that the statements contained in this ARTICLE III are true and correct as of the date hereof.

**Section 3.01    Authority of Seller.** Seller has full power and authority to enter into this Agreement and the other Transaction Documents to which Seller is a party, to carry out his obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  This Agreement has been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms, except as may be limited by bankruptcy, insolvency, moratorium, reorganization or similar laws affecting the rights of creditors generally and the availability of equitable remedies.  When each other Transaction Document to which Seller is or will be a party has been duly executed and delivered by Seller (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Seller enforceable against him in accordance with its terms, except as the enforceability hereof or thereof may be limited by any applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditor's rights generally and as limited by the availability of specific performance and other equitable remedies or applicable equitable principles (whether considered in a proceeding at law or in equity).

**Section 3.02    Organization, Authority and Qualification of the Companies.** Each of the Companies is a corporation duly organized, validly existing and in good standing under the Laws of the state of its incorporation and has full corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as it has been and is currently conducted. Section 3.02 of the Disclosure Schedules sets forth each jurisdiction in which each of the Companies is licensed or qualified to do business, and each of the Companies is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business as currently conducted makes such licensing or qualification necessary.  All corporate actions taken by the Companies in connection with this Agreement and the other Transaction Documents will be duly authorized at or prior to the Closing.

**Section 3.03    Capitalization.**

18

(a)     The authorized capital stock of Holdings consists of 1,549,000 shares of common stock, no par value ("**Common Stock**"), of which the only issued and outstanding shares of capital stock are the 51,000 shares of Class A Common Stock constituting the Shares.  All of the Shares have been duly authorized, are validly issued, fully paid and non-assessable, and are owned of record and beneficially by Seller, free and clear of all Encumbrances.  Holdings does not hold any of its stock as treasury stock.  Upon consummation of the transactions contemplated by this Agreement, Buyer shall own all of the Shares, free and clear of all Encumbrances.

(b)     All of the Shares were issued in compliance with all applicable Laws.  None of the Shares were issued in violation of any agreement, arrangement or commitment to which Seller or Holdings is a party or is subject to or in violation of any preemptive or similar rights of any Person.

(c)     There are no outstanding or authorized options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to the capital stock of Holdings or obligating Seller or Holdings to issue or sell any shares of capital stock of, or any other interest in, Holdings.  Holdings does not have outstanding or authorized any stock appreciation, phantom stock, profit participation or similar rights.  There are no voting trusts, stockholder agreements, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the Shares.

(d)     Holdings owns all of the issued and outstanding shares of capital stock of each of the Subsidiaries (the "**Subsidiary Shares**"), all of which have been duly authorized, are validly issued, fully paid and non-assessable, and are owned of record and beneficially by Holdings, free and clear of all Encumbrances.  All of the Subsidiary Shares were issued in compliance with all applicable Laws.  None of the Subsidiary Shares were issued in violation of any agreement, arrangement or commitment to which any of the Companies is a party or is subject to or in violation of any preemptive or similar rights of any Person.  There are no outstanding or authorized options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to the capital stock of any of the Subsidiaries or obligating Holdings or any of the Subsidiaries to issue or sell any shares of capital stock of, or any other interest in, any of the Subsidiaries.  The Subsidiaries do not have outstanding or authorized any stock appreciation, phantom stock, profit participation or similar rights.  There are no voting trusts, stockholder agreements, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the Subsidiary Shares.  None of the Subsidiaries owns any equity interests in any other Person or holds any of its stock as treasury stock.

(e)     Except for the Subsidiaries, Holdings does not own, or have any interest in any shares or capital stock or have an ownership interest in any other Person.

**Section 3.04   No Conflicts; Consents**.  The execution, delivery and performance by Seller of this Agreement and the other Transaction Documents to which he is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a)

conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, by-laws or other organizational documents of any of the Companies; (b) assuming the consents, approvals and filings set forth in <u>Section 3.04</u> of the Disclosure Schedules are duly obtained and/or made, conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Seller or any of the Companies; (c) except as set forth in <u>Section 3.04</u> of the Disclosure Schedules and except for the FINRA Application, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract to which Seller or any of the Companies is a party or by which Seller or any of the Companies is bound or to which any of their respective properties and assets are subject (including any Material Contract) or any Permit affecting the properties, assets or business of any of the Companies; or (d) result in the creation or imposition of any Encumbrance on any properties or assets of the Companies. Except as set forth in <u>Section 3.04</u> of the Disclosure Schedules, no consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Seller or the Companies in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

**Section 3.05   Financial Statements; EBIT.**   Complete and correct copies of (a) the unaudited consolidated financial statements of Holdings and its Subsidiaries consisting of the consolidated balance sheet of Holdings and its Subsidiaries as at December 31 in each of the years 2017, 2018 and 2019 and the related consolidated statements of income for the years then ended, (b) the audited financial statements of Securities consisting of the balance sheet as at December 31 in each of the years 2017, 2018 and 2019 and the related audited statements of income and retained earnings, shareholders' equity and cash flow for the years then ended (collectively, such financials referred to in clauses (a) and (b), the "**Historical Financial Statements**"), and (c) the unaudited financial statements consisting of the consolidated balance sheet of Holdings and its Subsidiaries as of November 30, 2020 and the related consolidated statements of income for the eleven-month period then ended (the "**Interim Financial Statements**" and together with the Historical Financial Statements, the "**Financial Statements**") are set forth in <u>Section 3.05</u> of the Disclosure Schedules. The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the period involved, subject, in the case of the Interim Financial Statements, to normal and recurring year-end adjustments (the effect of which will not be materially adverse) and the absence of notes (that, if presented, would not differ materially from those presented in the Financial Statements). The Financial Statements are based on the books and records of Holdings and its Subsidiaries, and fairly present the financial condition of Holdings and its Subsidiaries as of the respective dates thereof and the results of the operations of Holdings and its Subsidiaries for the periods indicated. The balance sheet of Holdings and its Subsidiaries as of December 31, 2019 is referred to herein as the "**Balance Sheet**" and the date thereof as the "**Balance Sheet Date**" and the balance sheet of Holdings and its Subsidiaries as of November 30, 2020 is referred to herein as the "**Interim Balance Sheet**". Holdings and its Subsidiaries maintain a standard system of accounting established and administered in accordance with GAAP. The average earnings of the

Companies before interest and taxes for the fiscal years ended December 31, 2017, 2018 and 2019 were not less than $832,000.

**Section 3.06   Undisclosed Liabilities; Holdings Bonds.**

(a)   The Companies have no Liabilities except (a) those which are adequately reflected or reserved against in the Balance Sheet as of the Balance Sheet Date, and (b) those which have been incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date and which are not, individually or in the aggregate, material in amount.

(b)   There is currently outstanding $950,000 aggregate principal amount of the Holdings Bonds which are unsecured.  Holdings is not in default in the payment of the principal of or interest on the Holdings Bonds, and no event has occurred under the provisions of the Bond Purchase Agreements or the Holdings Bonds which with or without the lapse of time or the giving of notice, or both, constitutes or would constitute an event of default thereunder.

(c)   The Securities PPP Loan, including all interest thereon, was forgiven on December 7, 2020.  The Advisors PPP Loan, including all interest thereon, has not yet been forgiven.  Other than the PPP Loans, none of the Companies have incurred any loan, directly or indirectly, pursuant to the Paycheck Protection Program, established by the CARES Act, as amended or supplemented from time to time by interim rules, policy statements, FAQs or otherwise, or any other lending program authorized by the CARES Act and administered by the SBA.

**Section 3.07   Absence of Certain Changes, Events and Conditions.** Except as set forth in <u>Section 3.07</u> of the Disclosure Schedules, since the Balance Sheet Date, and other than in the ordinary course of business consistent with past practice, none of the Companies has:

(a)   made any amendment to any of its organizational documents;

(b)   made any material change in any method of accounting or accounting practice;

(c)   made a material change in its cash management practices and related policies, practices and procedures with respect to collection of accounts receivable, establishment of reserves for uncollectible accounts, accrual of accounts receivable, prepayment of expenses, payment of trade accounts payable, accrual of other expenses, deferral of revenue and acceptance of customer deposits;

(d)   incurred, assumed or guaranteed any Indebtedness for borrowed money;

(e)   transferred, assigned, licensed, sold or disposed of any assets or cancelled any debts or entitlements;

(f)   transferred, assigned or granted any license or sublicense of any material rights under or with respect to any Company IP;

21

(g)    suffered material damage, destruction or loss (whether or not covered by insurance) to its property;

(h)    made any capital investment in, or any loan to, any other Person;

(i)    accelerated, terminated, materially modified or cancelled any Material Contract;

(j)    made any capital expenditures in excess of $50,000 in the aggregate;

(k)    utilized or leveraged social insurance programs and/or specific legislation, in each case related to COVID-19;

(l)    allowed the imposition of any Encumbrance upon any of its properties, equity interests or assets, tangible or intangible;

(m)    (i) granted any bonuses, whether monetary or otherwise, or increase in any wages, salary, severance, pension or other compensation or benefits in respect of its current or former employees, officers, directors, independent contractors or consultants, other than as provided for in any written agreements or required by applicable Law, (ii) changed the terms of employment for any employee or any termination of any employees, or (iii) taken action to accelerate the vesting or payment of any compensation or benefit for any current or former employee, officer, director, independent contractor or consultant;

(n)    adopted, modified or terminated any: (i) employment, severance, retention or other agreement with any current or former employee, officer, director, independent contractor or consultant, (ii) Benefit Plan or (iii) collective bargaining or other agreement with a labor union, in each case whether written or oral;

(o)    entered into a new line of business or abandonment or discontinuance of existing lines of business;

(p)    purchased, leased or acquired the right to own, use or lease any property or assets for an amount in excess of $25,000, individually (in the case of a lease, per annum) or $50,000 in the aggregate (in the case of a lease, for the entire term of the lease, not including any option term);

(q)    acquired by merger or consolidation with, or by purchase of a substantial portion of the assets or equity interests of, or by any other manner, any business or any Person or any division thereof;

(r)    taken action to make, change or rescind any Tax election, amend any Tax Return or change any position on any Tax Return;

(s)    taken any action, failed to take any action or entered into any other transaction that would have the effect of increasing the Tax liability or reducing any Tax asset of Buyer in respect of any Post-Closing Tax Period;

22

(t)  made any material change to its investment or risk management or other similar policies;

(u)  entered any Contract to do any of the foregoing, or made any action or omission that would result in any of the foregoing; or

(v)  experienced any change, event, condition, or development that has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**Section 3.08  Material Contracts.**

(a)  Section 3.08(a) of the Disclosure Schedules lists each Contract that is material to any of the Companies (such Contracts, together with all Contracts listed or required to be listed in Section 3.08(a) of the Disclosure Schedules, being the "**Material Contracts**" and each a "**Material Contract**"), including the following:

(i)  each Contract of any of the Companies involving aggregate consideration in excess of $10,000 and which, in each case, cannot be cancelled by such Company without penalty or without more than 30 days' notice;

(ii)  all Contracts that provide for the indemnification by any of the Companies of any Person or the assumption of any Taxes, or other Liability of any Person;

(iii)  all Contracts relating to Intellectual Property, including all licenses, sublicenses, settlements, coexistence agreements, covenants not to sue, and permissions;

(iv)  all Contracts relating to Indebtedness (including, without limitation, guarantees) of any of the Companies;

(v)  all employment and independent contractor Contracts with employees or consultants that are not terminable at will or without severance payment, and Contracts with any current employee or independent contractor whose annual compensation is equal to or greater than $10,000;

(vi)  all Contracts concerning a joint venture;

(vii)  all Contracts that include any right of first offer or right of first refusal in favor of the counterparty, or any Contract that imposes a "most favored nations" or similar term;

(viii)  all Contracts under which any of the Companies has advanced or loaned any amount to any of its directors, officers, managers or employees;

(ix)  all Contracts pursuant to which any of the Companies is currently a lessor or a lessee of any personal property, or holds or currently operates any

23

tangible personal property owned by another Person, which, in each case, cannot be cancelled by such Company without penalty or without more than 30 days' notice;

(x)     all Contracts that limit or purport to limit the ability of any of the Companies to compete (A) in any line of business or with any Person or in any geographic area or during any period of time or (B) requiring any of the Companies to (1) deal exclusively with any Person or (2) refrain from dealing in specific products or services;

(xi)     all hedging Contracts, swaps or other similar agreements;

(xii)     all Contracts related to the use, operation, occupancy or leasing of the Real Property, including the Leases;

(xiii)     all Contracts entered into not in the ordinary course of business consistent with past practice;

(xiv)     all Contracts with any Registered Representatives that are not in the standard form used by the Companies as set forth in <u>Section 3.18(e)</u> of the Disclosure Schedules;

(xv)     all custodial Contracts, Contracts with clearing brokers and any selling Contracts;

(xvi)     all membership agreements with FINRA;

(xvii)     all Contracts conferring a power of attorney to act on behalf the Companies;

(xviii)  all Bond Purchase Agreements;

(xix)     all Contracts not already listed pursuant to clauses (i) through (xviii) above with an unexpired term as of the Closing Date in excess of one year; and

(xx)     all other Contracts, the default of which would result in a Material Adverse Effect.

(b)     The Companies are in compliance with all material terms and requirements of each of the Material Contracts to which they are a party and, to the Sellers's Knowledge, each other Person that is party to a Material Contract is in material compliance with the terms and requirements of such Material Contract. None of the Companies is in receipt of any notice of cancellation or claim of default under any Material Contract. To the Seller's Knowledge, no event has occurred or circumstance exists which with the passage of time or the giving of notice or both that may contravene, conflict with or result in a violation or breach of, or give the Companies or any other Person the right to declare a default or exercise any remedy under, or to accelerate the

24

maturity or performance of in any respect, or to cancel, terminate or modify in any respect, any Material Contract. Each Material Contract is in full force and effect and is valid and binding against the applicable Company, and to the Seller's Knowledge, the counterparty (as applicable), and enforceable in accordance with its terms, except as the enforceability hereof or thereof may be limited by any applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditor's rights generally and as limited by the availability of specific performance and other equitable remedies or applicable equitable principles (whether considered in a proceeding at law or in equity). Except as set forth in Section 3.08(b) of the Disclosure Schedules, as of the date of this Agreement, there are no renegotiations, attempts to renegotiate or outstanding rights to negotiate any amount to be paid or payable to or by the Companies or any terms under any Material Contract, and no Person has made a demand for such to the Companies.   No counterparty to any Material Contract has exercised or threatened in writing, or to the Knowledge of Seller, threatened, to exercise, any force majeure (or similar) provision in any Material Contract in relation to COVID-19.

**Section 3.09    Real Property; Title to Assets.**

(a)    Section 3.09(a) of the Disclosure Schedules lists all Real Property in which any of the Companies has an ownership or leasehold (or subleasehold) interest, including: (i) the street address of each parcel of Real Property; (ii) for Real Property that is leased or subleased by such Company, the landlord under the lease, the rental amount currently being paid, and the expiration of the term of such lease or sublease, and any termination or renewal rights of either party; and (iii) the current use of each parcel of Real Property. Seller has delivered or made available to Buyer true, correct, and complete copies of all Contracts, title insurance policies, and surveys relating to the Real Property. With respect to all Contracts of the Companies for the lease of Real Property (the "**Leases**"), the Companies' possession and quiet enjoyment of the appliable leased Real Property under such Leases has never been disturbed, and there are no current disputes with respect to such Leases; the Companies do not owe, and will not owe in the future, any brokerage commissions or finder's fees with respect to such Leases; and none of the Companies has collaterally assigned or granted any security interest in such Leases or any interest therein.

(b)    The Companies have good and valid title to, or a valid leasehold interest in, all Real Property and personal property and other assets reflected in the Financial Statements or acquired after the Balance Sheet Date (other than properties and assets sold or otherwise disposed of in the ordinary course of business consistent with past practice since the Balance Sheet Date). All Real Property and such personal property and other assets (including leasehold interests) are free and clear of Encumbrances except for those items set forth in Section 3.09(b) of the Disclosure Schedules.

(c)    None of the Companies is a sublessor or grantor under any sublease or other instrument granting to any other Person any right to possess, lease, occupy, or use any leased Real Property. The use of the Real Property in the conduct of each of the Companies' business does not violate in any material respect any Law, covenant, condition, restriction, easement, license, Permit, or agreement and no material

improvements constituting a part of the Real Property encroach on real property owned or leased by a Person other than the Companies.

**Section 3.10    Condition and Sufficiency of Assets.**  The furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property of the Companies are structurally sound, are in good operating condition and repair, and are adequate for the uses to which they are being put, and none of such furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost.  The furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property currently owned or leased by the Companies, together with all other properties and assets of the Companies, are sufficient for the continued conduct of the business of the Companies after the Closing in substantially the same manner as conducted prior to the Closing and constitute all of the rights, property and assets necessary to conduct the business of the Companies as currently conducted.

**Section 3.11    Intellectual Property.**

(a)    "**Intellectual Property**" means any and all of the following in any jurisdiction throughout the world: (i) issued patents and patent applications; (ii) trademarks, service marks, trade names, and other similar indicia of source or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications for registration, and renewals of, any of the foregoing; (iii) copyrights, including all applications and registrations; (iv) trade secrets, know-how, inventions (whether or not patentable), technology, and other confidential and proprietary information and all rights therein; (v) internet domain names and social media accounts and pages; and (vi) other intellectual or industrial property and related proprietary rights, interests, and protections.

(b)    Section 3.11(b) of the Disclosure Schedules lists all issued patents, registered trademarks, domain names and copyrights, and pending applications for any of the foregoing and all material unregistered Intellectual Property that are owned by any of the Companies (the "**Company IP Registrations**").  The Companies own or have the valid and enforceable right to use all Intellectual Property used in or necessary for the conduct of the Companies' business as currently conducted (the "**Company Intellectual Property**"), free and clear of all Encumbrances.  All of the Company Intellectual Property is valid and enforceable, and all Company IP Registrations are subsisting and in full force and effect.  The Companies have taken all necessary steps to maintain and enforce the Company Intellectual Property.

(c)    The conduct of the Companies' business as currently and formerly conducted and as proposed to be conducted has not infringed, misappropriated, or otherwise violated and will not infringe, misappropriate, or otherwise violate the Intellectual Property or other rights of any Person.  No Person has infringed, misappropriated, or otherwise violated any Company Intellectual Property.

**Section 3.12    Insurance.**

26

Case 2:25-bk-50237-RRM    Doc 154-1    Filed 08/07/25    Entered 08/07/25 11:28:34
Desc Exhibit Ex. A    Stock Purchase Agreement    Page 32 of 76

EXHIBIT A

(a)    Section 3.12(a) of the Disclosure Schedules sets forth a true and complete list of all current policies or binders of insurance maintained by any of the Companies and relating to the assets, business, operations, employees, officers, and directors of any of the Companies (collectively, the "**Insurance Policies**"). Such Insurance Policies: (a) are in full force and effect; (b) are valid and binding in accordance with their terms; (c) are provided by carriers who are financially solvent; and (d) have not been subject to any lapse in coverage. Neither the Seller nor any of his Affiliates (including any of the Companies) has received any written notice of cancellation of, premium increase with respect to, or alteration of coverage under, any of such Insurance Policies. All premiums due on such Insurance Policies have been paid. None of Seller or any of the Companies is in default under, or has otherwise failed to comply with, in any material respect, any provision contained in any Insurance Policy. The Insurance Policies are of the type and in the amounts customarily carried by Persons conducting a business similar to the Companies and are sufficient for compliance with all applicable Laws and Contracts to which any of the Companies is a party or by which they are bound.

**Section 3.13    Legal Proceedings; Governmental Orders.**

(a)    Section 3.13(a) of the Disclosure Schedules accurately and completely describes all Legacy Arbitrations involving the Companies pending before FINRA as of the Closing Date.

(b)    Other than the Legacy Arbitrations, there are no Actions pending or, to Seller's Knowledge, threatened against or by the Seller, or any of the Companies: (i) relating to or affecting any of the Companies or any of the Companies' properties or assets; or (ii) that challenge or seek to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

(c)    There are no outstanding Governmental Orders against, relating to, or affecting any of the Companies or any of their properties or assets.

**Section 3.14    Compliance with Laws; Permits.**

(a)    The Companies have complied, and are now complying, in all material respects with all Laws applicable to them or their business, properties, or assets.

(b)    All Permits that are required for the Companies to conduct their businesses are listed in Section 3.14(b) of the Disclosure Schedules and have been obtained and are valid and in full force and effect.

(c)    Section 3.14(c) of the Disclosure Schedules set forth all Governmental Authorities with which each of the Companies is registered as a Broker-Dealer, investment adviser or insurance agent or broker or is a member or member organization.

(d)    Without limiting the generality of the foregoing:

(i)        Insurance is an insurance agency engaged in the life insurance and annuities lines of business and registered, licensed or qualified as an insurance agency in each jurisdiction where the conduct of its business requires such registration, licensing or qualification.  Each registration, license or qualification of Insurance is in full force and effect.

(ii)       Each director, officer and employee of the Companies is duly registered or appointed to serve in such capacity as required by applicable Law and such registration or appointment is in full force and effect.  Each such individual has all approvals of the relevant Governmental Authorities necessary to carry on such business as currently conducted and all of such approvals of the relevant Governmental Authorities are in full force and effect.

(iii)      Each Company has timely filed with or furnished all material filings, together with any material amendments, required to be made with respect thereto, that they were required to file or furnish (as applicable) since January 1, 2015 with (i) any state regulatory authority, (ii) the SEC, and (iii) any Self-Regulatory Organization (clauses (i) – (iii), collectively "**Regulatory Agencies**"), including any material filing required to be filed or furnished (as applicable) pursuant to the laws, rules or regulations of the United States, any state, any foreign entity, or any Regulatory Agency, and has paid all material fees and assessments due and payable in connection therewith.

(iv)      Except for normal examinations conducted by a Regulatory Agency in the ordinary course of business of a Company, no Regulatory Agency has initiated or has pending any proceeding or, to the Knowledge of Seller, investigation into the business or operations of Holdings or any Company since January 1, 2015.

(v)       There (i) is no unresolved violation, criticism, or exception by any Regulatory Agency with respect to any report or statement relating to any examinations or inspections of Holdings or any Company and (ii) has been no formal or informal inquiries by, or disagreements or disputes with, any Regulatory Agency with respect to the business, operations, policies of any Company since January 1, 2015 which have not been resolved to the satisfaction of the relevant Regulatory Agency.

(vi)      No Company is subject to any cease-and-desist or other order or enforcement action issued by, or is a party to any written agreement, consent agreement or memorandum of understanding with, or is a party to any commitment letter or similar undertaking to, or is subject to any order or directive by, or has been ordered to pay any civil money penalty by, or has been since January 1, 2015, a recipient of any supervisory letter from, or since January 1, 2015, has adopted any policies, procedures or board resolutions at the request or suggestion of, any Regulatory Agency or other Governmental Authority that currently restricts in any material respect or would reasonably be expected to restrict in any material respect the conduct of its business (each, whether or not

set forth in the Disclosure Schedules, a "**Company Regulatory Agreement**"),
nor have Holdings nor any Company been advised since January 1, 2015 or have
knowledge of any pending or threatened regulatory investigation or that any
Regulatory Agency or other Governmental Agency is considering issuing,
initiating, ordering or requesting any Company Regulatory Agreement.

(e)      None of the Companies are required to be registered under the Investment
Company Act of 1940, as amended.

**Section 3.15   Specific Matters Related to Securities.**

(a)      Securities has been duly registered as a Broker-Dealer with the SEC and
each state and other jurisdiction in which it is required to be so registered. Securities is,
and since January 1, 2015 has been, a member in good standing of FINRA and each other
Self-Regulatory Organization of which it is required to be a member. Each natural Person
whose functions require him or her to be licensed as a representative or principal of, and
registered with, Securities is registered with FINRA and all applicable states and other
jurisdictions, such registrations are not, and since January 1, 2015 have not been,
suspended, revoked or rescinded and remain in full force and effect, and no such natural
Person is registered with more than one Broker-Dealer in any jurisdiction where such
multiple registrations would violate any applicable Law.

(b)      Seller has made available to Buyer correct and complete copies of the
current Form BD of Securities.  Seller will make available to Buyer correct and complete
copies of any Form BD filed with the SEC before the Closing Date by Securities.  Each
current Form BD of Securities is, and any Form BD of Securities filed before the Closing
Date will be at the time of filing, in compliance in all material respects with the
applicable requirements of the Securities Exchange Act, the rules thereunder and the
rules of any Self-Regulatory Organization, as applicable.

(c)      The Regulatory Documents of Securities have complied, and have been
timely filed, in all material respects with and under applicable Law and the rules and
regulations of the SEC promulgated thereunder and any Self-Regulatory Organization
rules applicable to such Regulatory Documents, as in effect at the time the Regulatory
Documents were filed. With respect to such Regulatory Documents filed with the SEC
since January 1, 2015, no such Regulatory Documents, as of their respective dates,
contained any untrue statement of a material fact or omitted to state a material fact
required to be stated therein or necessary in order to make the statements therein not
misleading, in light of the circumstances under which they were made.

(d)      (i) None of Securities, or any of Holding's other Subsidiaries, nor any of
Securities' "associated persons" (as defined in the Securities Exchange Act) is (A)
ineligible pursuant to Section 15(b) of the Securities Exchange Act to serve as a Broker-
Dealer or as an "associated person" of a Broker-Dealer, (B) subject to a "statutory
disqualification" as defined in Section 3(a)(39) of the Securities Exchange Act, (C)
subject to any material disciplinary proceedings or orders that would be required to be
disclosed on Form BD or Forms U-4 or U-5 (and which disciplinary proceedings or

orders are not actually disclosed on such Person's current Form BD or current Forms U-4 or U-5 to the extent that such Person or its associated persons is required to file such forms, or (D) subject to a disqualification that would be a basis for censure, limitations on the activities, functions or operations of, or suspension or revocation of the registration of such Person as broker-dealer, municipal securities dealer, government securities broker or government securities dealer under Section 15, Section 15B or Section 15C of the Securities Exchange Act, and (ii) there is no proceeding pending or, to the Knowledge of Seller, threatened by any Governmental Authority that would reasonably be expected to result in any of the circumstances described in the foregoing clauses (i)(A), (i)(B), (i)(C) and (i)(D).

(e)      No fact relating to Securities or any "control affiliate" of Securities, as defined in Form BD requires any response in the affirmative to any question in Item 11 of Form BD, except to the extent that such facts have been reflected on Form BD of Securities.

(f)      The Brokerage Services performed by Securities have been conducted in compliance with all material requirements of the Securities Exchange Act, the rules and regulations of the SEC, FINRA, and any applicable state securities regulatory authority or Self-Regulatory Organizations, as applicable. Securities has established, in compliance with requirements of applicable Law, and maintained in effect at all times required by applicable Law since January 1, 2015, written policies and procedures reasonably designed to achieve compliance with the Securities Exchange Act, the SEC rules thereunder, and the rules of each applicable Self-Regulatory Organization ("**BD Compliance Policies**"), including those required by (i) applicable FINRA rules, including FINRA Rule 3110, 3120 and 3130, (ii) Rule 15c3-5 under the Securities Exchange Act, (iii) anti-money laundering laws, including a written customer identification program in compliance therewith, (iv) privacy laws including policies and procedures with respect to the protection of nonpublic personal information about customers, clients and other third parties and (v) identity theft laws, and approved such principals, managers and other supervisors as are required under the aforementioned laws, rules and regulations. All such BD Compliance Policies comply in all material respects with applicable Laws.

(g)      Securities currently maintains, and since January 1, 2015 has maintained, "net capital" (as such term is defined in Rule 15c3-1(c)(2) under the Securities Exchange Act) equal to or in excess of the minimum "net capital" required to be maintained by it, and in an amount sufficient to ensure that it is not required to file a notice under Rule 17a-11 under the Securities Exchange Act.

(h)      No Governmental Authority has, since January 1, 2015, formally initiated any administrative proceeding or investigation into Securities and Securities has not received a written "Wells Notice", or other written indication of the commencement of an enforcement action from FINRA or the SEC or any other Governmental Authority, or other notice alleging any material noncompliance with any applicable Law governing the operations of Broker-Dealers. Seller has no knowledge of any unresolved material violation or material exception raised by any Governmental Authority with respect to

Securities. Since January 1, 2015, Securities has not settled any claim or proceeding of FINRA or the SEC or any other Governmental Authority. Securities has not had an order, decree or judgement entered against it in connection with any applicable Law governing the operation of Broker-Dealers. Securities is not currently subject to, or has received any notice of, an examination, inspection, investigation or inquiry by a Governmental Authority, and no examination or inspection has been started or completed for which no examination report is available.

    (i)     Seller has provided Buyer with a list of all examinations relating to Securities from the SEC and FINRA since January 1, 2015.

**Section 3.16    Specific Matters related to Advisors.**

    (a)     Seller has made available to Buyer correct and complete copies of its current Form ADV.  Seller will make available to Buyer correct and complete copies of any Form ADV filed with the SEC before the Closing Date by Advisors.  Each current Form ADV of Advisors is, and any Form ADV of Advisors filed before the Closing Date will be at the time of filing, in compliance in all material respects with the applicable requirements of the Investment Advisers Act, the rules thereunder and the rules of any Self-Regulatory Organization, as applicable.

    (b)     Advisors has designated and approved an appropriate chief compliance officer in accordance with Rule 206(4)-7 under the Investment Advisers Act.  Advisors has established in compliance with requirements of applicable Law, and maintained in effect at all times required by applicable Law since January 1, 2015, (i) written anti-money laundering policies and procedures that incorporate, among other things, a written customer identification program, (ii) a code of ethics and a written policy regarding insider trading and the protection of material non-public information, (iii) written cyber security and identity theft policies and procedures, (iv) written supervisory procedures and a supervisory control system, (v) written policies and procedures designed to protect non-public personal information about customers, clients and other third parties, (vi) written recordkeeping policies and procedures and (vii) other policies required to be maintained by Advisors under applicable Law, including Rules 204A-1 and 206(4)-7 under the Investment Advisers Act.

    (c)     With respect to Advisors, (i) neither Advisors nor its control persons, directors, officers, or employees (other than employees whose functions are solely clerical or ministerial), nor, to the Knowledge of Seller, any of Advisor's other "associated persons" (as defined in the Investment Advisers Act) is (A) subject to ineligibility pursuant to Section 203 of the Investment Advisers Act to serve as a registered investment adviser or as an "associated person" of a registered investment adviser, (B) subject to disqualification pursuant to Rule 206(4)-3 under the Investment Advisers Act or (C) subject to disqualification under Rule 506(d) of Regulation D under the Securities Act, unless in the case of clause (A), (B) or (C), Advisors or "associated person" has received effective exemptive relief from the SEC with respect to such ineligibility or disqualification, nor (ii) is there any proceeding pending or, to the Knowledge of Seller, threatened by any Governmental Authority that would reasonably

31

be expected to result in the ineligibility or disqualification of Advisors, or any of its "associated persons" to serve in such capacities or that would provide a basis for such ineligibility or disqualification.

(d)    Advisors is, and since January 1, 2015, has been, in compliance in all material respects with (i) the applicable provisions of the Investment Advisers Act and (ii) all applicable Laws of the jurisdictions in which Advisors acts as an investment adviser.

(e)    Seller has provided Buyer with a list of all examinations relating to Advisors from the SEC since January 1, 2015.

(f)    Advisors is not currently subject to, and has not received any notice of, an examination, inspection, investigation or inquiry by a Governmental Authority, and no such examination or inspection has been started or completed for which no examination report is available.

(g)    Advisors is not prohibited from charging fees to any Person pursuant to Rule 206(4)-5 under the Investment Advisers Act or any similar "pay-to-play" rule or requirement, except as would not reasonably be expected to be, individually or in the aggregate, material to Advisors.

(h)    Each Advisory Agreement includes all provisions required by and complies in all respects with the Investment Advisers Act, in all material respects. No Advisory Client is, or to the Knowledge of Seller is required to be, registered as an investment company under the Investment Company Act. Advisors does not sponsor any public or private investment funds.

(i)    Advisors has complied in all material respects with all applicable obligations, requirements and conditions of each Advisory Agreement.

(j)    Advisors does not provide Investment Advisory Services to any Person other than Advisory Clients. Advisors provides Investment Advisory Services to Advisory Clients solely pursuant to written Advisory Agreements.

**Section 3.17    Employee Benefit Matters.**

(a)    Section 3.17(a) of the Disclosure Schedules contains a true and complete list of each "employee benefit plan" as defined in Section 3(3) of ERISA, whether or not written and whether or not subject to ERISA, and each supplemental retirement, compensation, employment, consulting, profit-sharing, deferred compensation, incentive, bonus, equity, change in control, retention, severance, salary continuation, and other similar agreement, plan, policy, program, practice, or arrangement which is or has been established, maintained, sponsored, or contributed to by any of the Companies or under which any of the Companies has or may have any Liability (each, a "**Benefit Plan**").

32

(b)    For each Benefit Plan, Seller has made available to Buyer accurate, current, and complete copies of each of the following: (i) the plan document with all amendments, or if not reduced to writing, a written summary of all material plan terms; (ii) any written Contracts and arrangements related to such Benefit Plan, including trust agreements or other funding arrangements, and Insurance Policies, certificates, and Contracts; (iii) in the case of a Benefit Plan intended to be qualified under Section 401(a) of the Code, the most recent favorable determination or national office approval letter issued by the Internal Revenue Service and any legal opinions issued thereafter with respect to the Benefit Plan's continued qualification; (iv) the most recent Form 5500 filed with respect to such Benefit Plan; and (v) any material notices, audits, inquiries, or other correspondence from, or filings with, any Governmental Authority relating to the Benefit Plan.

(c)    Each Benefit Plan and related trust has been established, administered, and maintained in accordance with its terms and in compliance with all applicable Laws (including ERISA and the Code). Nothing has occurred with respect to any Benefit Plan that has subjected or could subject any of the Companies or, with respect to any period on or after the Closing Date, Buyer or any of its Affiliates, to a civil action, penalty, surcharge, or Tax under applicable Law or which would jeopardize the previously-determined qualified status of any Benefit Plan. All benefits, contributions, and premiums relating to each Benefit Plan have been timely paid in accordance with the terms of such Benefit Plan and all applicable Laws and accounting principles. Benefits accrued under any unfunded Benefit Plan have been paid, accrued, or adequately reserved for to the extent required by GAAP.

(d)    None of the Companies has incurred, or reasonably expects to incur: (i) any Liability under Title I or Title IV of ERISA, any related provisions of the Code, or applicable Law relating to any Benefit Plan; or (ii) any Liability to the Pension Benefit Guaranty Corporation. No complete or partial termination of any Benefit Plan has occurred or is expected to occur.

(e)    None of the Companies has now or at any time within the previous six years contributed to, sponsored, or maintained: (i) any "multiemployer plan" as defined in Section 3(37) of ERISA; (ii) any "single-employer plan" as defined in Section 4001(a)(15) of ERISA; (iii) any "multiple employer plan" as defined in Section 413(c) of the Code; (iv) any "multiple employer welfare arrangement" as defined in Section 3(40) of ERISA; (v) a leveraged employee stock ownership plan described in Section 4975 (e)(7) of the Code; or (vi) any other Benefit Plan subject to required minimum funding requirements.

(f)    Other than as required under Sections 601 to 608 of ERISA or other applicable Law, no Benefit Plan provides post-termination or retiree welfare benefits to any individual for any reason.

(g)    Neither the execution of this Agreement nor any of the transactions contemplated by this Agreement will, either alone or in combination with any other event: (i) entitle any current or former director, officer, employee, independent

33

contractor, or consultant of any of the Companies to any severance pay, increase in severance pay, or other payment; (ii) accelerate the time of payment, funding, or vesting, or increase the amount of compensation (including stock-based compensation) due to any such individual; (iii) limit or restrict the right of any of the Companies to amend or terminate any Benefit Plan; (iv) increase the amount payable under any Benefit Plan; (v) result in any "excess parachute payments" within the meaning of Section 280G(b) of the Code; or (vi) require a "gross-up" or other payment to any "disqualified individual" within the meaning of Section 280G(c) of the Code.

## Section 3.18   Employment Matters.

(a)      Section 3.18(a) of the Disclosure Schedules lists: (i) all employees, independent contractors, and consultants of the Companies; and (ii) for each individual described in clause (i), (A) the individual's title or position, hire date, and compensation, (B) any Contracts entered into between any of the Companies and such individual, and (C) the fringe benefits provided to each such individual.  All compensation payable to all employees, independent contractors, or consultants of any of the Companies for services performed on or prior to the Closing Date have been paid in full.

(b)      The Companies are and have been in compliance in all material respects with: (i) all applicable employment Laws and agreements regarding hiring, employment, termination of employment, plant closings and mass layoffs, employment discrimination, harassment, retaliation, and reasonable accommodation, leaves of absence, terms and conditions of employment, wages and hours of work, employee classification, employee health and safety, engagement and classification of independent contractors, payroll taxes, and immigration with respect to all employees, independent contractors, and contingent workers; and (ii) all applicable Laws relating to the relations between it and any labor organization, trade union, work council, or other body representing employees of any of the Companies.

(c)      The Companies have properly completed and have on file a valid U.S. Citizenship and Immigration Services Form I-9 for each employee in accordance with applicable Laws and each of the Companies is currently, and has been in compliance with all applicable Laws governing work authorization in the United States covering employees. None of the Companies has received any letters, written notices or other written correspondence from any Governmental Authority, including, but not limited to, the Social Security Administration, indicating that the social security number of an employee of the Companies does not match his or her name in the database of such Governmental Authority.  None of the Companies has received any letters, notices or other correspondence from any Governmental Authority regarding the employment authorization of any of their employees.

(d)      The Companies have required each of their current and former employees, officers, contractors and consultants who have contributed to the conception, creation or development of any Company Intellectual Property to sign a valid and enforceable agreement that includes (i) perpetual confidentiality obligations in favor of the Companies, (ii) an assignment to the Companies of all right, title and interest in and to all

Company Intellectual Property conceived, created or developed by such Person during such Person's employment by or engagement with the Companies (including the rights to transfer, license, amend and modify such Company Intellectual Property) and (iii) a waiver of any and all moral rights (to the extent possible under applicable Law) such Person may possess in such Company Intellectual Property (collectively, the **"Assignment Agreements"**). No current or former employee, officers, contractor or consultant of the Company has ever excluded any Intellectual Property from any Assignment Agreement executed by such Person in connection with such Person's employment by or engagement with the Companies.

(e)      Section 3.18(e) of the Disclosure Schedules sets forth the Companies' standard form Contracts used with its Registered Representatives.

(f)      The Companies are in compliance with all COVID-19 Measures applicable to any location in which the Companies operate.  To the extent the Companies are requiring employees or other personnel to perform in-person work in any locations subject to a health and safety order, the Companies' requirements for in-person services meet the standards set forth in the current order. To the extent the Companies are aware of any employees that have tested positive for COVID-19, the Companies have taken all necessary precautions with respect to such employee and his/her suspected close contacts required by any applicable federal, state, and local health authorities.  The Companies have also documented any work-related injury and illness to the extent required by OSHA.

(g)      The Companies have not received any complaints or concerns (i) from employees regarding leaves of absence, paid sick time, or similar matters related to COVID-19, (ii) regarding the Companies' reporting, or failure to report, to employees, contractors, customers, vendors or the public, the presence of employees or contractors who have tested positive for, or exhibited symptoms of, COVID-19, or other potential means of exposure to COVID-19 or (iii) alleging the Company failed to provide a safe working environment, appropriate equipment or accommodation in relation to COVID-19.

**Section 3.19 Taxes.**  Except as set forth in Section 3.19 of the Disclosure Schedules:

(a)      Each Company has timely filed (taking into account any valid extensions) all Tax Returns required to be filed by it.  All such Tax Returns are true, complete and accurate in all respects.  None of the Companies is currently the beneficiary of any extension of time within which to file any Tax Return.  Buyer has been provided access to complete and accurate copies of all federal, state, local and foreign Tax Returns of the Companies filed for taxable periods ending on or after December 31, 2017.

(b)      The amount of the Companies' Liability for unpaid Taxes for all periods ending on or before the date of the most recent Financial Statements does not, in the aggregate, exceed the amount of accruals for Taxes (excluding reserves for deferred Taxes) reflected on the Financial Statements. The amount of the Companies' Liability for unpaid Taxes for all periods following the end of the most recent period covered by the

Financial Statements shall not, in the aggregate, exceed the amount of accruals for Taxes (excluding reserves for deferred Taxes) as adjusted for the passage of time in accordance with the past custom and practice of the Companies (and which accruals shall not exceed comparable amounts incurred in similar periods in prior years).

(c)     Each Company has timely paid, or caused to be timely paid, all Taxes due and owing by it (whether or not shown on any Tax Return), and the Companies have provided a sufficient reserve for the payment of all Taxes not yet due and payable on the Interim Financial Statements and the Interim Financial Statements, no Company has incurred any liability for Taxes outside the ordinary course of the Company's business.  Except for statutory liens for real and personal property Taxes that are not yet due and payable, there are no liens for any Tax upon the Shares or upon any of the assets of the Companies.

(d)     Each Company has complied in all respects with the provisions of the Code relating to the withholding and payment of Taxes, including the withholding and reporting requirements under Sections 1441 through 1464, 3401 through 3406, and 6041 through 6049 of the Code, as well as any applicable similar provisions under any other Laws, and has, within the time and in the manner prescribed by Law, withheld from amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party and paid over to the proper Governmental Authorities all amounts required.

(e)     There are no ongoing actions, suits, claims, investigations, audits or other administrative or court proceedings by any taxing authority against any of the Companies.  None of the Companies has received from any federal, state, local or foreign Governmental Authority (including in jurisdictions where the Company does not file Tax Returns) any (i) notice indicating an intent to open an audit or other review with respect to Taxes, (ii) request for information related to Tax matters or (iii) notice of deficiency or proposed adjustment for any amount of Tax (or Tax attributes) proposed, asserted or assessed by any Governmental Authority.

(f)     None of the Companies has entered into a closing agreement pursuant to Section 7121 of the Code or any similar provision of any Law.  None of the Companies is subject to, nor has it requested, any technical advice memorandum, private letter ruling or similar ruling from any Governmental Authority.  No power of attorney currently in force has been granted by any of the Companies concerning any Taxes or Tax Return.

(g)     No Claim has ever been made by any taxing authority in a jurisdiction where a Company does not file or has not filed Tax Returns that the Company is or may be subject to taxation by that jurisdiction.

(h)     No waiver or agreement by any of the Companies is in force for the extension of time for the assessment or payment of any Taxes.  No request for any such waiver or agreement is currently pending.

(i)    None of the Companies has ever been a member of an affiliated, combined, consolidated, or unitary Tax group for Tax purposes which includes any party other than the Companies. The Companies have no Liability for Taxes of any Person (other than the Companies) under Treasury Regulations Section 1.1502-6 (or any corresponding provision of state, local, or foreign Law), as transferee or successor, by contract, or otherwise.

(j)    None of the Companies will be required to include or accelerate any item of income in, or exclude or defer any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any (i) change in method of accounting for a taxable period ending on or prior to the Closing Date; (ii) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign Law) executed on or prior to the Closing Date; (iii) installment sale or open transaction disposition made on or prior to the Closing Date; (iv) prepaid amount received or deferred revenue accrued on or prior to the Closing Date, (v) election under Section 108(i) of the Code (or any corresponding or similar provision of state, local or foreign Law), (vi) any use of an improper method of accounting for a taxable period ending on prior to the Closing Date, or (vii) intercompany transaction or excess loss account described in Treasury Regulations under Section 1502 of the Code (or any corresponding or similar provision of state, local or foreign Law).

(k)    None of the Companies has ever been a party to, or a material advisor with respect to, a "reportable transaction" within the meaning of Section 6707A(c)(1) of the Code and Treasury Regulation § 1.6011-4(b)(1).

(l)    None of the Companies has ever been a party to any transaction that was purported or intended to be governed by Section 355 or Section 361 of the Code.

(m)    None of the Companies has ever been a United States shareholder (within the meaning of Section 951(b) of the Code) of a controlled foreign corporation (within the meaning of Section 957 of the Code).

(n)    None of the Companies is a party to any Tax-sharing agreement or similar arrangement with any other Person (whether or not written), and none of the Companies has assumed any Tax obligations of, or with respect to any transaction relating to, any other Person or agreed to indemnify any other Person with respect to any Tax.

(o)    None of the Companies is a party to any joint venture, partnership, other arrangement or contract that has been or is intended to be treated as a partnership for U.S. federal income Tax purposes.

(p)    Each Company has at all times correctly classified those individuals performing services for it as employees and independent contractors, as applicable.

(q)    None of the Companies is subject to Tax in any jurisdiction outside the United States by virtue of (i) having a permanent establishment or other place of business or (ii) having a source of income in that jurisdiction.

37

Case 2:25-bk-50237-RRM   Doc 154-1   Filed 08/07/25   Entered 08/07/25 11:28:34
Desc Exhibit Ex. A   Stock Purchase Agreement   Page 43 of 76

EXHIBIT A

(r)      None of the Companies has availed itself of any government grants, Tax holidays, loans, or other Tax benefits or relief related to COVID-19, including a loan under the Paycheck Protection Program or relief pursuant to Sections 2301 or 2302 of the CARES Act or any similar applicable federal, state or local Law, other than the PPP Loans.

(s)      Seller is not a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

## Section 3.20   Related Party Transactions.

(a)      Section 3.20(a) of the Disclosure Schedules sets forth every direct or indirect business relationship (other than normal employment relationships) between the Companies, on the one hand, and the present or former officers, shareholders (including Seller), directors or employees of the Companies or members of Seller's family (or any entity in which any of them controls or has a material financial interest, directly or indirectly), on the other hand (each, a "**Related Party**").  Except as set forth in Section 3.20 of the Disclosure Schedules, no Related Party (or Affiliate of a Related Party) (other than the Companies) directly or indirectly: (a) has asserted any Action against the Companies; (b) owes any money to the Companies or is owed money from the Companies (except for routine advances or reimbursement for reasonable ordinary and necessary out-of-pocket business expenses); (c) is a party to any Contract or other arrangement, written or oral, with the Companies; or (d) provides services or resources to the Companies or is dependent on services or resources provided by the Companies.  No Related Party (or Affiliate of a Related Party) (other than the Companies) is engaged in any business which competes with the Companies.

(b)      Section 3.20(b) of the Disclosure Schedules contains a complete and accurate list of any Contracts between or among the Companies.

**Section 3.21   Production of Registered Representatives.**  Section 3.21 of the Disclosure Schedules contains a complete and accurate list of the production of each Registered Representative for calendar years 2019 and 2020.

**Section 3.22   Books and Records.** The minute books and share record books each of the Companies, all of which are in the possession of Holdings and have been made available to Buyer, are complete and correct.

**Section 3.23   Brokers.** Except for Leiter, no broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Seller.

**Section 3.24   Full Disclosure.** No representation or warranty by Seller in this Agreement and no statement contained in the Disclosure Schedules to this Agreement or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to

make the statements contained therein, in light of the circumstances in which they are made, not misleading.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this ARTICLE IV are true and correct as of the date hereof.

**Section 4.01   Organization and Authority of Buyer.** Buyer is a limited liability company duly formed, validly existing, and in good standing under the Laws of the State of Illinois. Buyer has full limited liability company power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder, and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite limited liability company action on the part of Buyer. This Agreement and each Transaction Document to which Buyer is a party constitute legal, valid, and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms, except as the enforceability hereof or thereof may be limited by any applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditor's rights generally and as limited by the availability of specific performance and other equitable remedies or applicable equitable principles (whether considered in a proceeding at law or in equity).

**Section 4.02   No Conflicts; Consents.** The execution, delivery, and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with any provision of the certificate of formation, operating agreement, or other governing documents of Buyer; (b) violate or conflict with any provision of any Law or Governmental Order applicable to Buyer; or (c) except as set forth in Section 4.02 of the Disclosure Schedules, require the consent, notice, declaration, or filing with or other action by any Person or require any Permit, license, or Governmental Order.

**Section 4.03   Investment Purpose.** Buyer is acquiring the Shares solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof or any other security related thereto within the meaning of the Securities Act of 1933, as amended (the "**Securities Act**"). Buyer acknowledges that Seller has not registered the offer and sale of the Shares under the Securities Act or any state securities Laws, and that the Shares may not be pledged, transferred, sold, offered for sale, hypothecated, or otherwise disposed of except pursuant to the registration provisions of the Securities Act or pursuant to an applicable exemption therefrom and subject to state securities Laws and regulations, as applicable.

**Section 4.04   Brokers.** Except for Leiter, no broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the

EXHIBIT A

transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Buyer.

**ARTICLE V**
**COVENANTS**

**Section 5.01    Conduct of Business Prior to the Closing.**

(a)    During the period from the date of this Agreement to the Closing, except as set forth in Section 5.01(a) of the Disclosure Schedules, as otherwise agreed to in writing by Buyer (which agreement shall not be unreasonably withheld, conditioned or delayed), or as expressly contemplated or permitted by this Agreement, Seller shall cause the Companies to (a) conduct business in the ordinary course in all material respects and in a manner consistent with past practice, (b) use their commercially reasonable efforts to (i) maintain their assets and properties in their current condition (normal wear and tear excepted), (ii) preserve intact in all material respects their current business organization, goodwill, ongoing businesses and significant relationships with third parties, (iii) keep available the services of the Companies' key officers and (iv) maintain all of their material insurance policies.

(b)    During the period from the date of this Agreement to the Closing, except as set forth in Section 5.01(b) of the Disclosure Schedules or as expressly contemplated or permitted by this Agreement, Seller shall not permit the Companies to, without the prior written consent of Buyer, which shall not be unreasonably withheld, conditioned or delayed:

(i)    declare, set aside or pay any dividends on, make any other distributions in respect of, or enter into any agreement with respect to the voting of, the Equity Interests of the Companies, (ii) split, combine or reclassify any of the Equity Interests of the Companies or issue or authorize the issuance of any other securities in respect of, in lieu of, or in substitution for, such Equity Interests or (iii) purchase, redeem or otherwise acquire any Equity Interests of the Companies;

(ii)    issue, deliver, sell, pledge or otherwise encumber or subject to any Encumbrance any Equity Interests of the Companies;

(iii)    amend any organizational documents of the Companies;

(iv)    acquire or agree to acquire by merging or consolidating with, or by purchasing any assets or any equity securities of, or by any other manner, any business or any Person, or otherwise acquire or agree to acquire any assets or Equity Interests except in the ordinary course of business consistent with past practice;

(v)    sell, lease, license, mortgage or otherwise encumber or subject to any Encumbrance, or otherwise dispose of any of its properties or assets

40

(including any Company Intellectual Property), other than in the ordinary course of business consistent with past practice, and provided any such Encumbrances are not material, individually or in the aggregate;

(vi)    incur any Indebtedness for borrowed money or issue any debt securities or assume, guarantee or endorse, or otherwise become responsible for the obligations of any Person, or make any loans, advances or capital contributions to, or investments in, any Person other than the Subsidiaries, or as a result of ordinary advances and reimbursements to employees;

(vii)    change in any material respect their accounting methods (or underlying assumptions), principles or practices affecting their assets, liabilities or business, including any reserving, renewal or residual method, practice or policy, in each case, in effect on the date hereof, except as required by changes in GAAP or regulatory accounting principles;

(viii)    enter into any new line of business or change in any material respect its operating, asset liability, investment or risk management or other similar policies;

(ix)    except investments by Holdings in the Subsidiaries, make any investment, whether by purchase of Equity Interests, contributions to capital, property transfers, or entering into binding agreements with respect to any such investment;

(x)    make, change or revoke any material Tax election, change an annual Tax accounting period, adopt or change any material Tax accounting method, file any material amended Tax Return, enter into any closing agreement, settle any material Tax claim or assessment or surrender any right to claim a refund of a material amount of Taxes;

(xi)    terminate or waive any material provision of any material Contract other than normal renewals of Contracts without materially adverse changes, additions or deletions of terms, or enter into or renew any Contracts of the Companies containing (i) any restriction on the ability of any of the Companies to conduct business as it is presently being conducted or currently contemplated to be conducted or (ii) any restriction on any of the Companies in engaging in any type of business;

(xii)    incur any capital expenditures in excess of $50,000 in the aggregate or enter into any agreement obligating any of the Companies to spend more than $50,000 in the aggregate on capital expenditures;

(xiii)    institute any increase in any Benefit Plan, or modify any Benefit Plan or adopt any new Benefit Plan; make any change in the compensation, benefits or severance arrangements of the employees, consultants or contractors of the Companies; make any discretionary contributions or payments to any trust

41

or other funding vehicle on behalf of any employees, consultants or contractors of the Companies, or accelerate the payment or vesting of any payment or benefit provided or to be provided to any such employees, consultants or contractors; or establish, adopt or enter into any collective bargaining agreement;

(xiv)    agree or consent to any material agreement or material modifications of any existing agreements with any Governmental Authority, except as required by Law;

(xv)    pay, discharge, settle or compromise any claim, action, litigation, arbitration, suit, investigation or proceeding, other than any such payment, discharge, settlement or compromise in the ordinary course of business consistent with past practice that involves money damages in an amount not in excess of $5,000 that is paid prior to the Closing or will be entirely covered by insurance;

(xvi)    take any action that would materially impede or delay the ability of the parties to obtain any necessary approvals of any Governmental Authority required for the transactions contemplated hereby; or

(xvii)    agree to take, make any commitment to take, or cause its board of directors (or equivalent governing body) to adopt any resolutions in support of, any of the actions prohibited by this Section 5.01(b).

Section 5.02    Access to Information. From the date hereof until the Closing, Seller shall, and shall cause the Companies to, (a) afford Buyer and its Representatives full and free access to and the right to inspect all of the Real Property, properties, assets, premises, books and records, Contracts and other documents and data related to any of the Companies; (b) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Companies as Buyer or any of its Representatives may reasonably request; and (c) instruct the Representatives of Seller and the Companies to cooperate with Buyer in its investigation of the Companies. Any investigation pursuant to this Section 5.02 shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of Seller or any of the Companies. No investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement.

Section 5.03    No Solicitation of Other Bids.

(a)    Seller shall not, and shall not authorize or permit any of his Affiliates (including any of the Companies) or any of his or their Representatives to, directly or indirectly, (i) encourage, solicit, initiate, facilitate or continue inquiries regarding an Acquisition Proposal; (ii) enter into discussions or negotiations with, or provide any information to, any Person concerning a possible Acquisition Proposal; or (iii) enter into any agreements or other instruments (whether or not binding) regarding an Acquisition Proposal. Seller shall immediately cease and cause to be terminated, and shall cause his Affiliates (including the Companies and all of its and their Representatives) to immediately cease and cause to be terminated, all existing discussions or negotiations

with any Persons conducted heretofore with respect to, or that could lead to, an Acquisition Proposal. For purposes hereof, "**Acquisition Proposal**" shall mean any inquiry, proposal or offer from any Person (other than Buyer or any of its Affiliates) concerning (i) a merger, consolidation, liquidation, recapitalization, share exchange or other business combination transaction involving any of the Companies; (ii) the issuance or acquisition of the Equity Interests of any of the Companies; or (iii) the sale, lease, exchange or other disposition of any significant portion of any of the Companies' properties or assets.

(b)   In addition to the other obligations under this Section 5.03, Seller shall promptly (and in any event within three (3) Business Days after receipt thereof by Seller or his Representatives) advise Buyer orally and in writing of any Acquisition Proposal, any request for information with respect to any Acquisition Proposal, or any inquiry with respect to or which could reasonably be expected to result in an Acquisition Proposal, the material terms and conditions of such request, Acquisition Proposal or inquiry, and the identity of the Person making the same.

(c)   Seller agrees that the rights and remedies for noncompliance with this Section 5.03 shall include having such provision specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to Buyer and that money damages would not provide an adequate remedy to Buyer.

**Section 5.04   Notice of Certain Events.**

(a)   From the date hereof until the Closing, Seller shall promptly notify Buyer in writing of:

(i)   any fact, circumstance, event or action the existence, occurrence or taking of which (A) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (B) has resulted in, or could reasonably be expected to result in, any representation or warranty made by Seller hereunder not being true and correct or (C) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions set forth in Section 7.02 to be satisfied;

(ii)   any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(iii)   any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; and

(iv)   any Actions commenced or, to Seller's Knowledge, threatened against, relating to or involving or otherwise affecting Seller or any of the Companies that, if pending on the date of this Agreement, would have been

required to have been disclosed pursuant to Section 3.13 or that relate to the consummation of the transactions contemplated by this Agreement.

(b)    Buyer's receipt of information pursuant to this Section 5.04 shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement (including Section 8.01 and Section 9.01(b)) and shall not be deemed to amend or supplement the Disclosure Schedules.

**Section 5.05    Resignations.** Seller shall deliver to Buyer written resignations, effective as of the Closing Date, of any officers and directors of any of the Companies requested by Buyer at least two (2) Business Days prior to the Closing.

**Section 5.06    Confidentiality.** From and after the Closing, Seller shall, and shall cause its Affiliates to, hold, and shall use its reasonable best efforts to cause its or their respective Representatives to hold, in confidence any and all information, whether written or oral, concerning any of the Companies, except to the extent that Seller can show that such information (a) is generally available to and known by the public through no fault of Seller, any of its Affiliates or their respective Representatives; or (b) is lawfully acquired by Seller, any of its Affiliates or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation.  If Seller or any of its Affiliates or their respective Representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Law, Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which Seller is advised by his counsel in writing is legally required to be disclosed, *provided that* Seller shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

**Section 5.07    Non-competition; Non-solicitation.**

(a)    From the Closing Date and through the period that ends on the three (3) year anniversary of the date of termination of Seller's employment with Buyer and/or the Companies (the "**Non-Solicitation Period**"), Seller shall not, and shall not permit any of its Affiliates to, directly or indirectly (the following being referred to as the "**Restricted Solicitation Activities**"):

(i)    hire or solicit any employee, consultant or independent contractor of any of the Companies or encourage any such employee, consultant or independent contractor to leave such employment or relationship with the Companies or hire any such employee, consultant or independent contractor who has left such employment or relationship with the Companies in the prior six-month period, except pursuant to a general solicitation which is not directed specifically to any such employees, consultants or contractors; *provided, however,* that if Seller leaves the employment of Buyer and/or the Companies, he may solicit Tom Lisk and Amy Widener to leave with him; or

(ii)    solicit or entice, or attempt to solicit or entice, any clients or customers of any of the Companies or potential clients or customers of any of the

44

Case 2:25-bk-50237-RRM    Doc 154-1    Filed 08/07/25    Entered 08/07/25 11:28:34
Desc Exhibit Ex. A    Stock Purchase Agreement    Page 50 of 76

EXHIBIT A

Companies for purposes of diverting their business or services from any of the Companies;

(b)    During the Non-Solicitation Period, Seller shall not have an interest in any Person that engages directly or indirectly in the Restricted Solicitation Activities in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant.  Notwithstanding the foregoing, Seller may own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if Seller is not a controlling Person of, or a member of a group which controls, such Person and does not, directly or indirectly, own 5% or more of any class of securities of such Person.

(c)    During the Restricted Period, if (i) Seller voluntarily terminates his employment with Buyer and/or the Companies or (ii) if Buyer and/or the Companies terminate Seller's employment without Cause, Buyer will have the sole and exclusive discretion to elect to have Seller not engage in any Restricted Business for all or a portion of the remaining period of the Restricted Period (the "**Elected Restricted Period**") by continuing to pay Seller his base salary, at regular payroll intervals, for the duration of the Elected Restricted Period.

(d)    During the Restricted Period, if Buyer and/or the Companies terminate Seller's employment with Cause, Seller shall not engage in any Restricted Business for the remaining period of the Restricted Period. Seller agrees that he will receive no further compensation for his compliance with this paragraph in the event of a termination of his employment with Cause.

(e)    Seller acknowledges that a breach or threatened breach of this Section 5.07 would give rise to irreparable harm to Buyer, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by Seller of any such obligations, Buyer shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

(f)    Seller acknowledges that the restrictions contained in this Section 5.07 are reasonable and necessary to protect the legitimate interests of Buyer and constitute a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated by this Agreement.  In the event that any covenant contained in this Section 5.07 should ever be adjudicated to exceed the time, geographic, product or service, or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service, or other limitations permitted by applicable Law.  The covenants contained in this Section 5.07 and each provision hereof are severable and distinct covenants and provisions.  The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or

provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

## Section 5.08   Governmental Approvals and Consents.

(a)      Each party hereto shall, as promptly as possible, (i) make, or cause or be made, all filings and submissions required under any Law applicable to such party or any of its Affiliates; and (ii) use reasonable best efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement and the other Transaction Documents.  Each party shall cooperate fully with the other party and its Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals.  The parties hereto shall not willfully take any action that will have the effect of delaying, impairing or impeding the receipt of any required consents, authorizations, orders and approvals.

(b)      Each party shall have the right to review in advance, and, to the extent practicable, each party will consult the other party on, in each case subject to applicable Laws relating to the exchange of information, all the information relating to such party and any of its Subsidiaries, which appear in any filing made with, or written materials submitted to, any third party or any Governmental Authority in connection with the transactions contemplated by this Agreement.  In exercising the foregoing right, each of the parties shall act reasonably and as promptly as practicable. Each party shall keep the party apprised of the status of matters relating to completion of the transactions contemplated by this Agreement, including promptly furnishing the other with copies of notices or other communications received by such party or any of its Subsidiaries, from any third party and/or any Governmental Authority, or any Action commenced or threatened, with respect to such transactions; provided, however, that nothing in this Agreement shall be deemed to require any party to take any action, or commit to take any action, or agree to any condition or restriction, in connection with obtaining the foregoing Permits, consents, approvals, clearances and authorizations of third parties or Governmental Authorities, that would reasonably be expected to have a material adverse effect (measured on a scale relative to such party and its Subsidiaries, taken as a whole) on such party.

(c)      Seller and Buyer shall use reasonable best efforts to give all notices to, and obtain all consents from, all third parties that are described in Section 3.04 of the Disclosure Schedules.

(d)      Without limiting the generality of the parties' undertakings elsewhere in this Section 5.08, each of the parties hereto shall use all reasonable best efforts to:

(i)      respond to any inquiries by any Governmental Authority with respect to the transactions contemplated by this Agreement or any agreement or document contemplated hereby;

Case 2:25-bk-50237-RRM    Doc 154-1    Filed 08/07/25    Entered 08/07/25 11:28:34
Desc Exhibit Ex. A    Stock Purchase Agreement    Page 52 of 76

EXHIBIT A

(ii)　　　avoid the imposition of any order or the taking of any action that would restrain, alter or enjoin the transactions contemplated by this Agreement or any agreement or document contemplated hereby; and

(iii)　　　in the event any Governmental Order adversely affecting the ability of the parties to consummate the transactions contemplated by this Agreement or any agreement or document contemplated hereby has been issued, to have such Governmental Order vacated or lifted.

(e)　　　If any consent, approval or authorization necessary to preserve any right or benefit under any Contract to which any of the Companies is a party is not obtained prior to the Closing, Seller shall cooperate with Buyer and the applicable Company in attempting to obtain such consent, approval or authorization as promptly thereafter as practicable.  If such consent, approval or authorization cannot be obtained, Seller shall use its reasonable best efforts to provide such Company with the rights and benefits of the affected Contract for the term thereof.

**Section 5.09   Books and Records.**

(a)　　　In order to facilitate the resolution of any claims made against or incurred by Seller prior to the Closing, or for any other reasonable purpose, for a period of six (6) years after the Closing, Buyer shall:

(i)　　　retain the books and records (including personnel files) of the Companies relating to periods prior to the Closing in a manner reasonably consistent with the prior practices of the Companies; and

(ii)　　　upon reasonable notice, afford the Representatives of Seller reasonable access (including the right to make, at Seller's expense, photocopies), during normal business hours, to such books and records;

*provided, however*, that any books and records related to Tax matters shall be retained pursuant to the periods set forth in ARTICLE VI.

(b)　　　In order to facilitate the resolution of any claims made by or against or incurred by Buyer or any of the Companies after the Closing, or for any other reasonable purpose, for a period of six (6) years following the Closing, Seller shall:

(i)　　　retain the books and records (including personnel files) of Seller which relate to the Companies and their operations for periods prior to the Closing; and

(ii)　　　upon reasonable notice, afford the Representatives of Buyer or the Companies reasonable access (including the right to make, at Buyer's expense, photocopies), during normal business hours, to such books and records;

*provided, however*, that any books and records related to Tax matters shall be retained pursuant to the periods set forth in ARTICLE VI.

47

(c)      Neither Buyer nor Seller shall be obligated to provide the other party with access to any books or records (including personnel files) pursuant to this <u>Section 5.09</u> where such access would violate any Law.

**Section 5.10    Closing Conditions.** From the date hereof until the Closing, each party hereto shall, and Seller shall cause the Companies to, use reasonable best efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in ARTICLE VII hereof.

**Section 5.11    Public Announcements.** Unless otherwise required by applicable Law (based upon the reasonable advice of counsel), no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate as to the timing and contents of any such announcement.

**Section 5.12    Maintenance of Holdback Amount After Closing.** After the Closing, Buyer agrees to retain in a segregated bank account of Buyer the Holdback Amount, until paid in accordance with the Seller Note; and

**Section 5.13    Advisory Client Consents.**

(a)      <u>Client Consents</u>. In the event that, following the Closing, Advisors reasonably anticipates that the assignment (either deemed or actual) of its Advisory Agreements (each, an "Assignment") is likely, Advisors shall obtain, in accordance with applicable Law and the applicable Advisory Agreement, the consent of each Advisory Client. In such event, without limiting the generality of the foregoing, Advisors shall, if required under Applicable Law and the applicable Advisory Agreement, send notices complying with all applicable Laws and applicable Advisory Agreements (each, a "**Client Consent Letter**"), to each Person that is an Advisory Client at the time  (i) informing such Advisory Client of such Assignment;  (ii) requesting such Advisory Client's consent thereto; and (iii) containing any other information required by applicable Law or any Self-Regulatory Organization or the applicable Advisory Agreements.  For the avoidance of doubt, such Client Consent Letter may be either a negative or affirmative consent letter in accordance with applicable Law and the applicable Advisory Agreements.  Buyer shall have a reasonable opportunity to review and comment on all materials used to seek Advisory Client consents for purposes of this <u>Section 5.13(a)</u> prior to distribution. Seller agrees to cause Advisors to cooperate with and support its efforts under this <u>Section 5.13(a)</u>.

(b)      <u>Cooperation</u>. Buyer shall (i) reasonably cooperate with and assist Seller and Advisors in connection with obtaining the approvals and consents sought pursuant to this <u>Section 5.13</u> and (ii) promptly provide to Advisors in writing all information concerning Buyer and its Affiliates as may be  required under applicable Law, or otherwise reasonably requested in order for Advisors to seek to obtain the approvals and consents to be sought pursuant to this <u>Section 5.13</u>. Each party shall cause all information relating to such party and its Affiliates supplied by it for inclusion in such requests for

48

approvals and consents, at the time of the mailing or delivery of such requests for approvals and consents or supplemental communications related thereto, to not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

**Section 5.14   Seller Release.** Effective for all purposes as of and upon the Closing, in consideration for and subject to receipt of the Closing Consideration payable to the Seller, Seller acknowledges and agrees, on behalf of himself and his current or former Affiliates, family members, heirs, beneficiaries, estates, executors, administrators, trustees, successors or assigns (each a "**Releasing Party**") that:

(a)   Each Releasing Party (i) has no Claims (as defined below), (ii) has not transferred or assigned, or purported to transfer or assign, any Claims (as defined below) and (iii) shall not transfer or assign, or purport to transfer or assign, any Claims, in each case, against the Companies or their respective current Affiliates, Subsidiaries, officers, directors, employees, managers, stockholders, members, investors or equity holders, including, each case, their successors or assigns (collectively, the "**Released Parties**"); and

(b)   Each Releasing Party hereby unconditionally, irrevocably and forever releases, acquits and discharges the Released Parties from any and all claims, demands, allegations, assertions, complaints, controversies, charges, duties, grievances, rights, causes of action, actions, suits, liabilities, debts, obligations, promises, commitments, agreements, guarantees, endorsements, duties, breaches of duties, damages, costs, losses, debts and expenses (including out-of-pocket attorneys' fees and costs incurred) of any nature whatsoever (whether direct or indirect, known or unknown, disclosed or undisclosed, matured or unmatured, accrued or unaccrued, asserted or unasserted, absolute or contingent, determined or conditional, express or implied, fixed or variable and whether vicarious, derivative, joint, several or secondary) against the Released Parties relating to the Releasing Party's interest in the Shares or ownership of the Companies (collectively, "**Released Claims**") which the Releasing Party has or had or can, shall or may now or hereafter have, including any Released Claims arising under any applicable Law; *provided, however,* that each Releasing Party is not releasing, and the release provided in this Section 5.14 shall not cover (and the definition of Released Claim shall not include) any right under or relating to (i) this Agreement or any other agreement or certificate executed in connection with the Closing of the transactions contemplated by this Agreement and (ii) any claim for fraud committed by the Buyer or its Affiliates.

**Section 5.15   Supplemental Disclosures.** As of the date no later than five (5) Business Days prior to the Closing, Seller shall provide to Buyer an update regarding any Legacy Arbitration that arises after the date hereof.

**Section 5.16   Investment Repurchases.** Within 30 days after the Closing, Seller shall purchase from Securities, and Securities shall sell to Seller, those investments listed in Section 5.16 of the Disclosure Schedules for a purchase price equal to the book value of such investments as of the purchase date; provided, that any such purchase may be delayed if the

49

sponsor of such investment will not allow the transfer of such investment from Securities to Seller, and shall be completed as soon as practicable after the sponsor allows such transfer.

**ARTICLE VI**
**TAX MATTERS**

**Section 6.01   Tax Covenants.**

(a)    Without the prior written consent of Buyer, Seller (and, prior to the Closing, the Companies, their Affiliates and their respective Representatives) shall not, to the extent it may affect, or relate to any of the Companies, make, change or rescind any Tax election, amend any Tax Return or take any position on any Tax Return, take any action, omit to take any action or enter into any other transaction that would have the effect of increasing the Tax Liability or reducing any Tax asset of Buyer or any of the Companies in respect of any Post-Closing Tax Period.  Seller agrees that Buyer is to have no liability for any Tax resulting from any action of Seller, the Companies, their Affiliates or any of their respective Representatives, and agrees to indemnify and hold harmless Buyer (and, after the Closing Date, the Companies) against any such Tax or reduction of any Tax asset.

(b)    All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other Transaction Documents shall be borne and paid by Seller when due.  Seller shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Buyer shall cooperate with respect thereto as necessary).

(c)    Buyer shall prepare, or cause to be prepared, all Tax Returns required to be filed by any of the Companies after the Closing Date with respect to a Pre-Closing Tax Period.  Any such Tax Return shall be prepared in a manner consistent with past practice (unless otherwise required by Law) and without a change of any election or any accounting method and shall be submitted by Buyer to Seller (together with schedules, statements and, to the extent requested by Seller, supporting documentation) at least (i) in the case of an income Tax Return, 30 days prior to the due date (including extensions) of such Tax Return or (ii) in the case of any other Tax Return, as soon as reasonably practical prior to the due date (including extensions) of such Tax Return.  If Seller objects to any item on any such Tax Return, it shall, within (x) in the case of an income Tax Return, ten days after delivery of such Tax Return or (y) in the case of any other Tax Return, as soon as reasonably practical after delivery of such Tax Return, notify Buyer in writing that it so objects, specifying with particularity any such item and stating the specific factual or legal basis for any such objection.  If a notice of objection shall be duly delivered, Buyer and Seller shall negotiate in good faith and use their reasonable best efforts to resolve such items.  If Buyer and Seller are unable to reach such agreement within ten days after receipt by Buyer of such notice, the disputed items shall be resolved by the Independent Accountant and any determination by the Independent Accountant shall be final.  The Independent Accountant shall resolve any disputed items within

Case 2:25-bk-50237-RRM    Doc 154-1    Filed 08/07/25    Entered 08/07/25 11:28:34
Desc Exhibit Ex. A    Stock Purchase Agreement    Page 56 of 76

EXHIBIT A

twenty days of having the item referred to it pursuant to such procedures as it may require. If the Independent Accountant is unable to resolve any disputed items before the due date for such Tax Return, the Tax Return shall be filed as prepared by Buyer and then amended to reflect the Independent Accountant's resolution. The costs, fees and expenses of the Independent Accountant shall be borne equally by Buyer and Seller. The preparation and filing of any Tax Return of any of the Companies that does not relate to a Pre-Closing Tax Period shall be exclusively within the control of Buyer.

**Section 6.02    Termination of Existing Tax Sharing Agreements.** Any and all existing Tax sharing agreements (whether written or not) binding upon the Companies shall be terminated as of the Closing Date. After such date none of the Companies, Seller nor any of Seller's Affiliates and their respective Representatives shall have any further rights or Liabilities thereunder.

**Section 6.03    Tax Indemnification.** Seller shall indemnify the Companies, Buyer, and each Buyer Indemnitee and hold them harmless from and against (a) any Loss attributable to any breach of or inaccuracy in any representation or warranty made in Section 3.19; (b) any Loss attributable to any breach or violation of, or failure to fully perform, any covenant, agreement, undertaking or obligation in this ARTICLE VI; (c) all Taxes of any of the Companies or relating to the business of any of the Companies for all Pre-Closing Tax Periods; (d) all Taxes of any member of an affiliated, consolidated, combined or unitary group of which any of the Companies (or any predecessor of any of the Companies) is or was a member on or prior to the Closing Date by reason of a Liability under Treasury Regulation Section 1.1502-6 or any comparable provisions of foreign, state or local Law; and (e) any and all Taxes of any Person imposed on the Companies arising under the principles of transferee or successor liability or by contract, relating to an event or transaction occurring before the Closing Date. In each of the above cases, together with any out-of-pocket fees and expenses (including attorneys' and accountants' fees) incurred in connection therewith. Seller shall reimburse Buyer for any Taxes of any of the Companies that are the responsibility of Seller pursuant to this Section 6.03 within ten Business Days after payment of such Taxes by Buyer or such Company.

**Section 6.04    Straddle Period.** In the case of Taxes that are payable with respect to a taxable period that begins on or before and ends after the Closing Date (each such period, a **"Straddle Period"**), the portion of any such Taxes that are treated as Pre-Closing Taxes for purposes of this Agreement shall be:

(a)    in the case of Taxes (i) based upon, or related to, income, receipts, profits, wages, capital or net worth, (ii) imposed in connection with the sale, transfer or assignment of property, or (iii) required to be withheld, deemed equal to the amount which would be payable if the taxable year ended with the Closing Date, except that exemptions, allowances or deductions that are calculated on an annual basis, such as the deduction for depreciation, shall be apportioned on a time basis; and

(b)    in the case of other Taxes, deemed to be the amount of such Taxes for the entire period multiplied by a fraction the numerator of which is the number of days in the period ending on the Closing Date and the denominator of which is the number of days in the entire period.

**Section 6.05    Contests.** Buyer agrees to give written notice to Seller of the receipt of any written notice by any of the Companies, Buyer or any of Buyer's Affiliates which involves the assertion of any claim, or the commencement of any Action, in respect of which an indemnity may be sought by Buyer pursuant to this ARTICLE VI (a "**Tax Claim**"); *provided, that* failure to comply with this provision shall not affect Buyer's right to indemnification hereunder.  Buyer shall control the contest or resolution of any Tax Claim; *provided, however,* that Buyer shall obtain the prior written consent of Seller (which consent shall not be unreasonably withheld or delayed) before entering into any settlement of a claim or ceasing to defend such claim; and, *provided further,* that Seller shall be entitled to participate in the defense of such claim and to employ counsel of its choice for such purpose, the fees and expenses of which separate counsel shall be borne solely by Seller.

**Section 6.06    Cooperation and Exchange of Information.** Seller and Buyer shall provide each other with such cooperation and information as either of them reasonably may request of the other in filing any Tax Return pursuant to this ARTICLE VI or in connection with any audit or other proceeding in respect of Taxes of any of the Companies.  Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings or other determinations by tax authorities.  Each of Seller and Buyer shall retain all Tax Returns, schedules and work papers, records and other documents in its possession relating to Tax matters of any of the Companies for any taxable period beginning before the Closing Date until the expiration of the statute of limitations of the taxable periods to which such Tax Returns and other documents relate, without regard to extensions except to the extent notified by the other party in writing of such extensions for the respective Tax periods.  Prior to transferring, destroying or discarding any Tax Returns, schedules and work papers, records and other documents in its possession relating to Tax matters of any of the Companies for any taxable period beginning before the Closing Date, Seller or Buyer (as the case may be) shall provide the other party with reasonable written notice and offer the other party the opportunity to take custody of such materials.

**Section 6.07    Tax Treatment of Indemnification Payments.** Any indemnification payments pursuant to this ARTICLE VI shall be treated as an adjustment to the Initial Purchase Price by the parties for Tax purposes, unless otherwise required by Law.

**Section 6.08    Survival.** Notwithstanding anything in this Agreement to the contrary, the provisions of Section 3.19 and this ARTICLE VI shall survive for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation or extension thereof) plus 60 days.

**Section 6.09    Overlap.** To the extent that any obligation or responsibility pursuant to ARTICLE VIII may overlap with an obligation or responsibility pursuant to this ARTICLE VI, the provisions of this ARTICLE VI shall govern.

**ARTICLE VII**
**CONDITIONS TO CLOSING**

52

**Section 7.01    Conditions to Obligations of Both Parties.** The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)    No Governmental Order (whether temporary, preliminary or permanent) issued by any court or agency of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement shall be in effect. No statute, rule, regulation or Governmental Order shall have been enacted, entered, promulgated or enforced by any Governmental Authority that prohibits or makes illegal consummation of the transactions contemplated by this Agreement.

(b)    There shall be no pending Action with respect to this Agreement or the transactions contemplated hereby.

(c)    Buyer shall have received financing in an amount sufficient to consummate the transactions contemplated hereby, which financing shall be on terms reasonably acceptable to Buyer.

**Section 7.02    Conditions to Obligations of Buyer.** The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)    Other than the representations and warranties of Seller contained in Section 3.01, Section 3.02, Section 3.03, Section 3.06, Section 3.23 and Section 3.24, the representations and warranties of Seller contained in this Agreement, the other Transaction Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of Seller contained in Section 3.01, Section 3.02, Section 3.03, Section 3.06, Section 3.23 and Section 3.24 shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b)    Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by him prior to or at the Closing; *provided, that*, with respect to agreements, covenants and conditions that are qualified by materiality, Seller shall have performed such agreements, covenants and conditions, as so qualified, in all respects.

53

(c)    All approvals, consents and waivers that are listed in <u>Section 3.04</u> of the Disclosure Schedules shall have been received, in each case, in form and substance reasonably satisfactory to Buyer, and no such consent, authorization, order and approval shall have been revoked.

(d)    From the date of this Agreement, there shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect.

(e)    Each of: (i) thirty (30) days shall have elapsed following submission to FINRA of the FINRA Application of Securities and FINRA shall not have rejected such FINRA Application as incomplete during such period; (ii) Securities shall have notified FINRA that the parties to this Agreement intend to consummate the purchase and sale of the Shares without written approval from FINRA; and (iii) FINRA shall not have advised Securities that it will impose material operating conditions on Securities or Buyer if the Closing occurs prior to obtaining FINRA's approval of the FINRA Application.

(f)    Buyer shall have received a certificate, dated the Closing Date and signed by Seller, that each of the conditions set forth in <u>Section 7.02(a)</u> and <u>Section 7.02(b)</u> have been satisfied.

(g)    Seller shall have delivered to Buyer a good standing certificate (or its equivalent) for each of the Companies from the secretary of state or similar Governmental Authority of the jurisdiction in which such Company is organized.

(h)    Seller shall have delivered to Buyer a certificate pursuant to Treasury Regulations Section 1.1445-2(b) that Seller is not a foreign person within the meaning of Section 1445 of the Code.

(i)    Holdings and Securities shall have purchased EPLI coverage at their own expense for all periods prior to the Closing, in such amounts and from such insurers as shall be acceptable to Buyer.

(j)    Seller shall have duly executed and delivered the Employment Agreement and the Seller Note to Buyer.

(k)    Evidence of the dissolution of Management shall have been delivered to Buyer.

(l)    Evidence of termination of that certain Shareholder Agreement of Holdings, effective as of April 1, 2013.

(m)    Executed stock certificates evidencing Holdings' ownership of shares in each of Securities, Advisors and Insurance.

(n)     Seller shall have delivered to Buyer such other documents or instruments as Buyer reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

**Section 7.03    Conditions to Obligations of Seller.** The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)     Other than the representations and warranties of Buyer contained in Section 4.01 and Section 4.04, the representations and warranties of Buyer contained in this Agreement, the other Transaction Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).  The representations and warranties of Buyer contained in Section 4.01 and Section 4.04 shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.

(b)     Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date; *provided, that,* with respect to agreements, covenants and conditions that are qualified by materiality, Buyer shall have performed such agreements, covenants and conditions, as so qualified, in all respects.

(c)     Seller shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in Section 7.03(a) and Section 7.03(b) have been satisfied.

(d)     Buyer shall have delivered to Seller cash in an amount equal to the Closing Consideration.

(e)     Buyer shall have duly executed and delivered the Employment Agreement and the Seller Note to Seller.

(f)     Buyer shall have delivered to Seller such other documents or instruments as Seller reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

## ARTICLE VIII
## INDEMNIFICATION

**Section 8.01    Indemnification.**

55

(a)    <u>Indemnification by Seller</u>.  Subject to the terms and conditions in this ARTICLE VIII, from and after the Closing, Seller shall indemnify and hold harmless Buyer and each officer, member, manager of Buyer, and the other Affiliates of Buyer, including without limitation the Companies or any successors of the Companies (individually a "**Buyer Indemnified Party**" and collectively, the "**Buyer Indemnified Parties**") from and against any and all Losses incurred by any of the Buyer Indemnified Parties as a result of or in connection with:

(i)    any breach or inaccuracy of any of the warranties or representations contained in ARTICLE III of this Agreement or contained in any other Transaction Documents;

(ii)    any breach or default by Seller under any covenant or agreement in this Agreement or any other Transaction Documents;

(iii)    any Indebtedness or Transaction Expenses not reflected in the Closing Spreadsheet;

(iv)    any Legacy Arbitration Losses and any Post-Closing Litigation Losses; and

(v)    the matters set forth in <u>Section 8.01(a)(v)</u> of the Disclosure Schedules.

(b)    <u>Indemnification by Buyer</u>.  Buyer agrees to indemnify and hold harmless Seller and his heirs, executors and personal representatives (collectively, the "**Seller Indemnified Parties**" and together with the Buyer Indemnified Parties, each an "**Indemnified Party**" and collectively the "**Indemnified Parties**") from and against any and all Losses incurred by any of the Seller Indemnified Parties (whether or not brought by a third party) as a result of any misrepresentation, breach or default by Buyer of or under any of the warranties, representations, covenants, conditions, agreements or other provisions of the Transaction Documents.

**Section 8.02    Defense of Claims**.

(a)    <u>Third Party Claims</u>.

(i)    If a third party initiates a claim, demand, dispute, lawsuit or arbitration (a "**Third Party Claim**") against any Indemnified Party with respect to any matter that the Indemnified Party might make a claim for indemnification against any Party (the "**Indemnifying Party**" and collectively the "**Indemnifying Parties**") under this ARTICLE VIII, then the Indemnified Party must promptly notify the Indemnifying Party in writing of the existence of such Third Party Claim and must deliver copies of any documents served on the Indemnified Party with respect to the Third Party Claim; <u>provided</u>, <u>however</u>, that any failure on the part of an Indemnified Party to so notify an Indemnifying Party shall not limit any of the obligations of the Indemnifying Party under this ARTICLE VIII (except to

56

the extent such failure materially and adversely prejudices the defense of such proceeding).

(ii)    Upon receipt of the notice described in Section 8.02(a)(i), the Indemnifying Party will have the right to defend the Indemnified Party against the Third Party Claim with counsel reasonably satisfactory to the Indemnified Party, provided, that (A) the Indemnifying Party notifies the Indemnified Party in writing within fifteen (15) days after the Indemnified Party has given notice of the Third Party Claim that the Indemnifying Party will indemnify the Indemnified Party from and against the entirety of any Losses the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim, (B) the Indemnifying Party provides the Indemnified Party with evidence reasonably acceptable to the Indemnified Party that the Indemnifying Party will have the financial resources to defend against the Third Party Claim and fulfill its indemnification obligations hereunder, (C) the Third Party Claim involves only money damages and does not seek an injunction or other equitable relief and does not involve a criminal matter, and (D) the Indemnifying Party diligently conducts the defense of the Third Party Claim. The Indemnifying Party will keep the Indemnified Party apprised of all material developments, including settlement offers, with respect to the Third Party Claim and permit the Indemnified Party to participate in the defense of the Third Party Claim. So long as the Indemnifying Party is conducting the defense of the Third Party Claim in accordance with this Section 8.02(a)(ii), the Indemnifying Party will not be responsible for any attorneys' fees or other expenses incurred by the Indemnified Party regarding the defense of the Third Party Claim.

(iii)    In the event that any of the conditions under Section 8.02(a)(ii) is or becomes unsatisfied, however, (A) the Indemnified Party may defend against, and consent to the entry of any judgment on or enter into any settlement with respect to, the Third Party Claim in any manner it may reasonably deem appropriate, (B) the Indemnifying Parties will reimburse the Indemnified Party promptly and periodically for the costs of defending against the Third Party Claim (including reasonable attorneys' fees and expenses), and (C) the Indemnifying Parties will remain responsible for any Losses the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim to the fullest extent provided in this ARTICLE VIII.

(iv)    Except in circumstances described in Section 8.02(a)(iii), neither the Indemnified Party nor the Indemnifying Party will consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the other party, which consent will not be unreasonably withheld or delayed.

(v)    Notwithstanding anything in this Section 8.02(a) to the contrary, Buyer and Seller shall handle any Third-Party Claim relating to or arising from any Legacy Arbitrations or Post-Closing Litigation Matters as set forth on Exhibit D.

(b)     Direct Claims.  Any legal proceeding by an Indemnified Party on account of Losses which does not result from a Third Party Claim (a "**Direct Claim**") shall be asserted by the Indemnified Party giving the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than thirty (30) days after the Indemnified Party becomes aware of such Direct Claim.  The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party is materially and adversely prejudiced by reason of such failure. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably known, of the Losses that has been or may be sustained by the Indemnified Party.  The Indemnified Party shall allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim and the Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance (including access to the Company's premises and personnel and the right to examine and copy any accounts, documents or records) as the Indemnifying Party or any of its professional advisors may reasonably request.  If the Indemnifying Party in good faith objects to any Direct Claim made by the Indemnified Party, it shall deliver a written notice (a "**Claim Dispute Notice**") to the Indemnified Party during the thirty (30) day period commencing upon receipt by Indemnifying Party of notice of the Direct Claim. The Claim Dispute Notice shall set forth in reasonable detail the principal basis for the dispute of any Director Claim.  If no Claim Dispute Notice is delivered prior to the expiration of such thirty (30) day period, then (i) each Direct Claim for indemnification set forth in the relevant claim notice shall be deemed to have been conclusively determined in favor of the Indemnified Party for purposes of this Section 8.02(b) on the terms set forth in the claim notice. Following delivery of a Claim Dispute Notice, the Indemnifying Party and Indemnified Party shall attempt in good faith to resolve any such objections raised in such Claim Dispute Notice.  If the Indemnifying Party and Indemnified Party agree to a resolution of such objection, then a memorandum setting forth the matters conclusively determined shall be prepared and signed by the parties hereto.  If no such resolution can be reached during the thirty (30) day period following receipt of a given Claim Dispute Notice, then upon the expiration of such thirty (30) day period, the Indemnifying Party or the Indemnified Party may bring suit to resolve the objection in accordance with this Agreement. Judgment upon any award rendered by the trial court may be entered in any court having competent jurisdiction.

**Section 8.03   Limits on Indemnification.**

(a)     Survival.  All representations and warranties made hereunder and the related indemnities by Seller or Buyer shall survive the Closing for a period of twenty four (24) months following the Closing Date; provided that the Fundamental Representations shall survive the Closing for a period of six (6) years from the Closing Date, except that the representations and warranties in Section 3.19 (Taxes) shall survive the Closing until the 60th day after the expiration of the applicable statute of limitations. The covenants or other agreements contained in this Agreement (and any indemnities

herein related thereto) which by their terms contemplate performance after the Closing Date shall survive the Closing Date and each such surviving covenant and agreement (and any indemnity herein related thereto) shall survive the Closing for a period contemplated by its terms plus an additional thirty (30) days, or the end of the applicable statute of limitations, whichever is shorter. All other indemnities in <u>Section 8.01</u> shall continue until expiration of the 30th day after the expiration of the applicable statute of limitations. Notwithstanding the foregoing, any claim for Losses made prior to the expiration of the applicable survival period set forth in this <u>Section 8.03(a)</u> shall continue after such date until such claim is finally resolved. The foregoing limitations shall not apply to any claims for fraud by a party against any Indemnifying Party hereunder. The parties specifically intend that the statutory statutes of limitations applicable to the respective representations and warranties be superseded and replaced by the survival periods contained herein.

(b)      <u>Limitations</u>.

(i)      Seller shall not be obligated to pay any amounts for indemnification under <u>Section 8.01(a)(i)</u> until the aggregate amount of Losses payable thereunder exceeds the Indemnity Threshold, whereupon Seller shall be obligated to indemnify the Buyer Indemnified Parties for all Losses thereunder in excess of such Indemnity Threshold (provided however any Liability for breach of the Fundamental Representations shall not be subject to this limitation). Furthermore, in no event shall the aggregate Liability of Seller under <u>Section 8.01(a)(i)</u> exceed the Indemnity Cap for any breach of the representations and warranties other than the Fundamental Representations. In addition, in no event shall the Seller aggregate Liability under <u>Sections 8.01(a)</u> and <u>8.01(b)</u> exceed the Final Total Consideration.

(ii)      Notwithstanding anything in this <u>Section 8.03</u> to the contrary, the limitations in this <u>Section 8.03(b)</u> shall not apply to any claims for Losses for fraud by a Party against any Indemnifying Party hereunder.

(iii)      In no event shall the aggregate Liability of Seller under <u>Section 8.01(a)(iv)</u> exceed the Holdback Amount and Buyer's sole recourse for recovery under <u>Section 8.01(a)(iv)</u> shall be against the Holdback Amount and setoff against the Seller Note pursuant to <u>Section 8.05</u>; provided, that these limitations shall not apply in relation to any Liabilities under <u>Section 8.01(a)(iv)</u> arising out of or relating to the Carve-Out Products.

(iv)      For purposes of determining the amount of any Losses under this ARTICLE VIII any qualification or limitation of a representation, warranty or covenant by reference to materiality of matters stated therein or as to matters having or not having "Material Adverse Effect," being "material" or words of similar effect, shall be disregarded for all purposes of this ARTICLE VIII, including in determining whether a breach of such representation, warranty or covenant has occurred giving rise to rights to indemnification under this ARTICLE VIII.

59

(c)    Duty to Mitigate.  Each Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any Losses upon becoming aware of any event or circumstance that would be reasonably expected to, or does, give rise thereto, including incurring costs only to the minimum extent necessary to remedy the breach that gives rise to such Losses.

(d)    No Double Recovery.  Notwithstanding anything herein to the contrary, no party shall be entitled to indemnification pursuant to this ARTICLE VIII for any Losses to the extent such party has been fully indemnified or reimbursed for such Losses under (i) any other provision of this Agreement, (ii) any insurance recoveries actually received or (iii) any proceeds actually received from any other third party in connection therewith (net of all reasonable costs and reasonable expenses incurred in connection therewith).

(e)    Insurance Recoveries.  If a Buyer Indemnified Party receives insurance proceeds or indemnity, contribution or similar payments after being indemnified with respect to some or all of Indemnified Costs, such Buyer Indemnified Party shall pay to the applicable Indemnifying Party or Indemnifying Parties the lesser of (i) the amount of such insurance proceeds or indemnity, contribution or similar payment, less reasonable attorney's fees, coverage deductibles paid in connection with the indemnified claim and other reasonable expenses incurred in connection with such recovery, and (ii) the aggregate amount paid by the applicable Indemnifying Party or Indemnifying Parties to any Buyer Indemnified Party with respect to such Indemnified Costs. Nothing in this Section 8.03(e) shall create or be deemed to create any obligation on any party hereto to obtain or maintain any specific insurance policy.

(f)    Investigation.  Notwithstanding any right of any party to fully investigate the affairs of another party and notwithstanding any knowledge of facts determined or determinable by such party pursuant to such investigation or right of investigation, each party has the right to rely fully upon the representations, warranties, covenants and agreements of each other party in this Agreement, the Disclosure Schedules or in any agreement, certificate, financial statement, instrument or other document delivered by any Party pursuant hereto, and such party's right to indemnification under this ARTICLE VIII shall not be altered by such investigation or knowledge.

Section 8.04  **Exclusive Remedy**.  Should the Closing occur, a claim for Losses under this ARTICLE VIII constitutes the sole and exclusive monetary remedy of the parties hereto with respect to claims made under this Agreement or in connection with the transactions contemplated by this Agreement and the Transaction Documents; provided that such limitation shall not apply to any claims (a) for fraud by a Party against any Indemnifying Party hereunder, (b) under any other document delivered in connection with this Agreement or (c) any breach pursuant to Section 5.07.  In furtherance of the foregoing, should the Closing occur, each party hereby waives, to the fullest extent permitted under Law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other party and their Affiliates and each of their respective representatives arising under or based upon any Law, except pursuant to the indemnification provisions set forth in this ARTICLE VIII. Nothing in this Section 8.04 shall limit any Person's right to seek and obtain any equitable relief.

**Section 8.05    Right to Setoff.**  Notwithstanding anything to the contrary herein contained in this Agreement, with respect to any amounts which become due and payable by Seller to the Buyer Indemnified Parties under this ARTICLE VIII, Buyer shall have a right to setoff such amounts against the Holdback Amount and in such case, any setoffs shall also be setoff under the Seller Note (in which case the Seller Note shall be deemed automatically adjusted by such setoff amounts).

**Section 8.06    Tax Treatment.**  Any payment made by either party under the indemnification obligations set forth in this ARTICLE VIII shall be treated as an adjustment in the Final Total Consideration for purposes of Taxes and all other purposes.

## ARTICLE IX
## TERMINATION

**Section 9.01    Termination.**  This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Seller and Buyer;

(b)    by Buyer by written notice to Seller if:

(i)    Buyer is not then in material breach of any provision of this Agreement in a manner such that the conditions to Closing set forth in ARTICLE VII would not be satisfied and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in ARTICLE VII and such breach, inaccuracy or failure has not been cured by Seller within ten (10) days of Seller's receipt of written notice of such breach from Buyer; or

(ii)    the Closing shall not have occurred by February 28, 2021, unless such failure shall be due to the material failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(c)    by Seller by written notice to Buyer if:

(i)    Seller is not then in material breach of any provision of this Agreement in a manner such that the conditions to Closing set forth in ARTICLE VII would not be satisfied and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in ARTICLE VII and such breach, inaccuracy or failure has not been cured by Buyer within ten (10) days of Buyer's receipt of written notice of such breach from Seller; or

61

(ii)    the Closing shall not have occurred by February 28, 2021, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(d)    by Buyer or Seller in the event that (i) there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited or (ii) any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable.

**Section 9.02    Effect of Termination.** In the event of the termination of this Agreement in accordance with this ARTICLE IX, this Agreement shall forthwith become void and there shall be no Liability on the part of any party hereto or their Affiliates; provided, however, that (a) the rights and obligations of the parties hereto under Section 5.06 (Confidentiality), this Section 9.02 (Effect of Termination), ARTICLE I (Definitions) and ARTICLE X (Miscellaneous) will survive termination of this Agreement and remain valid and binding obligations of the parties and (b) nothing herein will relieve any party from Liability for any willful breach of this Agreement or fraud prior to such termination.

## ARTICLE X
## MISCELLANEOUS

**Section 10.01    Transaction Expenses.** If the Closing does not occur, the parties shall each pay 50% of the Shared Transaction Expenses and otherwise pay their own costs and expenses associated with this Agreement. If the Closing occurs, the Transaction Expenses and the Shared Transaction Expenses shall be paid as set forth herein.  Furthermore, Buyer shall be responsible for payment of the fees owed to Leiter other than the Leiter Closing Fee.

**Section 10.02    Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10.02):

If to Seller:                                Jack R. Thacker
                                             4332 Pretoria Run
                                             Murfreesboro, TN 37128
                                             E-mail jrthacker@centerstreetsecurities.com with
                                             copy to jackrthacker@yahoo.com

with a copy to:                              Holcomb + Ward, LLP

3455 Peachtree Rd NE, Suite 500
Atlanta, GA 30326
E-mail: scott@holcombward.com
Attention:  Scott Holcomb

If to Buyer:                          Old Growth Capital LLC
                                      1115 W. Fulton Market, 3rd Floor
                                      Chicago, Illinois 60607
                                      E-mail: joshua.rogers@aretewealth.com
                                      Attention:  Joshua Rogers, Chief Executive Officer

with a copy to:                       Croke Fairchild Morgan & Beres LLC
                                      180 N. LaSalle St., Suite 2750
                                      Chicago, Illinois 60601
                                      E-mail: pcroke@crokefairchild.com and
                                      jfairchild@crokefairchild.com
                                      Attention:  Patrick E. Croke and Jessica B.
                                      Fairchild

**Section 10.03 Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.  This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 10.04 Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 10.05 Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Except as provided in Section 5.07(f), upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 10.06 Entire Agreement.** This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 10.07 Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed; *provided, however,* that prior to the Closing Date, Buyer may, without the prior written consent of Seller, assign all or any portion of its rights under this Agreement to one or more of its direct or indirect wholly-owned subsidiaries. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 10.08 No Third-party Beneficiaries.** Except as provided in <u>Section 6.03</u> and ARTICLE VIII, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 10.09 Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 10.10 Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

(a)     This Agreement shall be governed by and construed in accordance with the internal Laws of the State of Illinois without giving effect to any choice or conflict of law provision or rule (whether of the State of Illinois or any other jurisdiction).

(b)     ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF ILLINOIS IN EACH CASE LOCATED IN THE CITY OF CHICAGO AND COUNTY OF COOK, AND

Case 2:25-bk-50237-RRM   Doc 154-1   Filed 08/07/25   Entered 08/07/25 11:28:34
Desc Exhibit Ex. A   Stock Purchase Agreement   Page 70 of 76

EXHIBIT A

EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING.  SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT.  THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.  EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10.10(c)</u>.

**Section 10.11 Specific Performance.** The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**Section 10.12 Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

**Section 10.13 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**EXHIBIT A**

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLER:**

Name:   Jack R. Thacker

**BUYER:**

**OLD GROWTH CAPITAL, LLC**

By
Name:   Joshua D. Rogers
Title:    Chief Executive Officer

**EXHIBIT A**

**EMPLOYMENT AGREEMENT**

See attached.

## EXHIBIT B

### CONTINGENT CONSIDERATION

The amount of the Contingent Consideration shall be determined based on the percentage of Registered Representatives employed or engaged as independent contractors by the Companies of the Closing Date who remain employed or engaged by Arete Wealth Management, LLC and/or Arete Wealth Advisors, LLC as of the First Anniversary Date, based on the table below; provided, that for the purpose of making such determination, Registered Representatives who are not employed or engaged by Securities as of the Closing Date but who are employed or engaged by Arete as of the Subsequent Determination Date with the prior approval of Buyer shall be counted as part of the number of Registered Representatives as of the First Anniversary Date. This time period may be extended beyond the First Anniversary Date by mutual agreement of the parties for a short period of time if Seller is close to meeting one of the thresholds in the table below.

To be counted as employed or engaged by Arete Wealth Management, LLC, each such Registered Representative must have filed and had accepted with FINRA a Form U-4 or other registration document as an investment advisor transferring their registration to Arete Wealth Management, LLC and/or Arete Wealth Advisors, LLC.

| Percentage of Registered Representatives Employed or Engaged by Buyer After Closing | Amount of Contingent Consideration |
|---|---|
| 90% or greater | $1,000,000 |
| 80% or greater but less than 90% | $750,000 |
| 60% or greater but less than 80% | $500,000 |
| Less than 60% | $250,000 |

EXHIBIT A

**EXHIBIT C**

**SELLER NOTE**

See attached.

## EXHIBIT D

## HANDLING OF LEGACY ARBITRATIONS AND

## POST-CLOSING LITIGATION MATTERS

### 1. Management and Costs

a) Buyer shall have the sole responsibility for and control of the management of the Legacy Arbitrations and the Post-Closing Litigation Matters (collectively, the "Litigation"), including, without limitation, the defense, determining strategy, hiring counsel, and settlement.

b) Buyer shall periodically inform Seller of significant matters relating to the Litigation. Without limiting the terms of Section 1(a) above, Buyer agrees to consult with Seller at his request, and to consider Seller's input on the Litigation.

c) Buyer may consent to entry of any judgment or enter into any settlement or compromise any claim related to the Litigation without Seller's consent.

d) All costs and expenses (including without limitation attorneys' fees) related to the Litigation incurred by Buyer shall be considered Legacy Arbitration Losses or Post-Closing Litigation Losses, as applicable.

### 2. Seller Cooperation

a) Seller shall cooperate fully with Buyer in the defense of the Litigation in a manner that will preserve attorney-client privilege and attorney work product protection thereto, including acting as a witness or providing affidavits.

b) In the event that Seller receives any notice or other communication in connection with the Litigation, he shall promptly notify Buyer and provide a copy of such notice or communication or, if oral, information about such notice or communication in reasonable detail.

4841-0942-5877, v. 2

D-1